IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

EDWARD TEAL,

                                    Civil Action No.
                    Plaintiff,      9:11-CV-0191 (NAM/DEP)

        v.

J. CROSS, Corrections Officer, Clinton
Correctional Facility; B. MENARD,
Corrections Officer, Clinton Correctional
Facility; M. LIBERTY, Corrections Officer,
Clinton Correctional Facility; J. COLLINS,
Corrections Officer, Clinton Correctional
Facility; and RIVERA, Corrections
Sergeant, Clinton Correctional Facility,

                    Defendants.

---

APPEARANCES:

FOR PLAINTIFF:                      OF COUNSEL:

EDWARD TEAL, *Pro Se*
07-A-6298
Southport Correctional Facility
P.O. Box 2000
Pine City, NY 14871

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN          KRISTA A. ROCK, ESQ.
Office of the Attorney General     Assistant Attorney General
State of New York
Department of Law
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Edward Teal, a New York State prison inmate, has

commenced this action pursuant to 42 U.S.C. § 1983, alleging deprivation

of his civil rights.  In his complaint plaintiff alleges that he was assaulted

by the defendants, resulting in injuries to his face, head, neck, back and

ribs.  As relief, plaintiff requests awards of compensatory and punitive

damages against the defendants.

Currently pending before the court in connection with this action is

defendants' pre-answer motion for summary judgment seeking dismissal

of plaintiff's complaint.  In their motion, which implicates facts that for the

most part are uncontroverted, defendants raise a single procedural issue,

arguing that plaintiff is precluded from pursuing his claims in this action as

a result of his failure to exhaust available administrative remedies before

filing suit.  Because I agree with the defendants' assertion that the record

firmly establishes plaintiff's failure to property exhaust available

administrative remedies before commencing suit, and there is no basis

presented for excusing the requirement of exhaustion, I recommend that

defendants' motion be granted.

2

I.    <u>BACKGROUND</u>[1]

Plaintiff is a prison inmate currently entrusted to the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Complaint (Dkt. No. 1) ¶ 2; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 19-3) ¶ 2. At the time of the occurrences giving rise to his claims plaintiff was incarcerated within the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York, although a short time later he was transferred into the Upstate Correctional Facility ("Upstate"), situated in Malone, New York.[2] Complaint (Dkt. No. 1) Attachment at ¶ 2; Defendant's Local Rule 7.1(3) Statement (Dkt. No. 19-3) ¶¶ 3-4.

On January 12, 2010, while at Clinton, plaintiff was ordered by defendant J. Cross, a corrections officer at the facility, to hand him a belt. Complaint (Dkt. No. 1), Attachment at ¶ 6. Rather than complying, plaintiff

---

[1]    In light of the procedural posture of this case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky*, No. 01 CIV. 8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

threw the belt on the floor, resulting in a verbal exchange which, according

to the plaintiff, escalated when Cross slapped Teal in the face, and Teal

thereafter responded by striking out at Cross.  Complaint (Dkt. No. 1)

Attachment at ¶ 6.  According to the plaintiff, other officers became

involved, including defendant Menard, who punched him in the head and

kicked and stomped on him; Sergeant Rivera, who kneed him in the groin

and slapped him in the face several times; defendant Cross, who

slammed Teal's face against the wall a number of times; and defendants

Liberty and Collins, who along with Cross repeatedly punched, slapped,

and kicked the plaintiff as he was being escorted to the prison infirmary.

*Id.* at ¶¶ 6-13.  Following the incident Teal was examined by medical

personnel at the facility, photographs were taken of him, and he was

thereafter escorted to the facility's punitive segregation unit.  *Id.* at ¶ 16.

On January 13, 2010, plaintiff prepared a handwritten letter

concerning the incident, addressed to "grievance".  Brousseau Aff. (Dkt.

No. 19-4) Exh. C.  That letter was processed at Clinton as a formal

grievance on January 26, 2010 and designated as Grievance No. CL-

59640-10.  *Id.* at ¶ 11 and Exh. 3.  In that grievance plaintiff alleged as

follows:

> I was recently jumped by 30 maybe 40 COs and
> thrown in a cell.  I sent you a letter yesterday
> 1/12/10 the day this incident happened.  Now
> yesterday Lt. Came [sic] to my cell and told me to
> take my shirt off so he could see my injuries.
> about [sic] 20 minutes later I was sent to the
> hospital where the doctor gave me Ibuprofen.  This
> medicine is not working and when I woke up this
> morning from a terrible night trying to go to sleep I
> could not hear out of my left ear.  Mind you, my left
> ear is swollen, black and it hurts very much.  Thank
> you for your time get [sic] back to me as soon as
> possible.

Brosseau Aff. (Dkt. No. 19-4) Exh. C.[3]  There is no indication of the relief

requested in plaintiff's grievance.  *See id.*

Upon its receipt, Grievance No. CL-59640-10 was coded by the

Inmate Grievance Review Committee ("IGRC") as related to a medical

issue rather than raising an allegation of staff harassment, and was

denied by the IGRC.  Brosseau Aff. (Dkt. No. 19-4) ¶ 12.  The denial was

forwarded to plaintiff by the IGRC on January 28, 2010, but was not

received by the plaintiff until February 2, 2010.  *Id.*; Teal Aff. (Dkt. No. 27)

¶ 29.  Plaintiff did not appeal the denial to the superintendent at Clinton,

nor did he pursue the matter to the DOCCS Central Office Review

---

[3]     While plaintiff's grievance references a letter sent by him on January 12, 2010, according to Tara Brosseau, an Inmate Grievance Program Supervisor at Clinton, there is no record of such a letter having been received.  Brosseau Aff. (Dkt. No. 19-4) ¶ 14.

Committee ("CORC").  Brousseau Aff. (Dkt. No. 19-4) ¶ 12; Hale Aff. (Dkt.

No. 19-6) ¶ 10 and Exh. A.  Aside from No. CL-59640-10, plaintiff did not

file any other grievances regarding the incident, either at Clinton or

following his transfer to Upstate.  Brousseau Aff. (Dkt. No. 19-4) ¶ 12;

White Aff. (Dkt. No. 19-5) ¶ 11.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on February 18, 2011.  Dkt. No. 1.

Plaintiff's complaint names Corrections Sergeant Rivera and Corrections

Officers J. Cross, B. Menard, M. Liberty, and J. Collins as defendants, and

asserts a claim of excessive force in violation of the Eighth Amendment to

the United States Constitution.  *Id.*  Plaintiff was granted *in forma pauperis*

status, and his complaint was approved for filing by a decision and order

issued by me on March 18, 2011.  Dkt. No. 6.

On May 24, 2011, prior to answering, defendants moved requesting

the entry of summary judgment dismissing plaintiff's complaint.[4]  Dkt. No.

---

[4]      Unlike its Rule 12(b) dismissal motion counterpart, a summary judgment
motion does not by rule have the effect of automatically staying the requirement of
answering a plaintiff's complaint.  *Compare* Fed. R. Civ. P. 12(b)(6) with Fed. R. Civ.
P. 56.  Despite the lack of a specific rule recognizing such a stay, some courts have
deemed the interposition of a pre-answer summary judgment motion as an act of
defending in the case, negating a finding of a default, while others have not.  *Compare
Rashidi v. Albright,* 818 F. Supp.  1354, 1355-56 (D. Nev. 1993) *with Poe V. Cristina
Copper Mines*, Inc., 15 F.R.D. 85, 87 (D. Del. 1953).  In this instance, exercising my
discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's

19.  In their motion defendants assert that plaintiff's failure to file and pursue a grievance regarding the alleged excessive use of force to completion, including by appealing to the CORC, effectively precludes him from bringing this action.  Defendants' motion, which is now fully briefed, *see* Dkt. Nos. 27, 29, and 30, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

_____

complaint until twenty days after a final determination is issued with respect to defendants' motion, in the event that the action survives. *See Snyder v. Goord*, 9:05-CV-01284, 2007 WL 957530, at * 5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, S. J. and Peebles, M. J.).

322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of

Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004).  A fact is "material", for purposes of this inquiry, if it "might affect

the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at

248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d

549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in

dispute "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at

2510.

A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be

decided with respect to any essential element of the claim in issue; the

failure to meet this burden warrants denial of the motion.  *Anderson*, 477

U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In

the event this initial burden is met the opposing party must show, through

affidavits or otherwise, that there is a material issue of fact for trial.  Fed.

R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*,

477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled

to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). Summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Failure to Exhaust

In their motion defendants assert that plaintiff's claims in this action

are fatally undermined by virtue of his failure to include them in a proper grievance and pursue that grievance to completion under the Inmate Grievance Program ("IGP") in existence within the New York prison system.  Plaintiff counters that his attempts to satisfy his exhaustion obligation were thwarted when the IGRC improperly coded his grievance, treating it as challenging the adequacy of medical treatment received for his injuries rather than addressing the underlying use of excessive force, a distinction which could have resulted in his taking advantage of an expedited grievance process involving the facility superintendent at an early stage.  Plaintiff asserts that because of the miscoding, the IGRC's decision denying his grievance did not address the merits of his excessive force claim.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. §

1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).[5]  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 992 (2002) (citation omitted).  In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).  "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules."  *Woodford*, 548 U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43

---

[5]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

(2d Cir. 2007) (citing *Woodford*).[6]

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.  *Macias*, 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004).  Under the prescribed protocol, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times.  *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.  If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense.  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.  In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special

---

[6]     While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA.  *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted).

circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[7]  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.

Following the three-step analysis required by the Second Circuit under *Hemphill,* I first conclude that there was an internal administrative remedy available to the plaintiff.  New York prison inmates are subject to an IGP established by the DOCCS and recognized as an "available" remedy for purposes of the PLRA.  *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)).  The IGP consists of a three-step review process.  First, a written grievance is submitted to the IGRC within twenty-one days of the incident.  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance.  *Id.* at §§ 701.4(b), 701.5(b).  If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination

---

[7]    In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap.  *See Hargrove*, 2007 WL 389003, at *8 n.14; *see also Giano v. Goord*, 380 F.3d 670, 677 n.6 (2d Cir. 2004).

and issues a decision.  *Id.* at § 701.5(c).  The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision.  *Id.* at § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon complete exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court.  *Reyes v. Punzal*, 206 F. Supp. 2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Plaintiff's claims in this action implicate misconduct on the part of corrections officials.  In addition to the established IGP procedure described above, the DOCCS has implemented an expedited grievance process to address complaints of alleged staff harassment.[8]  7 N.Y.C.R.R. § 701.8; *see Perez v. Blott,* 195 F. Supp. 2d 539, 543 (S.D.N.Y. 2002) (describing expedited grievance process under prior relevant regulation, 7 N.Y.C.R.R. § 701.11, which has since been re-codified).  Significantly, this expedited process is not exclusive, and does not preclude the filing of an ordinary grievance in the event of perceived staff harassment or

---

[8]      Before utilizing this alternative procedure, an inmate generally should first report any incident to an employee's supervisor.  7 N.Y.C.R.R. § 701.8(a).

retaliation.  *See* 7 N.Y.C.R.R. § 701.8(a).[9]  This alternate procedure

requires that an inmate claiming harassment by a DOCCS employee file a

grievance, which is then assigned a grievance number and, in the event of

allegations of staff harassment, forwarded to the superintendent of the

facility.  7 N.Y.C.R.R. § 701.8(b).  If, after reviewing the grievance, the

superintendent finds it not to be facially meritorious, the matter reverts

back to the IGRC for review.  7 N.Y.C.R.R. § 701.8(c).  If, on the other

hand, the superintendent believes that further inquiry is warranted, he or

she may initiate an in-house investigation, or instead request investigation

by the inspector general's office.  7 N.Y.C.R.R. § 701.8(d).  Once the

grievance is determined, a matter which must occur within twenty-five

business days of filing, *see*  7 N.Y.C.R.R. § 701.8(f), the inmate may

appeal to the CORC, a step which is required in order to satisfy the

exhaustion requirement.  *See Singh v. Goord*, 520 F. Supp. 2d 487, 495

(S.D.N.Y. 2007) (indicating that appeal to the CORC is required to

exhaust a prisoner's administrative remedies in New York State); *Sulton*,

2000 WL 1809284, at *4 (granting summary judgment for failure to

---

[9]     The regulations pertaining to the grievance process describe harassment
as any allegation involving "[e]mployee misconduct meant to annoy, intimidate, or
harm an inmate . . ."  7 N.Y.C.R.R. § 701.2(e); *see also* DOCCS Directive No. 4040.

exhaust administrative remedies where prisoner neglected to appeal to the CORC).

The plaintiff in fact availed himself of the prescribed IGP procedure. Unfortunately, and potentially fatal to his claims in this action, he chose not to pursue process through to the superintendent and CORC appeal stages.

Turning to the question of estoppel, in order for a plaintiff to be excused from the exhaustion requirement on this basis the court must find affirmative misconduct, including in the form of a misrepresentation, by the defendants, as well as reasonable reliance on the misrepresentation to the inmate's detriment. *Midalgo v. Bass,* No. 9:03-CV-1128, 2006 WL 2795332, at *8 (N.D.N.Y. Sept. 26, 2006) (Mordue, C.J.). The plaintiff apparently contends that defendants should be estopped from asserting exhaustion as a defense based upon the actions of the IGRC and "miscoding" his grievance. While, as will be seen, the alleged miscoding, even if it did in fact occur, is legally irrelevant, the IGRC's treatment of the grievance as challenging the failure of prison officials to provide Teal with adequate medical treatment for the injuries stemming from his assault appears to have been reasonable, given its content, which centers upon

16

swelling, pain, and loss of hearing in his left ear.  Plaintiff's grievance does not provide elaboration regarding the events of January 12, 2010, nor does he name any of the corrections officers allegedly involved in the assault.  Moreover, any uncertainty surrounding the object of the grievance is compounded by the lack of any specific relief requested.

Even if plaintiff intended in his grievance to complain of the underlying assault, the alleged miscoding did not deprive him of availability of the IGP since it is well established that a grievance concerning alleged staff misconduct can be pursued utilizing either the expedited, special procedure or through the filing of an ordinary grievance. *Applegate v. Annucci*, No. 9:02-CV-0276, 2008 WL 2725087, at *10 (N.D.N.Y. Jul. 10, 2008) (Kahn, J.); *see* 7 N.Y.C.R.R. § 701.8(a).  Upon denial of the grievance plaintiff was required to appeal the denial to the facility superintendent, and on to the CORC, in order to satisfy his exhaustion requirement.  *Woodford*, 548 U.S. at 95, 126 S. Ct. at 2388; *Lawyer v. Gatto*, No. 03 Civ. 7577, 2007 WL 549440, at *8 (S.D.N.Y. 2007).  Plaintiff's failure to do so effectively precludes him from now raising the excessive force claims in this action.

The circumstances in this case are closely analogous to those

17

confronted by the court in *Linares v. Albrith*, No.9:03-CV-1408, 2009 WL 799969 (N.D.N.Y. Mar. 25, 2009) (Kahn J. and Treece, M.J.).  The plaintiff in that action, who was injured while performing his duties in the messhall, filed a prison grievance complaining that he did not receive timely medical treatment for his injury; the only relief sought in that grievance was to have copies of that complaint sent to various DOCCS officials.  *Id.* at *2-3.  The IGRC rendered a decision recommending a finding that the plaintiff be seen by a doctor as soon as possible, which in fact occurred between the time of filing and issuance of the IGRC decision, and the plaintiff indicated his agreement with that response.  *Id.*  The matter was subsequently reviewed by the superintendent of the facility who essentially affirmed the IGRC decision, advising that if plaintiff wanted his complaint sent elsewhere he was free to do so.  *Id.* at *4.  When faced with an exhaustion defense in his civil rights action, plaintiff maintained that he had exhausted his administrative remedies with regard to complaints of deliberate indifference and retaliation he made against certain named defendants, asserting that his original grievance was written in Spanish and much was lost in the translation to English.  *Id.*  After reviewing the Spanish version along with  English translation of the plaintiff's grievance, broadly

18

construing that document, the court found that it could, indeed, be

interpreted to include the claims alleged in the plaintiff's civil rights

complaint.  *Id.*  Notwithstanding, the court concluded that plaintiff had

failed to fully exhaust his administrative remedies as to those claims,

stating:

> The fact that Plaintiff felt the IGRC was favorable to him did
> not excuse his obligation to pursue available remedies with
> regard to his claims against [the defendants]. . . .Arguably,
> though the IGRC's/superintendent's response was acceptable,
> it did not address his complaints against the Defendants in this
> action. [Plaintiff] could have pursued the fact that neither the
> IGRC nor the superintendent took any action with regard to his
> complaints of employee misconduct. [His] receipt of medical
> care, while arguably providing him with some relief sought, "did
> not provide him with all of the relief available to him.... [and] so
> long as some remedy remains available, failure to exhaust is
> not excused."

*Linares*, 2009 WL 799969, at * 5 (quoting *Ruggiero v. Cnty. of Orange*,

467 F.3d 170,177 (2d Cir.2006)); *see also Ferguson v. Cole*, No.

9:09-CV-549, 2011 WL 666103, at * 6 (N.D.N.Y. Jan. 24, 2011) (Treece,

M.J.) (finding that where neither the IGRC nor the superintendent took any

action with regard to the plaintiff's complaints, and he was not provided

with all of the relief available to him, as long as he could have pursued a

remedy through the grievance process, his failure to exhaust is not

excused) (citing and quoting *Ruggiero*, 467 F.3d at 177)); *Murray v.*

*Palmer*, No. 9:03-CV-1010, 2008 WL 2522324 (N.D.N.Y. June 20, 2008) (Hurd, J. and Lowe, M.J.) (rejecting plaintiff's assertion that he never received a response to a handwritten grievance and finding that to satisfy exhaustion plaintiff was required to file an appeal after not receiving a response); *Croswell v. McCoy,* No. CIV 9:01-CV-00447, 2003 WL 962534, at *4 (N.D.N.Y. Mar. 11, 2003) (Sharpe, J.) (a plaintiff who receives no response to a grievance and thereafter fails to appeal it to the next level has not satisfied his or her exhaustion requirement under the PLRA) (collecting cases).  Likewise, in this case, after receiving a response that did not address the excessive force claims purportedly contained within his grievance, plaintiff was similarly obligated to appeal to the next level in order to satisfy his exhaustion requirement.

In sum, the IGRC's failure to address plaintiff's excessive force claim, much like the failure to respond complaints of employee misconduct within the plaintiff's grievance in *Linares*, is an event that triggered an obligation to appeal to the superintendent, and on to the CORC if necessary, in order to satisfy the plaintiff's exhaustion obligation.[10]

---

[10]     In addition to appealing, plaintiff in this case also had the option of filing a further grievance on or before February 2, 2010 to the IGP addressing the alleged abuse of excessive force, upon learning of the miscoding and grievance denial. Plaintiff alleges that because he only discovered the miscoding and upon receipt of the

The third prong of the *Hemphill* test requires the court to assess whether special circumstances have been demonstrated by the plaintiff sufficient to excuse his failure to file and pursue to completion a grievance regarding the alleged assault forming the basis for his excessive force claims.  In this instance, neither plaintiff's complaint nor the papers submitted in opposition to defendants' motion disclose the existence of any such special circumstances not previously addressed.

In view of the foregoing, I recommend a finding that plaintiff was dutibound to pursue his excessive force claims through all of the stages of the IGP, and that by not doing so he forfeited his right to now bring this action based upon those claims.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

The plaintiff in this action, though having filed a grievance indirectly implicating the excessive force claims now raised, failed to pursue that grievance through to the superintendent at Clinton, and thereafter to the CORC.  Plaintiff has therefore failed to satisfy his obligation under the

_____

decision by the IGRC on February 2, 2012 the filing of a new grievance would have been impossible within the twenty-one day grievance period, which ended on that same date.  *See* 7 N.Y.C.R.R. 701.5(a).  The IGP, however, provides that the IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

PRLA to exhaust available administrative remedies.  Accordingly, finding no basis to estop the defendants from asserting exhaustion as an affirmative defense, nor the existence of any special circumstances making the application of that affirmative defense unjust, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 19) be GRANTED, and that plaintiff's complaint in this action be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:      February 8, 2012
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

**\*1** Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia*, his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

FN5. While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

FN6. The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf. [FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999. [FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> FN12. Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> FN13. No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> FN14. In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

*6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

**1. Legal Standards Governing Exhaustion of Administrative Remedies**

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

**2. Confiscation of Documents**

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ] [FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.](#) The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.](#) There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See [Flanagan,](#) 2002 WL 122921, at \*2.* The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., [Tookes v. Artuz,](#) 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002)* (noting that in the Second Circuit, confinement in a special

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

**4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths**

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

**5. Dismissal of Action**

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

**B. Due Process**

**1. Samuels Pleads a Valid Due Process Claim**

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

**2. Whether Samuels Received the Process Due Him**

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

**a. Witnesses**

***12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

d. Actions of the Hearing Officer

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

e. Timeliness of the Hearing

*14 Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

f. Notice

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

C. Retaliation

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g.,* Poe v. Leonard, 282 F.3d 123, 140 (2d Cir.2002); Emblen v. Port Auth. of New York/New Jersey, 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g.,* Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." Colon, 58 F.3d at 873.

FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

*16 Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Shawn Michael SNYDER, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.
**Civil Action No. 9: 05-CV-01284.**

March 29, 2007.

Shawn Michael Snyder, Pro Se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Christopher W. Hall, Esq., Assistant Attorney
General, of counsel, Albany, NY, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior United States District
Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred by this Court to the Hon. David E.
Peebles, United States Magistrate Judge, for a
Report-Recommendation pursuant to 28 U.S.C. § 636(b)
and Local Rule N.D.N.Y. 72.3(c). The Report,
Recommendation and Order dated February 27, 2007
recommended

that defendants' motion for summary judgment
dismissing plaintiff's complaint (Dkt. No. 20) be
GRANTED, in part, and that plaintiff's legal mail claim
be DISMISSED in its entirety, and further that all
remaining claims be DISMISSED as against defendants
Goord, Roy, Plescia and Miller, but that it otherwise be
DENIED, and that the matter proceed with regard to

plaintiff's constitutional claims against defendants
Whittier and Funnye based upon events occurring at the
Washington Correctional Facility.

Rep., Rec. & Ord., p. 33.

Plaintiff and Defendants have filed objections to the
Report-Recommendation. When objections to a magistrate
judge's Report-Recommendation are lodged, the Court
reviews the record *de novo. See* 28 U.S.C. § 636(b)(1).
After such a review, the Court may "accept, reject, or
modify, in whole or in part, the findings or
recommendations made by the magistrate [judge]. The
[Court] may also receive further evidence or recommit the
matter to the magistrate [judge] with instructions." *Id.*

Having reviewed the record *de novo* and having
considered the issues raised in the objections, this Court
has determined to accept and adopt the recommendation
of Magistrate Judge Peebles for the reasons stated in the
February 28, 2007 Report-Recommendation with one
modification as set forth below.

In this regard, it is hereby

**ORDERED** that Defendants' motion for summary
judgment [dkt. No. 20] is **GRANTED in part and
DENIED in part.** Plaintiff's legal mail claim is
**DISMISSED in its entirety.** Further all remaining claims
against Defendants Goord, Roy, Plescia and Miller are
**DISMISSED.** The motion is denied with regard to
Plaintiff's constitutional claims against Defendants
Whittier and Funnye based upon events occurring at the
Washington Correctional Facility, but Defendants are
**granted leave to renew** the motion following a period of
discovery. Accordingly, Defendants may assert in their
renewed motion, should they decide to file one, that
Plaintiff failed to exhaust his administrative remedies by
failing to promptly file a grievance once at Groveland
Correctional Facility.

**IT IS SO ORDERED.**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Shawn Michael Snyder, an openly gay New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 to complain principally of a series of occurrences which he attributes to his sexual orientation, including harassment by prison workers and fellow inmates and, in one instance, an assault by a corrections officer. Plaintiff's complaint, which is comprehensive, asserts constitutional claims under the First, Fourth, Eighth and Fourteenth Amendments arising out of those incidents as well as his apparently unsuccessful efforts to contact the National Gay and Lesbian Task Force to elicit that agency's assistance.

*2 In lieu of answering his complaint, defendants have instead moved for summary judgment dismissing plaintiff's claims based upon his failure to exhaust available administrative remedies before commencing suit and, in the case of some of the defendants and one entire claim, plaintiff's failure to allege and establish their personal involvement in the constitutional deprivations at issue. For the reasons set forth below I recommend that plaintiff's claims against defendants Goord, Roy, Miller and Plescia, as well as his cause of action for alleged interference with his legal mail, be dismissed on the basis of a lack of sufficient personal involvement in the constitutional violations alleged. Finding the existence of a genuine issue of material fact surrounding plaintiff's efforts to exhaust administrative remedies, however, I recommend that the portion of defendants' motion seeking dismissal of plaintiff's remaining claims on this procedural basis be denied.

I. *BACKGROUND* [FN1]

FN1. The vast majority of the information serving as a backdrop for the court's decision is drawn from plaintiff's complaint which, as notarized, qualifies as a functional equivalent of an affidavit for purposes of the pending motion. 28 U.S.C. § 1746 (1994); Fed.R.Civ.P. 56(e); *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1998) (citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir .1995); *Yearwood v. LoPiccolo,* No. 95 CIV. 2544, 1998 WL 474073, at *5-*6 & n. 2 (S.D.N.Y. Aug. 10, 1998); *Ketchmore v. Gamache,* No. 96 CIV. 3004, 1997 WL 250453, at *4 n. 1 (S.D.N.Y. May 12, 1997).* As required, for the purpose of analyzing defendants' arguments I have drawn all inferences, and resolved any ambiguities, in favor of the plaintiff, as the non-moving party. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997).

Plaintiff, who at the times relevant to his claims was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), has over time been confined in various DOCS facilities. Complaint (Dkt. No. 2) at 2. The bulk of plaintiff's claims were precipitated by events which transpired while he was housed in the Washington Correctional Facility ("Washington") although, as will later be seen, certain of the occurrences which followed his transfer out of Washington and ultimately into the Groveland Correctional Facility ("Groveland") are relevant to some of his claims, as well as to the issue of whether he properly exhausted available administrative remedies before commencing this action. *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 4. The plaintiff is gay, a fact which according to him was common knowledge within Washington during the time of his confinement within that facility. Complaint (Dkt. No. 2) ¶ 2.

The circumstances giving rise to plaintiff's centerpiece claim date back to May of 2005, when he was transferred from another location within Washington into the prison's B-2 housing dormitory. Complaint (Dkt. No. 2) ¶ 1. Immediately following that transfer Snyder began to experience verbal threats and abuse, attributed by the plaintiff to his sexual orientation, at the hands of defendant Whittier, a corrections officer. *Id.* ¶ 1. According to Snyder the abuse spread, fueled by encouragement from defendant Whittier, resulting in harassment from fellow inmates, who engaged in a variety of abusive and hostile acts which included the throwing of trash, objects, debris and body fluids at him. *Id.* ¶¶ 2-27.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Defendant Whittier's ongoing harassment of the plaintiff led to a confrontation between the two on June 1, 2005, during the course of which Snyder was physically assaulted by the officer, who thrust his elbow and forearm into plaintiff's throat, forcing him to the floor. *Id.* ¶¶ 24-36. Once plaintiff was on the floor, defendant Whittier placed his knees on Snyder's middle back area and neck, and pulled his left arm up behind his back. *Id.* Toward the end of the encounter defendant Whittier pulled the plaintiff up by his arm and hair and dragged him out of the area, pushing him into a wall and punching his kidney area several times in the process. *Id.* ¶¶ 33-39.

**\*3** On June 3, 2005 plaintiff was treated for injuries sustained during the encounter with Corrections Officer Whittier, and was transferred into the E-1 dormitory within Washington. Complaint (Dkt. No. 2) ¶¶ 47, 51. While housed in that unit Snyder was approached and advised by several inmates that they had been encouraged by other inmates, as well as by defendant Whittier, to assault him. *Id.* ¶¶ 51-54.

Plaintiff was again transferred within Washington on or about June 20, 2005, on this occasion having been re-assigned to the D-1 housing dormitory. Complaint (Dkt. No. 2) ¶ 57. While residing within that unit, plaintiff had his locker broken into and some of his personal property stolen, an event for which he blames fellow inmates. *Id.* ¶¶ 70.

Out of concern over reprisals which could result from his taking such action, plaintiff did not file a formal grievance regarding the assault by Corrections Officer Whittier while at Washington. Complaint (Dkt. No. 2) ¶ 51-54. As justification for that fear, plaintiff cites defendant Whittier's reported efforts to have him harmed by other inmates following his transfer out of the dormitory to which Whittier was assigned. *Id.* Plaintiff did, however, take other steps while at Washington to lodge complaints regarding defendant Whittier's actions. After earlier complaints registered verbally to other prison employees, including Corrections Officers Funnye and Graves, went unaddressed, *see* Complaint (Dkt. No. 2) ¶¶ 21, 42, plaintiff sent a letter dated July 7, 2005 to Corrections Lieutenant Greene, complaining of the assault by

defendant Whittier and expressing fear of retribution at the hands of that corrections officer; a copy of that letter was forwarded by Snyder to Corrections Lieutenant Hopkins.<u>FN2</u> Complaint (Dkt. No. 2) ¶ 60 & Exh. 1. Five days later, apparently precipitated by his letter to Lieutenant Greene, plaintiff was asked by Corrections Sergeant Belden to provide a formal, written statement regarding the assault, and was taken by Sergeant Belden to the prison infirmary for a medical evaluation. Complaint (Dkt. No. 2) ¶ 61.

> <u>FN2.</u> Plaintiff's complaint does not provide specifics regarding the official positions of Lieutenants Greene and Hopkins including, notably, whether either could properly be characterized as Corrections Officer Whittier's supervisor, nor does he indicate whether those individuals were officially designated by prison officials at Washington to receive inmate complaints regarding the actions of corrections workers.

On July 14, 2005, plaintiff was transferred temporarily into the Great Meadow Correctional Facility, where he was interviewed on the following day by defendant Miller, an Assistant Deputy Inspector General for the DOCS, regarding the alleged assault by defendant Whittier. Complaint (Dkt. No. 2) ¶¶ 62-64. During that session, defendant Miller advised Snyder that he had been transferred out of Washington for his safety, and that in light of his sexual orientation and the significant probability that similar acts would recur in the future, his contemplated transfer into the Greene Correctional Facility had been rescinded, and instead he would be moved "West and closer to home [.]" *Id.* ¶ 66. Later that day, plaintiff was transferred into the Groveland Correctional Facility. *Id.* ¶ 67.

Plaintiff reiterated his interest in pursuing his claims against Corrections Officer Whittier by letter dated July 22, 2005 sent to Investigator Miller. Complaint (Dkt. No. 2) Exh. 3. Despite sending subsequent written communications to defendant Miller and others, however, as of the time of commencement of this action plaintiff still had not been apprised of the status of the Inspector General's investigation into his allegations regarding Corrections Officer Whittier. *Id.* ¶¶ 67-69; *see also*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Complaint (Dkt. No. 2) Exhs. 9, 17.

*4 On August 24, 2005, while at Groveland, plaintiff filed a formal grievance regarding the physical assault involving Corrections Officer Whittier. Complaint (Dkt. No. 2) ¶ 76 and p. 60, ¶ B. That grievance was rejected, however, based upon the fact that it was filed beyond the fourteen day deadline for initiating such grievances, and did not recite any mitigating circumstances which would provide a ground for overlooking its lateness. FN3 *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 8 & Exh. 2; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 22) ¶ 27. Plaintiff did not appeal that determination, or any other grievance alleging harassment, excessive force, or other similar claims arising out of events at Washington, to the Central Officer Review Committee ("CORC"). Eagan Aff. (Dkt. No. 20) ¶ ¶ 5-6.

> FN3. DOCS Directive 4040, which governs the filing of inmate grievances, permits an Inmate Grievance Program Supervisor ("IGPS") to permit the late filing of grievances when presented with "mitigating circumstances." *See* O'Brien Aff. (Dkt. No. 20) ¶ 12.

On August 19, 2005 plaintiff endeavored to send a letter to the National Gay and Lesbian Task Force seeking the assistance of that organization; claiming that it qualified as legal mail, Snyder attempted to forward that communication without paying for postage. Complaint (Dkt. No. 2) ¶ 71. Prison officials rejected plaintiff's efforts, however, concluding that the communication did not fall within the prevailing definition of legal mail, and returned it to the plaintiff on August 22, 2005. *Id.* Plaintiff thereafter resent the letter on August 23, 2005, with proper postage affixed. *Id.* ¶ 72. The letter was later returned to the plaintiff on September 2, 2005, marked as "undeliverable". *Id.* ¶ 73. When the letter was returned plaintiff found that it had been opened, apparently by personnel within the Groveland mailroom. *Id.*

On August 29, 2005 plaintiff filed a grievance at Groveland seeking, as relief, a determination that the National Gay and Lesbian Task Force constituted a legal entity and that, as such, he should be permitted to send and receive correspondence from that organization as "legal mail". *Id.* ¶ 74 & Exh. 16. Plaintiff's grievance was denied at the local level, including by the facility superintendent, and that unfavorable determination was upheld on appeal to the CORC. *Id.* ¶ 75 & Exh. 16.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about September 27, 2005.FN4 Dkt. No. 2. Named as defendants in Snyder's complaint are DOCS Commissioner Glenn S. Goord; Richard Roy, the DOCS Inspector General; Assistant Deputy Inspector General Mark Miller; James Plescia, the Superintendent at Washington; and Corrections Officers Whittier and Funnye. *Id.* Plaintiff's complaint asserts a variety of claims growing out of the events at Washington and Groveland, alleging deprivation of his rights under the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as well as a host of pendent state statutory and common law claims.FN5 As relief, plaintiff seeks both the entry of an injunction and awards of compensatory and punitive damages.

> FN4. This action was initially filed in the United States District Court for the Western District of New York, but was transferred here by order issued by District Judge David G. Larimer on September 29, 2005. *See* Dkt. No. 4.

> FN5. Plaintiff's complaint, which is comprised of seventy-two typewritten pages and several attached exhibits, is not lacking in detail. Despite its refreshing clarity, however, plaintiff's complaint is in many respects repetitive and fails to comply with the governing provisions of the Federal Rules of Civil Procedure which require, *inter alia,* that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed.R.Civ.P. 8(a). This requirement is more than merely technical, and instead is designed to permit a responding party and the court to accurately gauge the allegations of a complaint and permit the issues in a case to be properly framed. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103 (1957); *Phillips v. Girdich,* 408 F.3d 124, 127-29 (2d Cir.2005); *Salahuddin v. Cuomo,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

861 F.2d 40, 42 (2d Cir.1988); *In re Ferro Corp. ERISA Litig.,* 422 F.Supp.2d 850, 857 (N.D.Ohio 2006); *Rashidi v. Albright,* 818 F.Supp. 1354, 1355-56 (D.Nev.1993).

**\*5** In lieu of answering plaintiff's complaint, defendants instead have chosen to interpose a motion seeking the entry of summary judgment. Dkt. No. 20. In that motion, which was filed on March 9, 2006, defendants assert that plaintiff's harassment and excessive force claims are procedurally barred based upon his failure to file and pursue to completion an internal grievance regarding those matters before commencing suit. *Id.* Defendants also argue that defendants Goord, Ray, Plescia, and Miller were not personally involved in any of the violations asserted, and that all of the defendants lack personal involvement with regard to plaintiff's legal mail cause of action. *Id.* Plaintiff responded in opposition to defendants' motion on April 12, 2006, Dkt. No. 23, and defendants have since filed a reply in further support of their motion. Dkt. No. 23.

Defendants' motion, which is now ripe for a determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Consequences of Defendants' Failure to Answer or Move to Dismiss*

While plaintiff has not raised this issue, one could argue that by their failure either to answer or to interpose a motion cognizable under Rule 12(b) of the Federal Rules of Civil Procedure within the allotted time, defendants are in default. Defendants' motion is brought under Rule 56 of the Federal Rules of Civil Procedure and does not, as an alternative, seek dismissal under Rule 12(b). While Rule 12(b) of the Federal Rules of Civil Procedure contains a specific provision in effect staying the requirement of answering a complaint during the pendency of a motion brought under its provision, Rule 56 does not contain a parallel provision.

Some courts confronted with this procedural setting have concluded that the interposition of a motion for summary judgment qualifies as otherwise defending against a complaint, and that as such no default is presented under the circumstances. *See, e. g., Rashidi,* 818 F.Supp. at 1355-56. Other courts, however, have noted that there is no automatic entitlement to a delay of the time to answer as a result of the filing of a summary judgment motion, the matter instead being addressed to the discretion of the court to extend that period, as authorized under Rule 6(b) of the Federal Rules of Civil Procedure.[FN6] *See, e.g., Poe v. Cristina Copper Mines, Inc.,* 15 F.R.D. 85, 87 (D.Del.1953).

> FN6. That rule provides, in relevant part, that
>
> > [w]hen by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged.
>
> Fed.R.Civ.P. 6(b).

Since this is not a situation where a motion to dismiss was initially filed but converted by the court to a summary judgment motion, a circumstance which would warrant a finding that the stay provisions of Rule 12 apply, *see Brooks v. Chappius,* No. 05-CV-6021, 2006 WL559253, at *1 (W.D.N.Y. Mar. 1, 2006), defendants are technically in default. In light of the circumstances presented, however, I find that the defendants have demonstrated their intention to defend against plaintiff's claims and, concluding that there is good cause for doing so, will order a stay of their time to answer plaintiff's complaint until ten days after a determination by the assigned district judge in connection with the pending motion. *See Rashidi,* 818 F.Supp. at 1355-56.

B. *Summary Judgment Standard*

**\*6** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if "it might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson).* A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313

F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

## C. Failure to Exhaust Administrative Remedies

**\*7** In their motion defendants assert that plaintiff's harassment and assault claims growing out of events which occurred at Washington are procedurally barred, based upon his failure to file and pursue to completion a timely grievance relating to those claims. Plaintiff responds by asserting that his failure to file a grievance regarding the matter while at Washington was the product of his fear of retaliation, and further argues that the requirement of exhaustion should be excused based upon the fact that his claims were, in fact, investigated by the DOCS Inspector General.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), altered the inmate litigation landscape considerably, imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. One such restriction introduced by the PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002). The PLRA's exhaustion requirement thus applies to plaintiff's excessive force claims absent a finding of sufficient basis to find that plaintiff's failure to exhaust was justified or should be excused. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

New York prison inmates are subject to an Inmate Grievance Program established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb. 20, 2004) (citing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

*Mojias v. Johnson,* 351 F.3d 606 (2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The New York Inmate Grievance Program consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within fourteen days of the incident.[FN7] 7 N.Y.C.R.R. § 701.7(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. § 701.7(a). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.7(b). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.7(c). Absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

> FN7. The Inmate Grievance Program supervisor may waive the timeliness of the grievance submission due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.7(a)(1).

*8 The record before the court confirms Snyder's awareness of New York's IGP. Plaintiff in fact grieved the failure of prison officials at Groveland to treat his correspondence to the National Gay and Lesbian Task Force as legal mail and unsuccessfully pursued that grievance through to a determination by the CORC. Accordingly-and defendants do not argue otherwise-plaintiff has fulfilled his obligation to exhaust administrative remedies with regard to his legal mail claim before commencing this action.

Distinctly different circumstances obtain with regard to plaintiff's claims of the use of excessive force and harassment by prison officials and fellow inmates. While plaintiff did file a grievance regarding those matters, the grievance was rejected as untimely, and that determination was neither appealed to the CORC, nor did plaintiff commence a second grievance challenging the untimeliness rejection, a course which was apparently

available to him under the IGP.[FN8]

> FN8. Although there is no need to address this argument since plaintiff failed to pursue the matter through to the CORC, he had done so with regard to the excessive force and harassment grievance filed at Groveland, he nonetheless would have failed to satisfy the PLRA's exhaustion requirement since, as the Supreme Court has now made clear, the filing and pursuit to completion of an untimely grievance does not satisfy the Act's exhaustion requirement. *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2382 (2006).

This is not to say that plaintiff cannot be said to have exhausted available administrative remedies. It should be noted that the three tiered IGP set forth in the controlling regulations does not describe the sole method for a New York State prison inmate to complain of prison conditions including, notably, the use of excessive force. *Heath v. Saddlemire,* No. 9:96-CV-1998, 2002 WL 31242204, at *4 (N.D.N.Y. Oct. 7, 2002). Indeed, the IGP regulations themselves provide that the three tiered mechanism " 'is intended to supplement, not replace, existing formal or informal channels of problem resolution.' " *Id.* (quoting 7 N.Y.C.R.R. § 701.1(a)). One of those alternative methods is a process for informal, expedited review of allegations of harassment by prison officials. 7 N.Y.C.R.R. § 701.11; *Perez,* 195 F.Supp.2d at 543. In this instance, an issue of fact exists surrounding whether plaintiff complied with section 701.11 by submitting a letter regarding Corrections Officer Whittier's actions to Lieutenant Greene. *See Perez,* 195 F.Supp.2d at 543.

Even assuming that plaintiff's efforts to address Corrections Officer Whittier's actions by writing to Lieutenant Green did not suffice to exhaust available remedies, the court must determine whether there is a basis to overlook this deficiency and permit the plaintiff to nonetheless proceed with his excessive force and harassment claims. The situations under which courts have excused an inmate's failure to comply with the IGP's three tier system generally one or more of the categories, including when 1) administrative remedies are not in fact available to the prisoner; 2) the defendants have either waived the defense or engaged in conduct which should

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

estop them from raising it; and 3) other special circumstances, including a reasonable misunderstanding of the grievance procedure, which justify the inmate's failure to comply with the applicable administrative procedural requirements.[FN9] *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Ruggiero,* 467 F.3d at 175 (citing *Hemphill* ). If the court deems any of these three categories applicable, then plaintiff's claims may be considered exhausted and should not be dismissed.[FN10] *Hemphill,* 380 F.3d at 690-91.

> **FN9.** As this case aptly illustrates, many of the typical fact patterns presented in cases involving an inmate's failure to exhaust do not fit neatly into any single category, but instead may overlap into two, or potentially even all three, of the groupings identified in *Hemphill. See Giano v. Goord,* 380 F.3d 670, 677 n. 6. This fact may well account for a blurring of these categories in a large share of Second Circuit PLRA cases. *Id.*

> **FN10.** Relying upon case law which has since been supplanted in light of the Supreme Court's contrary decision in *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983 (2002), plaintiff argues that he was not required to exhaust administrative remedies in light of the nature of his claim. The case upon which Snyder principally relies, however, *Lawrence v. Goord,* 238 F.3d 182 (2d Cir.2001), has since been vacated, 535 U.S. 901, 122 S.Ct. 1200 (2002), and the Court has now made it clear in *Porter* that PLRA's exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992; *Ruggiero,* 380 F .3d at 173 (citing *Porter* ). The contention implicit in plaintiff's argument, to the effect that his reliance upon pre-*Porter* case law as a basis for not filing a formal grievance was appropriate, citing *Rodriguez v. Westchester County Jail Correctional Dept.,* 372 F.3d 485 (2d Cir.2004), is misplaced, since *Porter* was decided some three years prior to the events at issue.

*1. Availability Of Administrative Remedies*

**\*9** Under certain circumstances the behavior of prison officials may have the legal affect of rendering administrative remedies functionally unavailable. *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004). In such cases, the finding that the three tiered IGP was open to the plaintiff inmate does not necessary end the inquiry. *Hemphill,* 380 F.3d at 686-88. Like the plaintiff in *Hemphill,* Snyder argues that he was deterred from filing a grievance while at Washington in light of threats made against him, principally by Corrections Officer Whittier. As was also the situation in *Hemphill,* however, plaintiff did avail himself of other avenues of recourse including to write a letter of complaint to a corrections lieutenant, thereby potentially signaling that his claims of fearing retribution are less than genuine.

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred based upon conduct such as threats by prison officials, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Id.* at 688 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). Plaintiff's complaint and papers in opposition to defendants' motion, in which he asserts that his fears of retribution were based in part upon defendant Whittier's reported efforts to have him harmed by other inmates following his transfer out of the dormitory to which he had been assigned, raises genuine issues of material fact in connection with the objective test to be applied under *Hemphill,* thus precluding the entry of summary judgment.

Urging the court to disregard the strictures associated with evaluation of a summary judgment motion and to proceed to assess plaintiff's credibility, in reliance upon the Second Circuit's decision in *Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (characterizing plaintiff's version of the events as so wholly credible that no reasonable jury could believe it), defendants contend that plaintiff's claimed fear of retribution does not suffice under *Hemphill* to serve as a counterweight to the availability of the IGP in New York. I recommend that the court decline defendants' invitation to assure the role of factfinder, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

instead find that plaintiff's assertion that he feared reprisal is sufficient to raise a genuine issue of material fact regarding whether administrative remedies were available to him.

2. *Waiver and Estoppel*

Since defendants have raised exhaustion of remedies, an affirmative defense, at the earliest available opportunity, they have not waived the defense. The circumstances now presented, however, do provide a basis upon which an estoppel could potentially be predicated.

Prison officials may be estopped from defending against an inmate civil rights action based upon the plaintiff's failure to exhaust available administrative remedies, including when "(1) an inmate was led to believe by prison officials that his alleged incident was not a 'grievance matter' and assured that his claims were otherwise investigated ... (2) an inmate makes a 'reasonable attempt' to exhaust his administrative remedies, especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts, and (3) the state's time to respond to the grievance has expired." *Martinez v. Williams,* 349 F.Supp.2d 677, 683 (S.D.N.Y.2004) (citing and quoting, *inter alia, O'Connor v. Featherston,* No. 01 Civ. 3251, 2002 WL 818085, at *2-*3 (S.D.N.Y. Apr. 29, 2002)). Thus, for example, a defendant who fails to forward an inmate's complaint to a grievance officer in a timely manner may be estopped from invoking the defense. *Hemphill,* 380 F.3d at 688-89. Similarly, an estoppel may be found where a defendant's use of force or threats inhibit an inmate's ability to utilize grievance procedures. *Ziemba v. Wezner,* 366 F.3d 161, 162-64 (2d Cir.2004).

**\*10** In this instance there is a potential basis for finding an estoppel. Plaintiff's complaints against Corrections Officer Whittier were the subject of an investigation by the DOCS Inspector General, a fact of which the plaintiff was keenly aware. Plaintiff's apparent belief that this investigation obviated the need for him to file a grievance regarding the issue was in all likelihood fortified when, in response to his grievance filed at Groveland, he was advised by the IGP Supervisor at that facility that if the matter had previously been brought "to some administration's

attention [,] ... it is not necessary to have this matter readdressed." *See* Complaint (Dkt. No. 2) Exh. 12. This response may well have dissuaded the plaintiff from pursuing the matter further, including to press his otherwise untimely grievance to the CORC or to attempt to convince officials at Groveland that mitigating circumstances existed to accept his otherwise untimely grievance. *See* 7 N.Y.C.R.C. § 701.7(a)(1). Accordingly, in my view a reasonable factfinder could conclude that defendants should be estopped from asserting a defense based upon failure to exhaust. [FN11]

> FN11. It should be noted that fear of retribution can also provide a basis for finding that a defendant should be estopped from asserting failure to exhaust as a defense. *See Hemphill,* 380 F.3d at 688-89.

3. *Special Circumstances*

The third category of circumstances under which an inmate's failure to exhaust may be excused was addressed by the Second Circuit in *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004). In *Giano,* the court rejected the concept of a categorical statement regarding the "special circumstances" exception, instead, determining that the court should "[look] at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." 380 F.3d at 678.

Defendants claim that plaintiff has not shown special circumstances which might explain why his grievance was late. Plaintiff counters that he should be entitled to the benefit of this special circumstances exception for two reasons. First, Snyder again asserts that his failure to file a grievance was motivated out of fear of retribution, based upon his efforts to seek review of the matter by the Inspector General's office. Additionally, plaintiff notes that his complaint regarding Corrections Officer Whittier was the subject of at least one letter to prison officials, resulting in an investigation by the DOCS Inspector General. Such efforts can provide a basis for finding exhaustion notwithstanding the technical failure of a prisoner to avail himself or herself of the three tiered IGP set forth in the governing regulations. *See Heath,* 2002 WL 31242204, at *4-*5; *Perez,* 195 F.Supp.2d at 545-46;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

*see also Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001) ("Resolution of the matter through informal channels satisfies the exhaustion requirement, as, under the administrative scheme applicable to New York prisoners, grieving through informal channels is an available remedy."). In order to avail himself of this exception, however, plaintiff must demonstrate that his informal complaints led to a favorable resolution in communication with his charges of misconduct. *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (rejecting plaintiff's argument that defendants' motion for summary judgment for failure to exhaust should be granted because although plaintiff complained to the Inspector General's Office, there were no allegations that his complaints resulted in a favorable resolution); *Grey v. Sparhawk,* No. 99 CIV. 9871, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) (complaint filed directly with the Inspector General found insufficient to fulfill exhaustion requirement); *cf. Giano,* 380 F.3d at 679 (finding that plaintiff's attempt to expose allegedly retaliatory behavior during a disciplinary hearing which centered upon the same retaliatory act which he complains provided a basis to find justification for plaintiff's failure to exhaust). While plaintiff is unable to make this claim, it is purely the product of the failure of prison officials to notify him of the results of the Inspector General's investigation despite his written requests for this information. I am therefore unable to state with certainty that plaintiff is not entitled to the benefit of the special circumstances exception to the PLRA's exhaustion requirement.

*11 In sum, applying the tripartite test announced in the Second Circuit's August, 2004 collection of exhaustion cases and their progeny, I find genuine issues of fact including summary judgment on the issue of plaintiff's alleged failure to exhaust available administrative remedies, and therefore recommend denial of defendants' motion to dismiss on this procedural basis.

C. *Personal Involvement*

Turning to the merits of plaintiff's claims, defendants allege that Snyder's complaint discloses potential personal involvement in the events occurring at Washington on the part of only defendants Whittier and Funnye, and that none of them are implicated in the legal mail claims

stemming from plaintiff's incarceration in Groveland. This, defendants argue, provides a basis for dismissal of certain of plaintiff's claims.

Personal involvement of a defendant in alleging a constitutional deprivation is a prerequisite to an award of damages against that person under section 1983 against that person. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

1. *Events at Washington*

The only defendants alleged by the plaintiff to have had direct involvement in or knowledge of the events at Washington are two corrections officers directly implicated, defendants Whittier and Funnye, as well as the Assistant Inspector General involved in the investigation of those matters, Mark Miller. Nothing in the record now before the court suggests any actual involvement of or awareness by DOCS Commissioner Goord, Inspector General Roy, or Washington Superintendent Plescia, in any of the relevant events. Instead, plaintiff's claims against those defendants appear to be based purely upon their supervisory positions and Snyder's contention that by virtue of their roles, they must have known about the incident, or the very least should be charged with constructive knowledge of the constitutional violations alleged. These allegations are insufficient to implicate those defendants in the matters involved; it is well established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501.

It is true that a supervisory official can be found liable in a civil rights setting such as that now presented in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). The plaintiff, however, has failed to present any evidence which tends to establish a basis for finding liability on the part of defendants Goord, Roy, or Plescia under any of those theories. Accordingly, I recommend a finding that claims against them based upon lack of personal involvement.

**\*12** Plaintiff's claims against defendant Miller present a slightly different situation. Defendant Miller was charged with investigating the incident implicated in plaintiff's excessive force claims. At the time of the investigation, however, any harassment of him by Whittier had ended, and plaintiff had been transferred out of Washington. Plaintiff does not allege the existence of any lingering effects of the events at Washington, following his transfer out of that prison, which could have been prevented had defendant Miller acted to end the constitutional violations involved. Plaintiff's only quarrel with defendant Miller appears to be his failure, and the failure of his office, to notify him of the status of the investigation conducted in response to his communications inquiring in that regard. This fact alone, however, provides no basis for a finding that defendant Miller was involved in the constitutional violations alleged. *Cf. Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at \*4 (S.D.N.Y. Apr. 19, 1995) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)).

2. *Plaintiff's Legal Mail Claims*

Plaintiff's legal mail claims involve actions taken by prison officials at Groveland, including those working in the prison mail room. None of the individuals named in plaintiff's complaint, however, was employed at Groveland, and plaintiff has identified no basis to conclude that any of them, including particularly DOCS Commissioner Goord, had any awareness of or involvement in the decision to deny legal mail status to his communications to the National Gay and Lesbian Task Force or to open his returned mail sent to that agency. Plaintiff's legal mail claim is subject to dismissal for failure to name, as a defendant, anyone proven to have been personally involved in that deprivation. *Bass,* 790 F.2d at 263.

IV. *SUMMARY AND RECOMMENDATION*

While plaintiff failed to file a grievance, and thereby avail himself of the comprehensive inmate grievance program offered to him as a New York State prisoner, to address the harassment allegedly endured at Washington at the hands of defendant Whittier and fellow inmates, in light of the existence of genuine issues of material fact I am unable to state that no reasonable factfinder could discern a proper basis exists to excuse this failure and find that plaintiff should not be barred on this procedural basis from pursuing his claims surrounding the events at Washington. I therefore recommend that defendants' motion for summary judgment dismissing plaintiff's excessive force and harassment claim on this procedural ground be denied. I do find, however, that plaintiff has failed to demonstrate the personal involvement of any of the defendants in his legal mail claim, and of defendants Goord, Roy, Plescia and Miller in connection with the claims growing out of events occurring at Washington, and therefore recommend that defendants' motion for summary judgment dismissing all claims against those defendants be granted.

**\*13** Based on the foregoing, it is hereby

ORDERED that the time within which defendants must answer plaintiff's complaint in this matter is hereby stayed and extended until ten days following the issuance of a decision by Senior District Judge Thomas J. McAvoy deciding the present summary judgment motion, or such other time as Judge McAvoy shall direct; and it is further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 20) be GRANTED, in part, and that plaintiff's legal mail claim be DISMISSED in its entirety, and further that all remaining claims be DISMISSED as against defendants Goord, Roy, Plescia and Miller, but that it otherwise be DENIED, and that the matter proceed with regard to plaintiff's constitutional claims against defendants Whittier and Funnye based upon events occurring at the Washington Correctional Facility.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

The clerk is directed to promptly forward copies of this order to the parties in accordance with this court's local rules.

N.D.N.Y.,2007.
Snyder v. Goord
Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Ⓒ  Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma, NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff") brings this *pro se* action pursuant to 42 U.S.C. § 1983 against the Nassau County Sheriff, Nassau County Correctional Facility ("NCCF") and NCCF's medical staff, (collectively, "defendants"), seeking damages for injuries allegedly caused by defendants while he was incarcerated at NCCF. Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that Hargrove's claims should be dismissed because he failed to exhaust administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e. For the following reasons, defendants' motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint, alleging that defendants violated his civil rights when they forcibly administered purified protein derivative skin tests ("PPD test") to test for latent tuberculosis ("TB") in April 2002, 2003 and 2004 while he was incarcerated at NCCF. Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove named Nassau County Sheriff Edward Reilly ("Reilly"), NCCF and Nassau County University Medical Staff [FN2] as defendants.[FN3] On November 22, 2004, after discovery, County Defendants and NHCC Defendants filed separate motions for summary judgment pursuant to Fed.R.Civ.P. 56. Both defendants properly filed a Local Rule 56.1 Statement and served Hargrove a Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment, pursuant to Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27, 2004. The *pro se* clerk's office received and filed the complaint on September 20, 2004. Under the prison mail-box rule, a *pro se* prisoner's complaint is deemed filed when it is delivered to prison authorities. *See, e.g., Walker v. Jastremski, 430 F.3d 560, 562 (2d Cir.2005)*(deeming *pro se* prisoner's § 1983 action filed on date complaint was handed to prison officials). There is no evidence in the record as to when Hargrove handed the complaint to prison officials. However, it is clear the operative date is between August 27, 2004 and September 20, 2004. As discussed, *infra,* both of these dates occur before Hargrove properly exhausted the administrative remedies available to him at NCCF.

FN2. The Nassau County University Medical Staff are employed by the Nassau Health Care Corporation ("NHCC"). Pursuant to the Correctional Center Health Services Agreement between the County of Nassau and NHCC, dated September 24, 1999, NHCC provides medical services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. FN6 The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶ ¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth*, 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford*, 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock*, 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero*, 467 F.3d at 176 (quoting *Woodford*, 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2382).

(3)

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams*, 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero*, 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford*, 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A–D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones, 2007 WL 135890, at \* 8-11;Sloane, 2006 WL 3096031, at \*4;Williams, 418 F.Supp.2d at 101.* Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero, 467 F.3d at 175;Collins v. Goord, 438 F.Supp.2d 399, 411 (S.D.N.Y.2006)* ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero, 467 F.3d at 175* (citing *Hemphill v. New York, 380 F.3d 680, 686 (2d Cir.2004)*).[FN13]

FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero, 467 F.3d at 175-76* (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at \*9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

*10 Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8; Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

*11 Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
**No. 9:04-CV-0471.**

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

### I. FACTS[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

H
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
No. 96 CV 5396(GBD).

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ☞ 1395(7)

78 Civil Rights
 78III Federal Remedies in General
  78k1392 Pleading
   78k1395 Particular Causes of Action
    78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

 FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

 FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

> FN3. The amended complaint reads as follows:

>> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

> FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations set forth within the Report. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996.) Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8.) That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57.) Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prison officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

*4 In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10 th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY,
Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, NY, By: S. Kenneth Jones,
Assistant Attorney General, for Defendants, of counsel.

OPINION

SWEET, J.

**\*1** Defendants Charles Greiner ("Greiner"), past
Superintendent of Sing Sing Correctional Facility ("Sing
Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams
("Williams"), and Dr. Lofton ("Lofton"), all of the Sing
Sing Medical Department, (collectively, the
"Defendants"), have moved to dismiss the amended
complaint of *pro se* inmate Roger Sulton ("Sulton"),
pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure
to exhaust administrative remedies. For the reasons set
forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,
2000, asserting a claim against the Defendants under
Section 1983 for alleged violation of his constitutional
rights under the Eighth Amendment for acting with
deliberate indifference to his serious medical needs.
Sulton filed an amended complaint on May 3, 2000, to
identify additional defendants to his suit. Additionally,
Sulton alleges negligent malpractice by the Sing Sing
medical staff. Sulton seeks monetary damages. The instant
motion was filed on August 9, 2000, and was marked fully
submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion
to dismiss for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b)(6). However, both the
Defendants and Sulton have submitted materials outside
the pleadings. Where a District Court is provided with
materials outside the pleadings in the context of a 12(b)(6)
motion to dismiss, it has two options: the court may
exclude the additional materials and decide the motion on
the complaint alone or convert the motion to one for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v.
Coughlin, 922 F.2d 152, 154 (2d Cir.1991)*; *Fonte v.
Board of Managers of Continental Towers Condominium,
848 F.2d 24, 25 (2d Cir.1988)*. The Court has determined
to treat the instant motion as a motion for summary
judgment. Therefore, the following facts are gleaned from
the parties' submissions, with all inferences drawn in favor
of the non-movant as required on a motion for summary
judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing
Sing at the time of the incidents in question. Greiner was
Superintendent of Sing Sing at that time. Halko was and is
a doctor on medical staff at Sing Sing. Williams and
Lofton are alleged to be affiliated with the Sing Sing
Medical Department.

According to Sulton, on October 8, 1998, he slipped on a
flight of wet stairs, where there was no "wet floor" sign
posted, and injured his left knee. The next day his knee
was swollen and the pain "was real bad." That same day

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**\*2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson,* 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender,* No. 99 Civ. 0969. 2000 WL 303280, at \*2- \*3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to

find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see Snider v. Melindez,* 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette,* 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at \*2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at \*4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit,* 2000 WL 303280, at \*3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Gabriel MIDALGO, Plaintiff,
v.
Sgt. BASS, Spinner, C.O. Streeter, John Doe,[FN1] Head
Medical Staff, C.O. Bennet,[FN2] Sgt. Trimm, C.O.
Bouyea, Defendants.

FN1. Defendant John Doe has not been identified and therefore has not been served with the Amended Complaint or otherwise appeared in this action. *See* Dkt No 12.

FN2. Plaintiff mistakenly spells Defendant Bennett's name as "Bennet." *See* Dkt. No. 23, Answer at n. 1. The Court will refer to this Defendant by the proper spelling.

No. 9:03-CV-1128 (NAM/RFT).

Sept. 26, 2006.

Gabriel Midalgo, Plaintiff, Pro Se.

Eliot Spitzer, Attorney General for the State of New York, Senta B. Siuda, Esq., Assistant Attorney General, Syracuse, NY, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

NORMAN A. MORDUE, Chief U.S. District Judge.

*1 Presently before this Court is defendants' motion (Dkt.

No. 105) for summary judgment dismissing the complaint in this civil rights action pursuant to 42 U.S.C. § 1983. In his amended complaint (Dkt. No. 8), plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), alleges deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment.

Defendants' motion was referred to United States Magistrate Judge Randolph F. Treece for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). In a thorough Report and Recommendation (Dkt. No. 110), Magistrate Judge Treece recommends that the Court grant the motion for summary judgment. Plaintiff objects (Dkt. No. 112). After the Court extended time for plaintiff to file additional objections to the Report-Recommendation (Dkt. No. 113), plaintiff filed a second objection (Dkt. No. 114).

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts a *de novo* review of those parts of a magistrate judge's Report and Recommendation to which a party specifically objects. Where only general objections are filed, the Court reviews for clear error. *See Brown v. Peters,* 1997 WL 599355,*2-* 3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d 1007 (2d Cir.1999). Failure to object to any portion of a Report and Recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

Plaintiff's objections include a variety of allegations. A number of them revisit issues which are the subject of the Report and Recommendation. They do not, however, demonstrate the existence of material questions of fact which would warrant denial of summary judgment. Other allegations concern events allegedly occurring subsequent to the filing of the amended complaint herein; these are not properly the subject of this action. Upon thorough *de novo* review, the Court accepts and adopts the Report and Recommendation.

It is therefore

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

ORDERED that the Report and Recommendation (Dkt. No. 110) is accepted and adopted in its entirety; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 105) is granted and the action is dismissed.

IT IS SO ORDERED.

RANDOLPH F. TREECE, Magistrate Judge.

### REPORT-RECOMMENDATION and ORDER

Pro se Plaintiff Gabriel Midalgo brings a civil action pursuant to 42 U.S.C. § 1983, alleging deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment. Dkt. No. 8, Am. Compl. at ¶¶ 42-54. Defendants Bass, Sergeant at the Upstate Correctional Facility ("Upstate"), Correction Officer ("C.O.") Spinner, C.O. Streeter, C.O. Bennett, Trimm, Sergeant at Upstate, and C.O. Bouyea, bring this Motion for Summary Judgment. Dkt. No. 105. Plaintiff opposes the Motion. Dkt. No. 106. For the reasons to follow, it is recommended that the Motion for Summary Judgment be **granted.**

### I. FACTS[FN3]

FN3. Plaintiff's response to the Motion for Summary Judgment fails to comport with the requirements of the Local Rules for the Northern District of New York. Plaintiff only submitted a Memorandum of Law and some Exhibits but did not provide a Statement of Material Facts as required. *See* N.D.N.Y.L.R. 7.1(a). Normally, if no Statement of Material Facts are filed, Defendants' Statement of Material Facts are deemed admitted. N.D.N.Y.L.R. 7.1(a)(3). This Court, nonetheless, will proceed to decide this Motion with the aid of Defendants' Statement of

Material Facts with accompanying Exhibits and Plaintiff's Verified Amended Complaint with Exhibits. Although no exhibits were attached to the Amended Complaint on the Docket Report, attachments were available with the Original Complaint and will hereby be incorporated into the Amended Complaint. *See* Dkt. Nos. 1 & 8.

**\*2** During the period of time of the alleged incidents, Plaintiff was incarcerated at the Upstate Correctional Facility. Dkt. No. 105, Defs.' 7.1 Statement at ¶ 3. In December 2002, an inmate was placed in Plaintiff's cell who Plaintiff alleges "was a paid informant." Am. Compl. at ¶ 16. Plaintiff further alleges that a wiretap was also placed in his cell during that time. *Id.* On February 4, 2003, Plaintiff wrote letters to the mail clerk and warden regarding his misplaced or delayed newspaper and magazine subscriptions and was told that they were handed out by correction officers. *Id.* at ¶ 23, Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lt. to Mail Clerk, dated Feb. 4, 2003; Lt. from Nason to Midalgo, dated Feb. 10, 2003. Plaintiff believed his subscriptions had been misplaced or delayed since January 2003. *Id.* at ¶ 22. Plaintiff's complaints about his subscriptions were forwarded to the Deputy Superintendent of Programs. *Id.* at ¶ 23, Ex. C, Lt. from Girdich to Midalgo, dated Feb. 5, 2003. Several months later, Plaintiff alleged he still had not received his magazines and newspapers and thus canceled his subscriptions. *Id.* at ¶ 24, Ex. C, Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Then, on April 20, 2003, Plaintiff's family arrived for a visit but were delayed for several hours in seeing him. *Id.* at ¶ 25. Plaintiff also claims that on April 24, 2003, and from June to September 2003, he received rotten fruits and vegetables and spoiled milk at meal time on several occasions.[FN4] *Id.* at ¶¶ 26 & 28. On April 26, 2003, Plaintiff wrote a complaint where he grieved that an officer took an excessive amount of time to read his legal mail, he received rotten food, there was a delay in visitation with his family, magazine and newspapers were intercepted and either destroyed or misplaced, his cell was wiretapped, and the outgoing and incoming mail was being read. *Id.,* Ex. A, Grievance, dated Apr. 26, 2003. Since Plaintiff received no response, he submitted a letter seeking an appeal to the Superintendent.[FN5] *Id.,* Grievance Lt., dated May 27, 2003.

FN4. Plaintiff does not provide any specific dates as to when he received rotten or spoiled

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

food.

FN5. It is unknown to this Court whether a response from the Superintendent was received.

On June 21, 2003, Plaintiff filed a grievance concerning "continuous harassment" regarding Plaintiff's legal mail as well as complaints made about his food and recreation. Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003, & Case History & Record, UST 16208-03. C.O. Streeter provided a memo based on Plaintiff's grievance stating that he did not provide Plaintiff with spoiled food and that the meal "is inspected and packed in the mess" and then it is inspected once again by him prior to going into Plaintiff's cell. *Id.,* Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. Correction Officers Spinner and Trimm also submitted memos regarding the grievance and noted they did not refuse recreation time and the grievance may have been a result of a misbehavior report filed against Plaintiff. *Id.,* Ex. A, Spinner Lt. to Sgt. King, dated July 23, 2003, & Trimm Lt. to Sgt. King, dated July 29, 2003. Sergeant King then submitted a memo to Captain Bezio stating that after he spoke to Plaintiff, and after interviewing several corrections officers on the matter, he could find no evidence to support the allegations. *Id.,* Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003. Based on the above investigation, the Inmate Grievance Resolution Committee ("IGRC") recommended that the grievance complaint pass through to the Superintendent. *Id.,* Ex. A, Case History & Record on Grievance dated June 21, 2003. Thereafter, the Superintendent found that the complaint had been investigated and that there was "no evidence to support [the] complaint[.]" *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff then appealed to the Central Office Review Committee ("CORC"). The CORC made several findings which included that the Superintendent's determination be upheld based on the same reasoning provided by the Superintendent and that there was no substantiation to the claim that Plaintiff was harassed nor was there sufficient evidence to conclude there was harassment and that performance of the employees' duties should not be construed as harassment.[FN6] *Id.,* Ex. A, CORC Appeal, dated Oct. 1, 2003.

FN6. The CORC also stated that no grievances were received by the IGRC in April or May 2003, as Plaintiff has alleged he filed grievances during those months. Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003; Am. Compl., Ex. A; *see also supra* p. 3.

**\*3** On June 27, 2003, a Fight Investigation Form was prepared by Sergeant Bass. Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June 27, 2003. The form had a notation stating that Midalgo purportedly was defending himself in a fight he had with his cellmate because they had been in rival gangs. *Id.* The Sergeant's assessment was that it was a real fight and they were in rival gangs. *Id.* After the fight, Midalgo and his cellmate were placed in different cells. *Id.*

On July 1, 2003, Plaintiff sent Captain Bezio a letter stating that a known enemy had been placed in his cell and that his cell had been searched and that no contraband slip was received by Plaintiff.[FN7] Defs.' 7.1 Statement, Ex. A, Pl.'s Lt., dated July 1, 2003. Captain Bezio responded stating that an investigation had been completed as to the issues Plaintiff had raised. *Id.,* Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. In Captain Bezio's letter, he noted that Sergeant Trimm interviewed Plaintiff about the missing materials but that Plaintiff did not provide any information. *Id.* Furthermore, the facility records were reviewed and it was found that there were no documented enemies of Plaintiff at the facility. *Id.*

FN7. It is unclear to this Court as to which cellmate Plaintiff referred to as a known enemy in the grievance.

On July 10, 2003, Plaintiff filed a grievance regarding bunking with an alleged known enemy, harassment, and other complaints. *Id .,* Ex. A, Grievance, dated July 10, 2003. C.O. Spinner submitted a memo to Sergeant Trimm stating that no legal material was removed from the cell and only items which were of excess were removed and logged, for which Plaintiff received a copy. *Id.,* Ex. A, Spinner Lt. to Sgt. Trimm, dated July 6, 2003. The Cell Search or Inspection Notice listed the items that were removed. *Id.,* Ex. A, Cell Search or Inspection Notice, dated June 27, 2003. Similarly, Sergeant Trimm sent a memo to Captain Bezio on July 6, 2003, stating that he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

had interviewed Plaintiff and that Plaintiff could provide no information as to the law books removed or any legal work that was missing. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. In addition, Trimm stated that Midalgo was not in a cell with a known enemy. *Id.* The IGRC recommended that the grievance complaint filed pass through to the Superintendent. *Id.,* Ex. A, Case History & Record for Grievance dated July 10, 2003. The Superintendent found that after an investigation, there was no evidence to show that Plaintiff was placed in a cell with a known enemy and that inmates are bunked together based on "[a]n assessment of compatibility" and that there was no evidence to support any of the other complaints. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff appealed to the CORC, which found the complaint to be without merit.[FN8] *Id.,* Ex. A, CORC Appeal, dated Aug. 20, 2003.

> FN8. Once again, the CORC noted that IGRC had not received grievances on April 26 or June 21, 2003, as Plaintiff has alleged he filed grievances on those dates. Am. Compl. at ¶ 27; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Aug. 20, 2003.

On July 17, 2003, Plaintiff wrote to food services stating he was receiving spoiled food. Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Food Services Lt., dated July 17, 2003. On August 5, 2003, in a letter from Captain Racette to Plaintiff, Captain Racette stated that after conducting an investigation "a check with the messhall indicates that the trays were received in the proper condition" and that no other inmate had any problems with the trays. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003.

**\*4** On July 28, 2003, Plaintiff received a letter stating two books he was requesting from the law library were not required to be provided by the facility's law library and that the other book he sought should be available and if it was missing, then a replacement would be ordered. *Id.,* Ex. D, Lt. from Litzenberger, dated July 28, 2003. On August 3, 2003, Plaintiff wrote a letter to Jean Botta stating that the library staff was refusing to provide him with a law book and that he had been told that two books

were not available at the facility.[FN9] *Id.,* Ex. D, Lt. to Botta, dated Aug. 3, 2003. Then, on August 4, 2003, Plaintiff submitted a letter to "D.S.G. Kiebert" stating he was receiving the wrong books and cases from the law library.[FN10] *Id.,* Ex. C, Lt., dated Aug. 4, 2003. He also noted that he did not receive a law book that was supposed to be available. *Id.* On August 5, 2003, Midalgo received a memo from Captain Racette stating that his complaints were investigated and that when Plaintiff was interviewed, he did not provide any further information, which resulted in a finding that the staff acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. On August 19, 2003, Plaintiff received a letter from the Law Library Supervisor, C.O. Bennett, stating one book requested was available but since it was in looseleaf and because Plaintiff was in SHU, he could request a photocopy of the materials. *Id.,* Ex. D, Lt. from Bennett, dated Aug. 19, 2003.

> FN9. Jean Botta is not named as Defendant in this action.

> FN10. "D.S.G. Kiebert" is also not named as a Defendant in this action.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

**\*5** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

**B. Eleventh Amendment**

Plaintiff brings suit against Defendants Bass, Spinner, Streeter, Bennett, Trimm, and Bouyea in both their individual and official capacities. *See* Am. Compl. Plaintiff seeks injunctive relief as well as compensatory damages against these individuals in their individual and official capacities. *Id.* at Wherefore Clause.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "real, substantial party in interest." *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, the Defendants cannot be sued in their official capacities in a claim for money damages. However, Midalgo may seek damages from them in their individual capacities. Furthermore, Plaintiff may sue the Defendants for injunctive relief in both their individual and official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U .S. 58, 71 n. 10 (1989)).

**C. Exhaustion of Remedies**

Defendants claim that Plaintiff has failed to exhaust his administrative remedies as to the following claims: 1) medical care;[FN11] 2) mail tampering; 3) law library issues; and 4) family visitation. Dkt. No. 105, Defs.' Mem. of Law at p. 4.

FN11. As to Plaintiff's medical care claim, Plaintiff may have grieved his medical care issues. *See* Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Grievance, dated Aug. 13, 2003. However, since the Eighth Amendment medical indifference claim is against the John Doe

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Defendant who was never identified nor appeared in this action, the issue will not be addressed further.

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004).

**\*6** The New York State Department of Corrections has created a three-step process to exhaust all administrative remedies available to inmates. *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). First, the inmate must file a grievance complaint with the Grievance Clerk within fourteen (14) days of the incident. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(1). The complaint is then submitted to the IGRC to review the grievance. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(2)-(5). Second, the inmate may appeal the IGRC decision to the Superintendent. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(b). Third, if the inmate appeals the Superintendent's determination, the CORC is to make a final administrative determination. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(c). Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) (citing *Neal v. Goord* 267 F.3d 116, 122 (2d Cir.2001) & *Santos v. Hauck,* 242 F.Supp.2d 257, 259 (W.D.N.Y.2003)). Moreover, "[e]ven if a prisoner receives no reply to a grievance or appeal, he is not excused from completing the appeals process. The rules provide that matters not decided within the prescribed time limits must be appealed to the next level of review." *Walters v. Carpenter,* 2004 WL 1403301, at \*3 (S.D.N.Y. June 22, 2004) (citing N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8 FN12 & *Mendoza v. Goord,* 2002 WL 31654855, at \*2 (S.D.N.Y. Nov. 21, 2002)).

FN12. N.Y. COMP.CODES R. & REGS. tit. 7,

§ 701.8 states: "[t]ime limit extensions may be requested at any level of review, but such extensions may be granted only with the written consent of the grievant. Absent such extension, matters not decided within the time limits may be appealed to the next step."

The Second Circuit has suggested a three-step inquiry when the inmate opposes a defendant's assertion that the inmate did not exhaust his remedies.

Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 667-68 (2d. Cir.2004). The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 695 (2d. Cir.2004), or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d at 675 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003); *Rodriguez* order).

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Braham v. Clancy,* 425 F.3d 177, 181-82 (2d Cir.2005).

**\*7** Since failure to exhaust is an affirmative defense and defendants may be estopped from asserting the defense as "special circumstances may excuse a prisoner's failure to exhaust," the specific circumstances of each case must be examined. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (citations omitted). Some special circumstances include, but are not limited to, occasions when prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

officials "inhibit an inmate's ability to utilize administrative grievance procedures," if the prisoner received a favorable disposition from his grievance but the time to appeal had expired and no relief was forthcoming, and all appeals were undertaken but prison officials did not respond within the required time period. *Id.* at 677. The effect of a plaintiff's justification as to why there was no exhaustion "is that, even though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Id.* at 676. Additionally, "exhausted claims filed alongside unexhausted ones may proceed even though the unexhausted claims must be dismissed." *Id.* at 675.

Here, the Amended Complaint was filed on October 24, 2003. Dkt. No. 8. Any grievances filed subsequent to that date are untimely and irrelevant to the current action.[FN13] Therefore, only grievances filed prior to the date the Amended Complaint was filed will be considered.

> FN13. As Exhibits to their 7.1 Statement, Defendants include grievances filed by Plaintiff on April 27, 2004, and May 20, 2004, which clearly were submitted after the filing of the Amended Complaint.

Plaintiff's June 21st complaint grieved the issues of harassment, food, and recreation. *See* Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003. Plaintiff's other complaint in July addressed the issues of a known enemy in his cell, harassment, and a cell search where items were taken. *Id.,* Ex. A., Grievance, dated July 10, 2003. Both of these grievances were appealed to the Superintendent and CORC, thus, they are exhausted.

As to Plaintiff's claims regarding the law library, outgoing/incoming mail, and visitation, Defendants assert such were not fully exhausted. Plaintiff states that he did exhaust all his remedies as shown by the Exhibits to his Amended Complaint. Dkt. No. 106, Pl.'s Mem. of Law at Point Two. Plaintiff claims that Defendant Spinner destroyed legal documents that showed he attempted to exhaust. *Id.* Midalgo also alleges that he "filed and appealed at least ten grievances" and that "more than half were ignored or intercepted" by Defendant Streeter. *Id.*

Plaintiff did provide a copy of his grievance on the law library, outgoing/incoming mail, and visitation issues, which was dated April 26, 2003; however, the CORC stated they never received any grievances from April 2003. Am. Compl., Ex. A, Grievance, dated Apr. 26, 2003; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003. Plaintiff also submitted a letter stating that since he received no response that he sought an appeal to the Superintendent. Am. Compl., Ex. A, Grievance Lt., dated May 27, 2003. No other appeals were instituted on that grievance. Nonetheless, even if the CORC stated they did not receive the grievance, Plaintiff attempted to fulfill the exhaustion requirement by seeking an appeal to the next level as required when he received no response. *See Walters v. Carpenter,* 2004 WL 1403301, at *3; N.Y. COMP.CODES R. & REGS . tit. 7, § 701.8.

**\*8** Since Defendants put forth the affirmative defense of failure to exhaust, this Court will make the three-step inquiry set forth by the Second Circuit. With the first inquiry, depending on the prisoner's explanation, the Court must decide whether the remedies were "available." " 'Available' means more than the mere presence of a grievance system but also that the system is functionally available to the prisoner." *Shaheen v. Hollins,* 2005 WL 2179400, at *3 (N.D.N.Y. Sept. 7, 2005) (citing *Hemphill v. New York,* 380 F.3d at 686-87 ("[I]n some circumstances, the behavior of the defendants may render administrative remedies unavailable.")); *see also Abbas v. Senkowski,* 2005 WL 2179426, at *6 (S.D.N.Y. Sept. 9, 2005). The "proper test for determining whether ordinary grievance procedures are 'available' [is] whether 'a similarly situated individual of ordinary firmness [would] have deemed them available.' " *McCullough v. Burroughs,* 2005 WL 3164248, at *3 (E.D.N.Y. Nov. 29, 2005) (quoting *Hemphill v. New York,* 380 F.3d at 688). In addition, "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *McCullough,* 2005 WL 3164248, at *3 (quoting *Hemphill v. New York,* 380 F.3d at 688). Here, administrative remedies were available as a similarly situated inmate of ordinary firmness could deem the remedies available and because Plaintiff stated he did actually file the grievances, copies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

of which were provided to the Court.

As remedies were "available," it must be determined if the Defendants' own actions estop them from raising the failure to exhaust affirmative defense. The Second Circuit has held that "prison officials' threats or other inhibiting conduct may estop defendants from asserting the affirmative defense of non-exhaustion." *Hemphill v. New York,* 380 F.3d at 688. Also, in making a determination based on the second inquiry, "[t]o establish equitable estoppel, the party claiming estoppel must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d 829, 834 (7th Cir.2002)). In addition, "[w]hen asserting equitable estoppel against the government, one must also prove affirmative misconduct." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d at 834). In this case, Plaintiff claims that Defendant Spinner destroyed legal documents showing he attempted to exhaust his administrative remedies and that "more than half [of the grievances] were ignored or intercepted" by Defendant Streeter. Pl.'s Mem. of Law at Point Two. Plaintiff's claim raises a matter of credibility but, for the purposes of this Motion, drawing all inferences in favor of Plaintiff, since Plaintiff set forth allegations of affirmative misconduct that could be considered "inhibiting," Defendants shall be deemed estopped from asserting the affirmative defense of failure to exhaust. Since we are considering Defendants actions as inhibiting, again for the purposes of this Motion, the claims will be deemed exhausted.

**D. Eighth Amendment Claims**

**\*9** Plaintiff alleges that Defendants Bass and Trimm were deliberately indifferent to his health and safety when they placed incompatible cellmates or known enemies in Plaintiff's cell. Am. Compl. at ¶ 42. Plaintiff also contends that Defendants Bouyea, Spinner, and Streeter served him spoiled food which caused him psychological harm. *Id.* at ¶ 54.

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). To state a claim under § 1983, the inmate "must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996).

The Supreme Court has delineated a two-part test for deliberate indifference. First, the "depravation alleged must be, objectively, sufficiently serious," and "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). Second, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also Hayes v. New York City Dep't of Corr.,* 84 F.3d at 620.

The Eighth Amendment also imposes on prison officials "a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. at 833 (citation omitted). Nonetheless, prison officials may not be constitutionally liable for every injury an inmate suffers at the hands of other inmates. *Id.* at 834. A plaintiff may recovery for injuries received while in custody "if the injury resulted from the defendant prison official's purposeful subjection of the prisoner to a 'substantial risk of serious harm' or from the official's deliberate indifference to that risk." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (quoting *Farmer v. Brennan,* 511 U.S. at 834). The Second Circuit has stated that "[t]he failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment." *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) (citing *United States v. Bailey,* 444 U.S. 394, 423 (1980)). However, "[a]n isolated omission to act by the state prison guard does not support a claim under section 1983 absent circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent upon him." *Id.* (quoting *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)). Instead, "reckless disregard of plaintiff['s] right to be free from attacks by other inmates may be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

shown by the existence of a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.,* 904 F.Supp. 217, 221-22 (S.D.N.Y .1995) (citing *Rucco v. Howard,* 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993) & *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984)) (internal quotation marks omitted) (alteration in original). Furthermore, "an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference." *Sims v. Bowen,* 1998 WL 146409, at *3 (N.D.N.Y. Mar. 23, 1998). Moreover, there is no constitutional right to the cellmate of a prisoner's choice even if a prisoner is not getting along with his cellmate. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

*10 Here, Plaintiff claims a known enemy was placed in his cell. Midalgo states that he filed a grievance expressing his fear that he would be placed with a "known or made for hire enemy" and that on June 27, 2003, he was bunked with a known enemy and a fight broke out where Plaintiff suffered injuries to his face, eye, knees, and tricep. Am. Compl. at ¶¶ 27 & 31. However, Captain Bezio stated in a letter to Midalgo that "there [was] no evidence to indicate that [he] was placed in a cell with a known enemy. A review of facility records reveal[ed] that there [were] no documented enemies of [his] at [the] facility" and that if an inmate should be considered an enemy, Midalgo should contact the assigned Correction Counselor. Defs.' 7.1 Statement, Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. Defendant Trimm also conducted an investigation into the grievance and found that there was no evidence that there was a known enemy placed in Midalgo's cell. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. Even the Superintendent stated that inmates were bunked based on compatibility. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003.

When questioned about how Plaintiff knew there was a known enemy placed in his cell, Plaintiff stated that his "circumstantial evidence clearly proves that [he] was placed in the cell with a known enemy. The timing, the dates, [his] grievances, [his] appeals, the coincidences, everything[.]" Dkt. No. 105, Ex. A., Pl.'s Dep. at p. 63, lines 5-8. He also stated he told his correction counselor

he was in danger from "all gang members" but then stated that he did not tell his counselor anything of such nature since "there was no counselor for [him] to speak to" until after the incident occurred. *Id.* at pp. 63, lines 12-14, 64, lines 17-20, & 65, lines 17-23. Plaintiff further stated that the fights he had with his cellmate occurred because his cellmate made "homosexual advances" on him. *Id.* at p. 16, line 14. After that cellmate, Plaintiff had approximately twenty (20) more cellmates because "things weren't working out" and he was fighting with them as well over alleged homosexual advances. *Id.* at pp. 25, lines 11-14 & 30, lines 21-24, & 31, lines 1-11. Plaintiff stated he had "plenty of fights" with other cellmates. *Id.* at p. 31, lines 16-24.

Midalgo has failed to meet the Eighth Amendment standard of deliberate indifference. First, Midalgo must show that he was incarcerated under conditions that posed a substantial risk of serious harm. Plaintiff has stated he fought with many of his cellmates and was injured, especially with his first cellmate whom "Sergeant Bass thought was a rival gang member." Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June. 27, 2003. However, Plaintiff has not shown that the injuries he received were based on the purposeful subjection of Midalgo to a substantial risk of serious harm or by deliberate indifference to the risk. Plaintiff's claims were investigated and found to be without merit as there were no known enemies in the facility. Furthermore, after Plaintiff's fight with his cellmate, they were separated and placed in different cells. *Id.* Moreover, Plaintiff, over time, had numerous cellmates because they were not compatible. Prison officials took appropriate measures to protect Midalgo after the fights by removing the other inmate from the cell. Therefore, Plaintiff has failed to prove that any depravation alleged was serious and that he was incarcerated under conditions that posed a substantial risk of harm.

*11 Even if Plaintiff could satisfy the first prong, Plaintiff clearly fails on the second prong. Midalgo has not shown that the Defendants knew of and disregarded an excessive risk to his health or safety. This is evidenced by the fact that he had nearly twenty other cellmates. He was not forced to bunk with another cellmate for an extended period of time. Even with his first cellmate, he only bunked with him for a month or so. Pl.'s Dep. at pp. 16,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

lines 12-24, & 17, lines 1-3. Investigations were conducted into the matter and no evidence was found to support Plaintiff's claim that there was a known enemy placed in his cell. Plaintiff also admitted that many of his fights were because he thought other inmates were making homosexual advances towards him. *Id.* at pp. 30, lines 21-24, & 31, lines 1-11. Although there is a duty to protect placed on prison officials, the injuries were not a result of indifference on the part of the officials. Furthermore, Plaintiff did not inform the correction officials of his belief until a fight ensued. *Id.* at p. 65, lines 22-23. Plaintiff seemingly would prefer to choose his own cellmate, however inmates do not possess such a right, and the Superintendent noted that cellmates were chosen based on compatibility.

Plaintiff also claims that Defendants Spinner, Streeter, and Bouyea brought him spoiled or rotten food on several occasions and that from June to September 2003, Defendants Spinner and Streeter served Midalgo "moldy cheese, bread, spoiled milk and rotten fruits ." *Id.* at p. 14, lines 3-6; Am. Compl. at ¶ 28.

The Eighth Amendment places a duty upon prison officials to ensure that prisoners receive adequate food. *Farmer v. Brennan,* 511 U.S. at 832. In that context, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2005).

Here, C.O. Streeter stated that he did not provide Plaintiff with spoiled food and that meals are inspected and placed on the trays at the messhall and then are further inspected once again by him prior to Plaintiff receiving the food. Defs.' 7.1 Statement, Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. The Superintendent found no evidence to support Plaintiff's claim on this issue. *Id., *Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff admits that the officers do not prepare food trays and that they merely inspect them before they get to Plaintiff. Pl.'s Dep. at pp. 36, lines 19-24, & 37, lines 1-5. Midalgo also stated that while in the normal population, all the meals are sealed but in SHU some items are not sealed, however

some do remain sealed such as cheese and meat. *Id.* at p. 38, lines 2-14. Plaintiff further stated that he received expired milk from the correction officers and that Defendants Spinner and Streeter provided spoiled food during breakfast and lunch from June to September 2003. *Id.* at pp. 41, lines 23-24, 42, lines 1-13, 50, lines 16-24, & 51, lines 1-12. On October 10, 2003, Plaintiff received a memo from the Food Services Administrator stating that his kosher meal was prepared in accordance with the guidelines set by the Department of Correctional Services. Pl.'s Mem. of Law, Ex., Inter-Departmental Memo from Haug to Midalgo, dated Oct. 10, 2003. The memo also states that items such as milk and bread are prepackaged and the trays are checked and wrapped with cellophane before they are delivered to the inmates. *Id.* The Superintendent further stated that after an investigation was conducted with the Food Service Administrator, since the food is prepackaged, contact between an officer and the trays are limited. Pl.'s Mem. of Law, Ex. Superintendent's Appeal, dated Oct. 28, 2003. Midalgo states, however, that he had to beg other prisoners to sell him food so that he "wouldn't starve or get sick" and that as a result he received psychological harm which include "anxiety, nightmares about being poisoned, delusions and dizziness." *Id.* at p. 50; Am. Compl. at ¶ 54.

**\*12** Prison officials are required to provide nutritionally adequate meals that are served under conditions which do not present an immediate danger to the health and well being of an inmate. Here, Plaintiff received kosher meals for several years because the food was more healthy than regular food received by the inmates. Pl.'s Dep. at pp. 38, lines 15-24, & 39, lines 1-18. Upstate provided the kosher meals since Plaintiff made the request. *Id.* at p. 39, lines 1-18. Furthermore, Midalgo only stated he received psychological harm from the alleged incident. There was no immediate danger to his health or well being. Plaintiff did not starve nor was he denied meals. He also does not state he had weight loss or anything of the sort which would put his health in immediate danger. He stated that he purchased food from other inmates. Moreover, investigations were conducted into Plaintiff's spoiled and rotten food claims and the claims were found to be unsupported by any evidence as most items were prepackaged and wrapped in cellophane. Moreover, Plaintiff admits that the Defendants he seeks to hold liable had no control over the contents on his foodtrays.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Therefore, it is recommended that the Motion for Summary Judgment on Plaintiff's Eighth Amendment claims be **granted**.

### E. First Amendment Claims

Plaintiff claims that Sergeant Trimm and "her C.O.s" were misplacing or destroying his magazine and newspaper subscriptions and that his outgoing mail/legal mail was read by Defendant Bouyea in order to "play mind games with [Plaintiff]." Am. Compl. at ¶¶ 22 & 46. Plaintiff further alleges that Defendant Bennett purposefully gave him the wrong books and cases and lost legal documents which resulted in frustrating Plaintiff's lawsuit and an inability to file a 440 motion pursuant to New York State's Criminal Procedure Law. *Id.* at ¶ 48.

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim for lack of access to the courts by interference with legal mail, "an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Cancel v. Goord*, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis v. Casey*, 518 U.S. 343, 349 (1996)). However, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Cancel v. Goord*, 2001 WL 303713, at *5 (citing *Jermosen v. Coughlin*, 877 F.Supp. 864, 871 (S.D.N.Y.1995) & *Jones v. Smith*, 784 F.2d 149, 151-52 (2d Cir.1986)). But, if an adverse judgment to an "otherwise meritorious" motion resulted from defendants' delay, then a § 1983 claim is stated. *Id.*

A prisoner maintains the right to the flow of incoming and outgoing mail as protected by the First Amendment. *Davis v. Goord*, 320 F.3d at 351 (citing, *inter alia, Heimerle v. Attorney General*, 753 F.2d 10, 12-13 (2d Cir.1985)). Any "[r]estrictions on prisoners' mail are justified only if they 'further [ ] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest

involved.' " *Id.* (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir.1986)) (alterations in original). Therefore, "in balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (citing, *inter alia, Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989)). Although an inmate has the right to be there when his legal mail is opened, an isolated event of tampering will be insufficient to allege a constitutional violation unless the inmate can show "that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.' " *Id.* (quoting *Cancel v. Goord*, 2001 WL 303713, at *6); *see also Wolff v. McDonnell*, 418 U.S. 539, 574-76 (1974); *Morgan v. Montanye*, 516 F.2d 1367, 1371 (2d Cir.1975); *Gill v. Riddick*, 2005 WL 755745, at *15 (N.D.N.Y. Mar. 31, 2005).

**\*13** With regard to non-legal incoming mail, a prison's "regulations or practices affecting a prisoner's receipt of non-legal mail must 'be reasonably related to legitimate penological interests[.]' " *Cancel v. Goord*, 2001 WL 303713, at *6 (quoting *Thornburg v. Abbott*, 490 U.S. 401, 409 (1989)). "[P]rison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." *Id.* (quoting *Gaines v. Lane*, 790 F.2d 1299, 1304 (7th Cir.1986)). In order to state a claim for interference with incoming non-legal mail, the inmate will have to show a pattern and practice of interference without the legitimate penological interest. *Id.*

With regard to Plaintiff's legal mail being read, Plaintiff states that C.O. Bouyea "mumble[d] something similar to what [Plaintiff] wrote in [his] legal mail under his breath." Am. Compl. at ¶ 26. Bouyea purportedly repeated "something verbatim to a letter" Midalgo had written to a legal organization and that there were similar occurrences on several occasions. Pl.'s Dep. at pp. 39, lines 19-24, & 40, lines1-6. Plaintiff claims that Bouyea whispered so that only Plaintiff could hear the statements. *Id.* at p. 40, lines 19-23. When Plaintiff was asked about the statement made in his Amended Complaint that "outgoing mail/legal mail was being read due to a fabricated penological interest" Midalgo stated that he believed his mail was read because he "agitated [the facility's] security interest and that ... gave them a reason to read [his] mail and things

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

[he] was writing in [his] mail." *Id.* at p. 83, lines 3-8. Another reason Plaintiff believed the mail was read was because the inmates who became his cellmates "would try to start a whole situation based on letters" that Plaintiff had written. *Id.* at p. 83, lines 9-12. Plaintiff had submitted a grievance about his legal mail and it was found to have no merit and that there was no evidence to support his complaint. Defs.' 7.1 Statement, Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003; Ex. A, Superintendent's Appeal, dated Aug. 6, 2003.

Here, Plaintiff has failed to show that there was interference with his legal mail. Plaintiff has not alleged any deliberate and malicious interference that actually impeded his access to the courts nor prejudiced an existing action. Plaintiff also provides no proof that his mail was read except that he states Defendant Bouyea was mumbling under his breath something similar to what had been written in Plaintiff's letters. Moreover, Midalgo has not shown that Bouyea opened and read his mail on a regular and unjustifiable basis.

Plaintiff further states he was not receiving his magazine and newspaper subscriptions and that Defendant Trimm "was aware that her C.O.s were purposefully misplacing [his] magazines and newspaper subscription" or providing them to other inmates. Am. Compl. at ¶ 22; Pl.'s Dep. at p. 34. Midalgo says he knew some of his magazines that were in the "rec room" were his because he saw his name on the label. Pl.'s Dep. at 34, lines 2-4. He also stated he wrote to the mail clerk to inquire about his mail, the mail clerk told him that magazines were given to the correction officers to be handed out, that they were not delivered to him. *Id.* at p. 34, lines 8-12. Then when Plaintiff spoke to Sergeant Trimm about the situation, she gave him "a devious smile and wrote something out on a pad and said she would look into it and she never did." *Id.* at p. 34, lines 16-19.

**\*14** In regards to the non-legal mail, Plaintiff does have a right to incoming, non-legal mail, although to a lesser extent than legal, outgoing mail. *See Davis v. Goord,* 320 F.3d at 351. Plaintiff would have to show a pattern and practice of interference without a penological interest or purpose. Midalgo makes the general claim that he did not receive his subscriptions for several months. In a letter to the Warden, Plaintiff provides the names of five different magazines which were not delivered to him. Plaintiff only submitted two letters to the Court that were sent to two different magazine companies stating he needed to cancel his subscriptions due to his failure to receive the magazines. Am. Compl., Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Midalgo also states he received one issue per each subscription. Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Plaintiff states he received one issue of Maxim after it had gone through the procedure of media review. Pl.'s Dep. at pp. 34, lines 20-24, & 35, lines 4-12. Despite the letters, Plaintiff has not shown that there was a pattern and practice in not receiving his subscriptions. Plaintiff has not stated with any specificity which magazines he did not receive and, more importantly, for what time periods he did not receive them. *See* Am. Compl. at ¶¶ 22-24; Pl.'s Mem. of Law at Point Five. Plaintiff merely makes a generalization that from January 2003 until he cancelled his subscriptions, his magazines and newspapers were misplaced and that several months had passed without receiving any subscriptions. Am. Compl. at ¶¶ 23 -24. More to his detriment, Plaintiff does not state which officers misplaced or destroyed his magazines nor does he show that there was a practice of this by the Defendants.[FN14] Therefore, Plaintiff has failed to state a claim on his non-legal, incoming mail.

> FN14. The Court also notes that the Defendants fail to address whether or not there was a penological interest in the regulations or practices that may have affected Midalgo's receipt of non-legal mail. *See* Defs.' Mem. of Law.

In addition, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Even if the Court were to draw all inferences in favor of Plaintiff that a pattern and practice has been established, Plaintiff has failed to allege the personal involvement of Defendant Trimm or any other Defendant. Furthermore, to the extent Plaintiff states that Defendant Trimm would be liable in a supervisory capacity, Plaintiff has failed to show what supervisory position Defendant Trimm holds as to the corrections officers who may have misplaced or destroyed his magazines.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Plaintiff further makes the claim that he received the wrong books and cases from the law library or that he never received the books requested. *Id.* at ¶ 48. Midalgo also alleges that his legal documents simply were lost and he was unable to file court documents as a result. *Id.*

Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. at 828; *Bourdon v. Loughren,* 386 F.3d at 92 (quoting *Bounds).* However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. at 351. The Supreme Court held that in order to fulfill the actual injury requirement, derived from the constitutional doctrine of standing, on a law library claim where there is a lack of access to the courts, the inmate must be pursuing direct appeals from the conviction for which he or she was incarcerated, a *habeas corpus* petition, or a civil rights claim pursuant to § 1983 "to vindicate basic constitutional rights." *Lewis v. Casey,* 518 U.S. at 354.

**\*15** As to Plaintiff's law library claim, in regards to some of the books Midalgo sought, he received a letter stating that the law library was not required to carry two of the books he requested and that the other book should have been available and if it was missing, then a replacement would be ordered. Am. Compl., Ex. D, Lt. from Litzenberger, dated July 28, 2003. Then Plaintiff wrote two letters noting that the library staff was refusing to provide him with a law book, that he had been told that two books were not available at the facility, and that he was receiving the wrong books and cases from the law library. *Id.,* Exs. D, Lt. to Botta, dated Aug. 3, 2003 & Ex. C, Lt., dated Aug. 4, 2003. However, Plaintiff received a memo noting that an investigation had been completed and that the staff had acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...,"

Mem. from Captain Racette, dated Aug. 5, 2003. Midalgo also received a letter from C.O. Bennett whereby Plaintiff was told that one book he had requested was available but that because Plaintiff was in SHU and since the book was looseleaf, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003. However, Plaintiff claims that the book was not in looseleaf and that Defendant Bennett had lied and then stated the book was missing after Plaintiff claimed that all he received was the index. Pl.'s Dep. at pp. 78, lines 14-24, & 79, lines 1-3. Plaintiff alleges that every book he requested from the law library was missing and that one book that he did receive had a section ripped out that Plaintiff needed. *Id.* at p. 85, lines 1-18. However, Plaintiff states that he would not say it was Defendant Bennett's fault but that it is his duty to oversee the law library. *Id.* at p. 86, lines 18-24.

Additionally, Plaintiff states that he was trying to find out how to copyright some of his poetry. *Id.* at p. 74, lines 22-23. Midalgo further acknowledges he was trying to file a N.Y. CRIM. PROC. LAW 440 motion because he claims he was wrongfully convicted and that he is still unable to file the motion because he received the wrong books and cases. *Id.* at pp. 74, line 24, & 75, lines 1-20. Plaintiff claims that he sent legal documents, which were exhibits Plaintiff wanted to attach to his 440 motion, to the law library to be copied, but that they were never returned even though the request was made. *Id.* at pp. 79, lines 16-24, & 80, lines 1-8. As a result, Plaintiff claims that this was another reason why he was unable to file the motion. *Id.* at p. 80, lines 1-5. Midalgo stated that he did not file the 440 motion prior to arriving at Upstate because he had been studying the process and procedures. *Id.* at p. 81, lines 18-21. Plaintiff alleges that if not Defendant Bennett, then either Defendants Streeter or Spinner lost his copies because "[t]hey colluded together" and conspired against Plaintiff. *Id.* at pp. 87, lines 10-24, & 88, lines 1-4. Midalgo avers that his claim could be proven by "circumstantial evidence," which would include his grievances and hearings. *Id.* at p. 88, lines 7-17.

**\*16** Here, Plaintiff does have a constitutional right to the access of the courts and, in turn, the right to an adequate law library or assistance from those trained in the law when preparing and filing legal documents. Plaintiff does not state a claim as to the availability of books he sought for the purposes of his copyright lawsuit. *See Lewis v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

*Casey,* 518 U.S. at 354. Plaintiff does state a claim in regards to the missing books and copies of exhibits to his 440 motion as he seeks to challenge his conviction, which would provide standing as it would be a direct appeal from the conviction for which he was incarcerated. *See id.*

However, the Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In this case, as only Plaintiff's law library claim as to his 440 motion could proceed, Plaintiff has failed to allege any personal involvement on the part of any of the Defendants. Plaintiff states that Defendant Bennett was not at fault for the missing books. That statement belies the notion that there was any personal involvement. In addition, Plaintiff fails to state a claim for supervisory liability against Defendant Bennett for the missing books as Plaintiff does not state which Defendants Bennett was supervising. Furthermore, as to the missing copies of exhibits for the 440 motion, Plaintiff merely claims that Defendants Bennett, Streeter, and Spinner were involved because he believes there was a conspiracy. That allegation does not constitute personal involvement.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** on the First Amendment claims.

### F. Inadequate Visitation

Plaintiff alleges that Defendant Trimm delayed his visit with his mother for several hours causing him emotional distress. Am. Compl. at ¶ 50.

"Although inmates do not relinquish their constitutional rights when imprisoned, implicit with incarceration is the fact that confinement imposes a limitation on privileges and rights." *Henry v. Coughlin,* 940 F.Supp. 639, 642 (S.D.N.Y.1996) (citing, *inter alia, Sandin v. Conner,* 515 U.S. 472, 485 (1995)). Restrictions that are placed upon an inmate's constitutional rights "may be upheld as long as they are 'reasonably related to legitimate penological

interests.' " *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 226 (W.D.N.Y.2003) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). However, family visitations for inmates only constitute a privilege and not a right. *See Block v. Rutherford,* 468 U.S. 576, 589 (1984); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125-26 (1977) (holding that one of the more obvious constitutional rights curtailed by confinement is the right to freely associate with those outside the penal institution); *see also Lynott v. Henderson,* 610 F.2d 340, 342 (5th Cir.1980) (stating that "[c]onvicted prisoners have no absolute constitutional right to visitation"); *Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir.1975) (holding that a "[prisoner] has no constitutional right to physical contact with his family"); *Hernandez v. McGinnis,* 272 F.Supp.2d at 227.

*17 Here, Plaintiff does not claim that he was denied visitation nor has he stated that visitation was delayed at any other time than the one time alleged. He merely states that a visit with his mother and brother was delayed by a few hours. Am. Compl. at ¶ 25. As there is no constitutional right to visitation and because of the fact that Plaintiff did actually receive visitation that same day, Plaintiff has failed to state a claim.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** as to the visitation claim.

### G. Harassment

Plaintiff claims that Defendants Trimm and Bass harassed him by placing a wiretap in his cell as well as confidential informants and/or hired help in order to cause him physical and psychological harm.[FN15] Am. Compl. at ¶ 52.

FN15. Although Plaintiff does not specify what aspect of the Constitution was violated, though Plaintiff does insert a short sentence saying Defendants were deliberately indifferent, this Court will analyze the wiretap claim pursuant to the Fourth Amendment. *See* Am. Compl. at ¶ 52.

In terms of the wiretap, the claim would turn on whether

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

a plaintiff had a legitimate expectation of privacy with respect to his conversations. To assess the expectation, "the person asserting a privacy interest must demonstrate a subjective expectation of privacy." *George v. Carusone,* 849 F.Supp. 159, 165 (D.Conn.1994) (citing *California v. Greenwood,* 486 U.S. 35, 39 (1988)) (further citations omitted). Then "that person's subjective expectation must be one that society accepts as reasonable." *Id.* (citing *California v. Greenwood,* 486 U.S. at 39) (further citations omitted). The Second Circuit has held that "a convict has no expectation of privacy in his prison cell" because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a [prisoner] might have in his prison cell[.]" *Willis v. Artuz,* 301 F.3d 65, 66, & 69 (2d Cir.2002) (citing *Hudson v. Palmer,* 468 U.S. 517, 526 (1984)).

Here, besides alleging that a wiretap was placed in his cell, Plaintiff does not provide a shred of evidence that there was actually a wiretap placed within his cell. Plaintiff sets forth certain circumstances, which to him seem like too much of a coincidence that a wiretap had to have been placed in his cell. Pl.'s Mem. of Law at Point Eight. Plaintiff merely states that he **thought** there was a wiretap because his cellmate attempted to talk about illegal activity and that his neighbor was trying to get Midalgo to bring back drugs. Pl.'s Dep. at p. 15, lines 13-17. He also stated the lights would flicker and that some of the officers would talk about the same things Midalgo and his cellmate had discussed. *Id.* at p. 15, lines 18-24. Even though Plaintiff does not have an expectation of privacy in his cell, Plaintiff fails to allege any facts that are not general or conclusory as to state any claim in regards to the alleged wiretap.

With regard to his claim of a confidential informant or hired help being placed in his cell to harass him, Plaintiff states that he believes his cellmate was a confidential informant because Officer Bouyea, Officer Streeter, and others gave the cellmate extra food trays, magazines, and books. Pl.'s Dep. at pp. 17, lines 4-12 & 29, lines 4-10. Other than supposition, Plaintiff has not provided any proof or evidence that his cellmate was a confidential informant. Midalgo's claims are merely conclusory and unsupported by any facts. Furthermore, the Superintendent stated that inmates are placed together based on compatibility. Defs.' 7.1 Statement, Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff has

not stated any type of claim available and moreover, Plaintiff would not have any choice in who was placed within his cell as inmates do not a have a constitutional right to the cellmate of their choice. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

**\*18** Therefore, it is recommended that the Motion for Summary Judgment be **granted** on his claim.

### H. John Doe Defendant

As noted previously, Defendant John Doe has not been identified or appeared in this action. *See* Dkt No 12. FED.R.CIV.P. 4(m) states that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, then the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time[.]" Furthermore, pursuant to the Local Rules for the Northern District of New York, "service of process [is required] upon all defendants within sixty (60) days of the filing of the complaint." N.D.N.Y.L.R. 4.1. Plaintiff's time for service on John Doe has expired, per both the Local Rules and the Federal Rules, as the date of the filing of the Amended Complaint was October 24, 2003. *See* Dkt. No. 8. Since Plaintiff has failed to properly identify this Defendant, such claims should be dismissed.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Motion for Summary Judgment (Dkt. No. 105) be **GRANTED;** and it is further

**RECOMMENDED,** that all claims against the John Doe Defendant be **DISMISSED** due to Plaintiff's failure to timely identify and serve such Defendant; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a), & 6(e).

N.D.N.Y.,2006.
Midalgo v. Bass
Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Bradford APPLEGATE, Plaintiff,
v.
Anthony J. ANNUCCI, et al., Defendants.
No. 9:02-CV-0276 (LEK/DEP).

July 10, 2008.
Bradford Applegate, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General
State of New York, Megan M. Brown, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on June 2, 2008, by the
Honorable David E. Peebles, United States Magistrate
Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of
the Northern District of New York. Report-Rec. (Dkt. No.
53).

Within ten days, excluding weekends and holidays,
after a party has been served with a copy of a Magistrate
Judge's Report-Recommendation, the party "may serve
and file specific, written objections to the proposed
findings and recommendations," FED. R. CIV. P. 72(b),
in compliance with L.R. 72.1. No objections have been
raised in the allotted time with respect to Judge Peeble's
Report-Recommendation. Furthermore, after examining
the record, the Court has determined that the
Report-Recommendation is not subject to attack for plain
error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt.

No. 53) is **APPROVED** and **ADOPTED** in its
**ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary
judgment (Dkt. No. 52) is **GRANTED** and it is further

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1)
is **DISMISSED** in its entirety, without prejudice against
defendant C .O. Gardner, but otherwise with prejudice;
and it is further

**ORDERED,** that the Clerk serve a copy of this Order
on all parties.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Bradford Applegate, a New York State
prison inmate who is proceeding *pro se* and *in forma
pauperis,* has commenced this civil rights action pursuant
to 42 U.S.C. § 1983 against the Deputy Commissioner and
General Counsel of the New York State Department of
Correctional Services ("DOCS") and several other DOCS
employees, complaining of diverse constitutional
violations alleged to have occurred during the time of his
confinement. In his complaint, Applegate asserts claims
stemming from various events at three separate
correctional facilities alleging *inter alia,* the use of
excessive force, acts of retaliation, deprivation of
procedural due process, and interference with
communications relating to legal matters, and seeks
recovery of compensatory and punitive damages.

Certain of plaintiff's claims were previously dismissed
by the court for failure to state a claim upon which relief
may be granted. Now that issue has been joined and
pretrial discovery has concluded, the defendants remaining
in the action have moved for summary judgment
requesting dismissal of the balance of plaintiff's claims,
both procedurally based upon his failure to properly
exhaust available administrative remedies with regard to
a majority of his causes of action, and on the merits. For

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

the reasons set forth below I recommend that the motion, which plaintiff has not opposed, be granted and that Applegate's remaining claims be dismissed.

I. *BACKGROUND*

At the times relevant to his complaint, plaintiff was a New York State prison inmate entrusted into the custody of the DOCS. *See* Generally Complaint (Dkt. No. 1). Beginning in or around May of 1998, plaintiff was assigned to the Greenhaven Correctional Facility ("Greenhaven"). *Id.* ¶¶ 22-23. Plaintiff was later transferred into the Upstate Correctional Facility ("Upstate") in July of 1999, where he remained until December, 1999 when he was reassigned to the Elmira Correctional Facility ("Elmira").[FN1] *Id.* ¶¶ 56, 74.

> FN1. Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

**\*2** Plaintiff's complaint in this action chronicles several instances of alleged harassment and retaliatory conduct on the part of prison officials; many of the incidents of which he now complains are attributed by the plaintiff to retaliatory motivation based upon his commencement and prosecution of another civil rights action in this district, *Applegate v. Mann, et al.,* Civil Action No. 98-CV-0067 (N.D.N.Y., filed in 1998) (*"Applegate I"* ). Complaint (Dkt. No. 1) ¶ 3. The first incident of which the plaintiff complains occurred shortly after his transfer into Greenhaven, when his typewriter was destroyed and the "vast majority" of his legal papers were taken from him. Complaint (Dkt. No. 1) ¶ 23. With this exception, however, plaintiff's existence at Greenhaven was apparently fairly uneventful until September 11, 1998, when he amended his complaint in *Applegate I* to challenge an earlier special housing unit ("SHU") disciplinary confinement-an action which, he maintains, led defendant S. Carlson, a corrections officer at Greenhaven, to initiate a "campaign of relentless harassment" against him, including "constant pat-frisks[.]" *Id.* ¶ 26. Plaintiff asserts that defendant Carlson's regimen

of harassment also included the issuance of a false misbehavior report on January 25, 1999, accusing him of smuggling and stealing toilet paper.[FN2] *Id.* ¶ 27.

> FN2. Plaintiff's claims relating to the allegedly false misbehavior report were previously dismissed by the court. *See* Report and Recommendation dated September 21, 2005 (Dkt. No. 38) at pp. 16-19, affirmed as modified by decision and order issued by District Judge Lawrence E. Kahn on February 6, 2006 (Dkt. No. 40).

After sending a letter on February 21, 1999 to Greenhaven Superintendent C. Artuz complaining of Corrections Officer Carlson's conduct, the harassment experienced by the plaintiff escalated. Complaint (Dkt. No. 1) ¶¶ 30-38. Plaintiff was pat-frisked on March 4, 1999 by defendant Carlson as part of a routine security measure implemented for inmates returning to their cell blocks from their workstations in order to detect weapons and other materials attempted to be smuggled out of the area. Carlson Aff. (Dkt. No. 52-13) ¶¶ 14-25; Complaint (Dkt. No. 1) ¶¶ 36-37. Plaintiff asserts that during the course of that pat-frisk defendant Carlson "savagely grabbed [him] by the back of his shirt and attempted to slam his face into the wall." Complaint (Dkt. No. 1) ¶¶ 36-37. Defendant Carlson vociferously denies that allegation, countering that during the course of the March 4, 1999 pat-frisk Applegate engaged in provocative behavior, taking his hands off of the wall where he had been instructed to place them, and turning toward the left prior to conclusion of the pat-frisk, necessitating that Carlson take appropriate counter-measures to ensure the safety and security of corrections officers and other inmates present in the area at the time. Carlson Aff. (Dkt. No. 52-13) ¶¶ 14-23. Defendant Carlson denies having used unnecessary force during the encounter, and specifically denies attempting to push Applegate's face in the wall or otherwise cause him harm. *Id.* ¶ 19. Plaintiff was not injured as a result of the incident. Brown Aff. (Dkt. No. 52-4), Exh. A at 55.

**\*3** Following the incident plaintiff was issued a misbehavior report alleging that he had engaged in violent conduct (Disciplinary Rule 104.11), violated a direct order

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

(Disciplinary Rule 106.10), engaged in physical interference with a corrections officer (Disciplinary Rule 107.10), and violated prison policies related to searches and frisks (Disciplinary Rule 115.10). Complaint (Dkt. No. 1) ¶ 40; Carlson Aff. (Dkt. No. 52-13) ¶ 27. Following a Tier II hearing conducted by defendant G. Schneider beginning on March 7, 1999, plaintiff was found guilty of all charges set forth in the misbehavior report, and sentenced to a period of thirty days of keeplock confinement.[FN3,FN4] Complaint (Dkt. No. 1) ¶ 45. That determination was affirmed on appeal to First Deputy Superintendent Dennis Bliden on March 18, 1999. Complaint (Dkt. No. 1) ¶ 48.

> FN3. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. See Hynes v. Squillace, 143 F.3d 653, 655 (2d Cir.), cert. denied, 525 U.S. 907, 119 S.Ct. 246 (1998).

> FN4. Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. Gittens v. LeFevre, 891 F.2d 38, 39 (2d Cir.1989) (citing 7 N.Y.C.R.R. § 251-1.6); Warburton v. Goord, 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing Gittens ); Tinsley v. Greene, No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, inter alia, Green v. Bauvi, 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. Lee v. Coughlin, 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). An inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. Id.

Inmates can leave their cells for showers, visits, medical exams and counseling. Id . Inmates can have cell study, books and periodicals. Id. The main difference between keeplock and the general population is that keeplocked inmates do not leave their cell for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. Id.

In or about April of 1999, following an altercation involving several inmates at Greenhaven, plaintiff was charged with participating in the fight and with possession of a weapon based upon the discovery of a sharpened can-top which, he contends, "was planted on his person by prison guards[.]" Complaint (Dkt. No. 1) ¶ 54. Although plaintiff's complaint provides no specifics regarding any ensuing disciplinary proceedings, he was apparently found guilty, following a hearing, of multiple infractions and sentenced to a period of seventy-five days of keeplock confinement for fighting, and an additional six months of SHU confinement based upon the weapon possession charge. Id. ¶ 55.

In mid-July of 1999, plaintiff was transferred to Upstate and placed in that facility's SHU. Plaintiff maintains that while there he was deprived of law library materials for a period of over three months, and during that time was hampered in his ability to pursue a state court application to vacate his state court judgment of conviction and to pursue discovery in Applegate I. Complaint (Dkt. No. 1) ¶¶ 57-71.

In or about December of 1999, after serving his full keeplock and SHU sentences at Upstate, plaintiff was transferred into Elmira. Id. ¶ 74. There, following a fight in March of 2000 involving the plaintiff, a search of his cell revealed an unworked length of metal, claimed by him to have been planted in his locker by staff members. Id. ¶ 75. Plaintiff attributes the incident to his "repeated attempts" to amend or supplement his complaint in Applegate I. Id. Although once again plaintiff's complaint is lacking in specifics in this regard, disciplinary charges were apparently lodged against him as a result of the incident, leading to the imposition of thirty days of keeplock confinement for fighting and 150 days of SHU confinement for possession of a weapon. Id. ¶ 76.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on February 26, 2002.[FN5] Dkt. No. 1. Named as defendants in plaintiff's complaint are Anthony J. Annucci, Esq., the DOCS Deputy Commissioner and General Counsel; Corrections Officer S. Carlson, Deputy Superintendent of Security Schneider, Corrections Lieutenant G. Schneider, and Corrections Lieutenant A. Pelc, all of whom were employed at the relevant times at Greenhaven; Deputy Superintendent of Programs R. Santor, Superintendent T. Ricks, and Corrections Officer Gardner, all of whom worked at Upstate during the relevant times; and Superintendent F.G. Bennett, Jr. and Deputy Superintendent of Administrative Services William J. Hopkins, both assigned to Elmira.

> FN5. Plaintiff's complaint was initially dismissed by the court based upon his failure to comply with a directive that he file an amended complaint eliminating the excessive and unnecessary details set forth in the original pleading. *See* Dkt. No. 10. The judgment entered dismissing plaintiff's complaint on this ground was later reversed on appeal to the United States Court of Appeals for the Second Circuit, and the matter was remanded to this court for further appropriate proceedings. Dkt. No. 13. In its summary order, which was subsequently issued as a mandate on July 9, 2004, the Second Circuit noted that on remand the district court would be authorized by Rule 12(f) of the Federal Rules of Civil Procedure to strike any portions of the complaint deemed to be redundant or immaterial, citing *Salahuddin v. Cuomo,* 861 F.2d 40, 42-43 (2d Cir.1988). Dkt. No. 13. In their earlier dismissal motion, however, defendants chose not to avail themselves of this mechanism for eliminating portions of plaintiff's complaint, which extends over twenty-eight typewritten pages and contains 102 paragraphs.

**\*4** Following service of the summons and complaint and reinstatement of the action by the Second Circuit, defendants moved on February 28, 2005 seeking dismissal on a variety of grounds including, *inter alia,* the applicable

statute of limitations, lack of personal involvement, and the general failure of plaintiff's complaint to set forth a claim upon which relief may be granted.[FN6] Dkt. No. 35. That motion, which was not opposed, led to the issuance on September 21, 2005 of a report in which I recommended dismissal of certain of plaintiff's claims on various grounds. Dkt. No. 38. The report was adopted, with slight modification, by Senior District Judge Lawrence E. Kahn in a decision and order issued on February 2, 2006. Dkt. No. 40. As a result of the issuance of my report and Judge Kahn's order, the claims which remain in the action include causes of action for retaliation, a portion of plaintiff's original claim related to denial of access to the courts, a procedural due process cause of action stemming from disciplinary proceedings at Elmira, and an excessive force claim. The defendants remaining in the action following the issuance of that decision include defendants Annucci, S. Carlson, Deputy Superintendent of Security G. Schneider, and Corrections Officers A. Pelc, Gardner and F.G. Bennett, Jr.[FN7,FN8]

> FN6. In their pre-answer motion, defendants also asserted entitlement to qualified immunity-an argument which was not directed toward any particular cause of action.

> FN7. As will be seen, Lieutenant G. Schneider and Corrections Officer Gardner, though named as defendants, have never been served in the action and are thus not presently before the court. *See* pp. 11-16, *post.*

> FN8. While my initial report recommended dismissal of plaintiff's claims against defendant R. Santor, based upon lack of personal involvement, and that portion of my report appears to have been adopted by Senior District Judge Lawrence E. Kahn, the docket sheet was not modified to reflect this fact. The clerk's office is hereby directed to amend its records to reflect that all of plaintiff's claims against defendant R. Santor have been dismissed by the court.

Now that pretrial discovery, which included the taking of plaintiff's deposition, has been completed the remaining

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

defendants having appeared in the action have moved for the entry of summary judgment dismissing plaintiff's remaining claims. Dkt. No. 52. In their motion, defendants assert that with the exception of plaintiff's denial of court access claim, each of plaintiff's causes of action is procedurally barred based upon his failure to exhaust available administrative remedies before commencing suit. *Id.* Defendants also contend that plaintiff's remaining claims are lacking in merit, as a matter of law, additionally asserting a lack of personal involvement on the part of defendant F.G. Bennett, Jr., the Superintendent at Elmira, in the constitutional deprivations alleged, and renew their claim of entitlement to qualified immunity. *Id.* Defendants' motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).[FN9] *See also* Fed.R.Civ.P. 72(b).

> FN9. The motion papers served upon the plaintiff and filed with the court include the requisite notice pursuant to Northern District of New York Local Rule 56.2, apprising him of the potential consequences of his failure to oppose defendants' motion. *See* Dkt. No. 52-2.

III. *DISCUSSION*

A. *Dismissal Of Unserved Defendants*

Following the return of this matter to this court from the Second Circuit, summonses were issued by the clerk on September 2, 2004 and forwarded for service to the United States Marshals Service.[FN10] *See* Dkt. No. 14. On November 19, 2004 the summonses were returned as unexecuted with regard to certain of the defendants, including Corrections Officers Sean Carlson, Ralph Santor, William Hopkins, Arlon Pelc and Gardner. Dkt. No. 17. Accompanying that return was a letter advising that the DOCS was unable to identify the employee designated by the plaintiff only by the last name of Gardner, noting that there are several DOCS workers with that last name.[FN11] *Id.* The docket sheet discloses neither a return of an acknowledgment of service by the other remaining unserved defendant, Lieutenant G. Schneider, nor a return of service reflecting the failure to serve that

individual. Defendants now seek dismissal of plaintiff's claims with regard to both of the two unserved defendants, including Lieutenant G. Schneider and Corrections Officer Gardner.

> FN10. According to the court's records, those summonses were later reissued on October 28, 2004.

> FN11. According to that letter the summonses were re-sent to defendants Santor, Hopkins, Carlson and Pelc, and those four defendants have since appeared in the action.

*5 Defendant's request is bottomed upon the requirement, imposed by Rule 4(m) of the Federal Rules of Civil Procedure, that service be made within 120 days of issuance of the summons, absent a court order extending that period.[FN12] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.,* 94 F.3d 338, 340 (7th Cir.1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed.R.Civ.P. 4(m)); *Zapata v.. City of New York,* 502 F.3d 192, 196 (2d Cir.2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir.1986). When examining whether to extend the prescribed period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See Zapata,* 502 F.3d at 197.

> FN12. That rule provides that

> > [i]f a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

an appropriate period....

Fed.R.Civ.P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of a case on its merits rather than on the basis of a procedural technicality. *Poulakis v. Amtrak,* 139 F.R.D. 107, 109 (N.D.Ill.1991). When a plaintiff proceeds *in forma pauperis,* such as is the case in this instance, the court is obligated to issue the plaintiff's process to the United States Marshal, who must in turn effect service upon the defendants, thereby relieving the plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint. *Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996). That does not mean, however, that a *pro se* plaintiff may stand idly by upon being notified that efforts by the U.S. Marshals Service to serve a particular defendant have been unsuccessful. *VanDiver v. Martin,* 304 F.Supp.2d 934, 938-43 (E.D.Mich.2004). In such instances it is incumbent upon the plaintiff to develop, though pretrial discovery or otherwise, any additional information necessary to permit service by the United States Marshals Service. *See VanDiver,* 304 F.Supp.2d at 942.

In this case defendant Gardner has not been served or otherwise appeared in the action within the appropriate time period. Based upon a review of the record I am unable to find good cause justifying plaintiff's failure to effectuate timely service, and find no sufficient basis presented to exercise discretion in favor of extending the governing period of service. Accordingly, since this court has never acquired jurisdiction over him, I recommend dismissal of the complaint as against defendant Gardner, without prejudice. *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citing *Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444-45, 66 S.Ct. 242, 245-46 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

**\*6** The situation is distinctly different with regard to Lieutenant G. Schneider. The fact that two individuals, apparently husband and wife, named G. Schneider are listed as defendants in this case has engendered considerable confusion on all levels. While it appears that Deputy Superintendent of Security G. Schneider has been served, Lieutenant G. Schneider has not, although the summons issued to that individual was not returned as unexecuted. It also appears that letters received by the court from the defendants' counsel requesting extensions of time to answer have furthered that confusion, not clearly referencing which G. Schneider is among the persons on whose behalf the requests have been made. *See* Dkt. Nos. 28, 33. And, while defendants' notice of motion in support of their earlier dismissal motion refers to the defendant as "George Schneider" without indicating whether it is Deputy Superintendent of Security G. Schneider or Lieutenant G. Schneider, as defendants' counsel herself acknowledges both G. Schneiders were referenced in her objections filed to the report and recommendation issued in the case. *See* Dkt. No. 39. Under these circumstances I recommend against dismissal of plaintiff's claims against defendant Lt. G. Schneider on the basis of failure to serve.[FN13]

> FN13. The fact that the two defendants named G. Schneider appear to be related and work at the same DOCS facility is strongly suggestive of awareness on the part of a Lieutenant G. Schneider of the pendency of this action and the assertion of claims against him or her. While not intended to minimize the importance of obtaining personal jurisdiction over a named defendant, I am therefore satisfied that no significant due process concerns are presented by failing to dismiss this action against Lieutenant G. Schneider on this procedural ground.

B. *Significance Of Plaintiff's Failure To Properly Oppose Defendants' Motion*

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that omission automatically entitles defendants to dismissal of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

Applegate's complaint, based upon their motion.

This court's rules provide that

[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). While *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N .Y.1997) (McAvoy, C.J.)), the failure of such a plaintiff to oppose a summary judgment motion does not preclude the court from deciding the motion. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). As can be seen by the face of Local Rule 7.1(b)(3), however, before summary judgment can be granted under such circumstances the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

*7 Although a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have routinely invoked Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement.[FN14] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also*

*Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that when reviewing defendants' motion for facial sufficiency, the court follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement.

FN14. According to Local Rule 7.1(a)(3), "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3).

C. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*8** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

D. *Failure To Exhaust*

In their motion defendants assert that with the exception of his court access claims, which appear to have been the subject of more than one grievance filed over time, plaintiff's claims are procedurally barred based upon his failure to exhaust available, administrative remedies before commencing suit. While acknowledging that some of plaintiff's claims, including claims of harassment, were the subject of letters allegedly written by the plaintiff to prison officials, defendants assert that those letters do not act as a surrogate for the filing and pursuit to completion of a grievance.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), imposing several

restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at \*5-6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

**\*9** The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones,* 127 S.Ct. at 918. In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias, 495 F.3d at 43* (quoting *Johnson, 380 F.3d at 697-98*) (emphasis omitted).

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *Macias, 495 F.3d at 41; see Hemphill v. New York, 380 F.3d 680, 686 (2d Cir.2004)*. Under the prescribed algorythm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias, 495 F.3d at 41; Hemphill, 380 F.3d at 686*. If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions, by preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. *Macias, 495 F.3d at 41; Hemphill, 380 F.3d at 686*. In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[FN15] *Macias, 495 F.3d at 41; Hemphill, 380 F.3d at 686*.

> FN15. In practicality these three prongs of the prescribed test, though intellectually distinct, plainly admit of significant overlap. *See Hargrove v. Riley, No. CV-04-4587, 2007 WL 389003, at *8 n .14 (E.D.N.Y. Jan. 31, 2007); see also Giano v. Goord, 380 F.3d 670, 677 n. 6 (2d Cir.2004)*.

1. *Availability of Remedy*

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the Department of Correctional Services ("DOCS"), and recognized as an "available" remedy for purposes of the

PLRA. *See Mingues v. Nelson, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004)* (citing *Mojias v. Johnson, 351 F.3d 606 (2d Cir.2003)* and *Snider v. Melindez, 199 F.3d 108, 112-13 (2d Cir.1999)*). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[FN16] *7 N.Y.C.R.R. § 701.5(a)*. The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701 .4(b), *701.5(b)*. If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id. § 701.5(c)*. The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id. § 701.5(d)*. Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to *section 1983* in a federal court. *Reyes v. Punzal, 206 F.Supp.2d 431, 432 (W.D.N.Y.2002)* (citing, *inter alia, Sulton v. Greiner, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)*).

> FN16. The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

**\*10** Certain of plaintiff's claims implicate misconduct on the part of corrections officials. In addition to the established IGP described above, the DOCS has implemented an expedited grievance process to address complaints of alleged staff harassment.[FN17] *7 N.Y.C.R.R. § 701.8; see Perez v. Blott, 195 F.Supp.2d 539, 543 (S.D.N.Y.2002)* (describing expedited grievance process under prior relevant regulation, *7 N.Y.C.R.R. § 701.11,* which has since been re-codified). This expedited process is not exclusive, and does not preclude the filing of an ordinary grievance in the event of perceived staff harassment or retaliation. *See* Bellamy Decl. (Dkt. No. 52-15) ¶¶ 13, 17; *see also 7 N.Y.C.R.R. § 701.8(a).*[FN18] An inmate claiming harassment by a DOCS worker must file a grievance, which is then assigned a grievance number and, in the event of allegations of staff harassment, forwarded to the superintendent of the facility. *7*

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

N.Y.C.R.R. § 701.8(b). If, after reviewing the grievance of the superintendent finds it not to be facially meritorious, the matter reverts back to the inmate grievance resolution committee ("IGRC") for review. 7 N.Y.C.R.R. § 701.8(c). If, on the other hand, the superintendent believes that an investigation is warranted, he or she may initiate an in-house investigation, or instead, request investigation by the inspector general's office. 7 N.Y.C.R.R. § 701.8(d). Once the grievance is determined, a matter which must occur within twenty-five business days of filing, see 7 N.Y.C.R.R. § 701.8(f), the inmate may appeal to the CORC, a step which is required in order to satisfy the exhaustion requirement. See Singh v. Goord, 520 F.Supp.2d 487, 495 (S.D.N.Y.2007) (indicating that appeal to the CORC is required to exhaust a prisoner's administrative remedies in New York State); Sulton v. Greiner, No. 00 Civ. 0727, 2000 WL 1809284, at *4 (S.D.N.Y. Dec.11, 2000) (granting summary judgment for failure to exhaust administrative remedies where prisoner neglected to appeal to the CORC).

> FN17. Before utilizing this procedure, an inmate generally should first report any incident to an employee's supervisor. 7 N.Y.C.R.R. § 701.8(a).

> FN18. The regulations pertaining to the grievance process describe harassment as any allegation involving "[e]mployee misconduct met to annoy, intimidate, or harm an inmate ..." 7 N.Y.C.R.R. § 701.2(e); see also DOCS Directive No. 4040.

In this instance the record discloses that plaintiff did not follow either of these procedures with regard to his claims of retaliation, instead by-passing the grievance process altogether by allegedly writing letters to the facility superintendent. It is well-established that such communications, however, are insufficient to satisfy the PLRA's exhaustion requirement. See, e.g., Houze v. Segarra, 217 F.Supp.2d 394, 397 (S.D.N.Y.2002).

Despite an inmate's entitlement under most circumstances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff. See Hemphill, 380

F.3d at 687-88. Thus, for example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, ... or where defendants' behavior prevents plaintiff from seeking administrative remedies." Hargrove, 2007 WL 389003, at *8 (citations omitted) (noting, for example, that a defendant's failure to advance plaintiff's grievances or the issuance of threats against an inmate to deter the filing of a grievance may effectively render the administrative process unavailable). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." Id. at 688 (internal quotations and citations omitted); see Hargrove, 2007 WL 389003, at *8.

*11 From a review of the record before the court it appears that the claims now being raised by the plaintiff constitute grievable controversies as defined under the IGP. Plaintiff has asserted no basis to conclude that he misunderstood the grievance process or that through their actions the defendants improperly deterred his filing of a grievance, and the record discloses no basis for such a finding.[FN19] Accordingly, I conclude that there was an administrative remedy available to the plaintiff in this case at the times relative to his claims.

> FN19. The court is somewhat hampered in its ability to determine whether a basis exists to excuse the requirement of exhaustion in this case, in light of plaintiff's failure to respond to defendants' motion. The record is lacking, however, in any evidence suggesting that the defendants or other prison officials prevented Applegate from pursuing available administrative remedies. Brown Aff. (Dkt. No. 52-4) Exh. A at 43-44; see also Defendants' Local Rule 7.1(a)(3) Statement ¶ 83.

### 2. Presentation of Defense/Estoppel

The second prong of the Hemphill analysis focuses upon "whether the defendants may have forfeited the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted).

In their answer, defendants have asserted failure to exhaust as an affirmative defense. *See* Answer (Dkt. No. 41) ¶ 14. Since the record does not disclose any circumstances which would warrant a finding that defendants have relinquished the affirmative defense of non-exhaustion, I find no basis to conclude that the defendants have forfeited their right to assert an exhaustion defense.

3. *Special Circumstances*

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676-77 (2d Cir.2004); *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ). In this instance plaintiff does not allege, nor does the record disclose, any special circumstances which would justify excusing the plaintiff from the PLRA exhaustion requirement.

In sum, the record supports a finding, as defendants now assert, that with the exception of his court access claims, plaintiff has forfeited his right to pursue the remaining cause of action in his complaint by failing to satisfy the exhaustion requirement before filing this action. I therefore recommend that the portion of defendants' motion seeking dismissal of plaintiff's claims, with the exception of the court access claim, be granted on this procedural basis.

D. *Sufficiency Of Plaintiff's Excessive Force Claim*

**\*12** The centerpiece of plaintiff's complaint in this action is his claim against defendant Carlson, alleging that during the course of conducting a security pat-frisk he exerted excessive force toward him, thus violating his rights under the Eighth Amendment. In their motion, defendants contend that even if this claim were not subject to dismissal for failure to exhaust, they would nonetheless be entitled to summary judgment dismissing the claim as a matter of law because no reasonable factfinder could conclude that the incident arose to a level of constitutional significance.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)).

Eighth Amendment analysis requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298-99, 111 S.Ct. 2321, 2324 (1991); *Griffen,* 193 F.3d at 91. The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive, as the defendants seemingly suggest. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe' ", a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

**\*13** In his complaint plaintiff alleges that he was "grabbed ... by the back of his shirt" by Carlson, who "attempted to slam his face into the wall." Complaint (Dkt. No. 1) ¶ 37. Plaintiff also alleges that defendant Carlson continued "to attempt to smash [his] face into the wall[.]" [FN20] *Id.* ¶ 38. Plaintiff does not allege, however, that he was required to seek medical treatment, or for that matter that he suffered any significant injury as a result of defendant Carlson's actions, and in fact acknowledged during his deposition that he was not injured as a result of the incident. Brown Aff. (Dkt. No. 52-4) Exh. A at 55.

> FN20. During his deposition, plaintiff recounted a slightly different version of the incident, noting that Officer Carslon "slammed [him] in the back and tried to ... slam [his] face against the wall...." Brown Aff. (Dkt. No. 52-4) Exh. A at 49.

In his affidavit Officer Carlson notes that the incident occurred during a routine pat-frisk of all inmates, accomplished for security reasons. Carlson Decl. (Dkt. No. 52-13) ¶¶ 4-13. Officer Carlson also asserts that the use of force was necessitated by plaintiff's removal of his hand from the walls during the pat-frisk despite instructions that he keep his hands "high and flat on the wall" ... and not "take them down until [he was] told to do so ." *Id.* ¶ 14. Defendant denies attempting to push the plaintiff's face into the wall and any intent to cause bodily harm, instead stating that he simply took measures calculated to respond to what he believed was a threat of resistence by the inmate. *Id.* ¶¶ 22-23. Under these circumstances, from an objective point of view, I am unable to find that plaintiff's excessive force claim arises to a level of constitutional significance. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (the fact that the plaintiff, who claims he was "bumped, grabbed,

elbowed, and pushed" by the defendants did not rise to a level of constitutional significance since plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact"); *Cunningham v. Rodriguez,* No. 01 Civ. 1123, 2002 WL 31654960, at *5 (S.D.N.Y. Nov. 22, 2002). Accordingly I recommend a finding that objectively, plaintiff's excessive force claim is legally insufficient.

Turning to the subjective element, as defendants argue, to prevail plaintiff must establish that defendant acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d at 1033). When considering the subjective element of the governing Eighth Amendment test, a court must consider that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

**\*14** [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) ( McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

mankind." [FN21] *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

> FN21. It should be noted, however, that in practice a truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9-10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action"); *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

Analyzing the subjective element, utilizing this test as a backdrop, I conclude that the record does not support a finding of requisite subjective intent. Accordingly, having found that when presented with the evidence now before the court no reasonable factfinder could conclude that plaintiff has met either the objective or the subject component of the controlling test, I recommend the entry of summary judgment dismissing his excessive force claim in its entirety.

### E. *Sufficiency Of Plaintiff's Retaliation Claim*

Another primary focus of plaintiff's complaint in this action is his retaliation claim. Plaintiff contends that in retaliation for his having brought and prosecuted the claims raised in *Applegate I,* prison officials at Greenhaven engaged in retaliatory conduct against him. Plaintiff also alleges that after writing to Greenhaven Superintendent C. Artuz regarding harassment on February 21, 1999, he was the subject of further pat-frisks and the use of excessive force by Corrections Officer Carlson on March 4, 1999. Defendants also seek dismissal of this cause of action, asserting that it is stated in purely conclusory terms and that the record is lacking in evidence to establish the requisite connection between the various actions taken against plaintiff and the events which allegedly precipitated them.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) he or she

engaged in protected activity; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002). If the plaintiff succeeds in meeting this burden, then the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct" in order to avoid liability, *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. Put another way, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*15** The theory articulated by the plaintiff in support of his retaliation claim is that defendant Annucci, a Deputy Commissioner and the General Counsel for the DOCS, directed that DOCS employees at Greenhaven retaliate against him in light of having filed suit in *Applegate I.*[FN22] In support of their motion defendants have submitted an affirmation from Deputy Commissioner Annucci in which he points out that in his capacity as General Counsel he has overarching responsibility for the provision of legal services necessary to operate the DOCS, with its 31,600 employees and 63,800 inmates. Annucci Aff. (Dkt. No. 52-12) ¶ 2. Defendant Annucci further notes that his involvement in inmate litigation, which is typically defended by the office of the New York State Attorney General, is extremely limited and ordinarily would only involve class actions or issues implicating overall departmental policies. *Id.* ¶¶ 4-7. Defendant Annucci also notes that at any given time there are thousands of lawsuits pending against the DOCS or its employees. *Id.* ¶ 7. Defendant Annucci states that to his recollection he had no contact with the attorneys representing the defendants in *Applegate I,* and denies having ordered anyone to retaliate against the plaintiff, including to initiate a weapons possession charge at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

Elmira. *Id.* ¶¶ 10, 16-17.

FN22. Plaintiff also seemingly alleges that a Tier II misbehavior report, received shortly following the 1999 incident, was issued in retaliation for his having "immediately" written to the DOCS Inspector General's Office on that same date complaining of the matter. Complaint (Dkt. No. 1) ¶¶ 39-40. There is no evidence in the record, however, to link the two, or to indicate defendant Carlson's awareness of the writing of that letter, or to otherwise suggest that the misbehavior report was issued solely in retaliation for that letter.

Now that the matter has progressed to the summary judgment stage, it is no longer sufficient for the plaintiff to engage in mere conjecture; instead, in response to the defendants' motion it was incumbent upon Applegate to come forward with evidence from which a reasonable factfinder could find the requisite nexus between his pursuit of claims in *Applegate I*-unquestionably activity which is constitutionally protected-and the adverse actions taken against him. *See Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. It should be noted that none of the defendants in this action were defendants in *Applegate I,* and that matter appears to have implicated actions taken by DOCS employees at prisons other than those involved in this case, including the Shawangunk Correctional Facility, the Woodburn Correctional Facility, the Downstate Correctional Facility, the Southport Correctional Facility, and the Clinton Correctional Facility. Simply stated, the record discloses no basis to conclude that the defendants in this action had knowledge of the *Applegate I* suit, nor any basis upon which a factfinder could conclude that the pursuit of plaintiff's claim in *Applegate I* led to retaliatory animus on the part of the defendants named in this action.

As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around the engaging in protected conduct, and require establishment of a nexus between that conduct and the adverse action ultimately taken. Because plaintiff's retaliation claims have been alleged in only conclusory form, and are not supported by evidence now in the record establishing a nexus between any protected activity and

the adverse actions complained of, I recommend that defendants' motion for summary judgment dismissing plaintiff's retaliation claims be granted. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

F. *Sufficiency of Plaintiff's Court Access Claim*FN23

FN23. In the court's prior orders, all of plaintiff's court access claim, with the exception of the portion related to the challenge of his state court conviction, was dismissed based upon lack of prejudice. *See* Report and Recommendation, dated 9/21/05 (Dkt. No. 38) at pp. 21-24; Decision and Order, dated 2/2/06 (Dkt. No. 40).

**\*16** The portion of plaintiff's court access claim which remains intact, following the earlier decision regarding defendants' dismissal motion, concerns his alleged inability to conduct proper research in order to pursue a request for leave to appeal from an apparent denial of a N.Y. Criminal Procedure Law § 440.10 motion collaterally challenging his underlying murder conviction. Complaint (Dkt. No. 1) ¶¶ 57-68. Defendants assert that this claim, though properly exhausted, is legally deficient because plaintiff cannot establish a right of court access protected by the Constitution.

Without question, an inmate's constitutional right to "meaningful" access to the courts is firmly established. *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495 (1977) (citations and internal quotation marks omitted). Although in *Bounds* the Supreme Court held that this right of access requires prison authorities "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law[,]" *id.* at 828, 97 S.Ct. at 1498, the Court later clarified that

prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

assistance program is subpar in some theoretical sense.

*Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 2180 (1996) (internal quotations and citations omitted). Instead, to prevail on such a claim an inmate "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.* In other words, to establish a violation of the right of access to the courts, a plaintiff must demonstrate that defendants' interference caused him or her actual injury-that is, that a "nonfrivolous legal claim had been frustrated or was being impeded" as a result of defendants' conduct. *Id.* at 353, 116 S.Ct. at 2181.

Plaintiff's court access claims surround the alleged inadequacy of law library facilities at Upstate. *See* Complaint (Dkt. No. 1) ¶¶ 58-60; *see also* Brown Aff. (Dkt. No. 52-4) Exh. A at 21-23. Plaintiff asserts that because it was a new facility at the time of his transfer there, Upstate did not then contain a fully stocked law library.[FN24] *Id.* Accordingly, while acknowledging that he had adequate opportunity to perform legal research at Greenhaven in connection with his initial motion under N.Y. Criminal Procedure Law § 440.10, *see* Brown Aff. (Dkt. No. 52-4) Exh. A at 28, plaintiff apparently contends that he was deprived of sufficient materials to support his request for leave to appeal from the unfavorable determination of that application.

> FN24. According to the plaintiff, beginning in or about October of 1999 a CD ROM computer system was installed at Upstate for the purpose of permitting inmates to perform legal research. Brown Aff. (Dkt. No. 52-4) Exh. A at 32. That was followed by the acquisition of books and legal manuals, beginning the following month. *Id.* at 32-33. Plaintiff's challenge to the inadequacy of the legal facilities at Upstate in this action is apparently limited to during the first four months that the prison was open. *Id.* at 33.

*17 There are two fatal deficiencies in plaintiff's library access claim. First, neither plaintiff's complaint nor his deposition reveal the existence of any injury suffered as a result of the alleged library shortcomings. After the

failure of his section 440.10 motion, which he was fully able to research and file, plaintiff was apparently able to file a request for leave to appeal, having been provided with the requisite paper and writing instruments to do so. Plaintiff apparently surmises that had he been able to conduct proper research, his request for permission to appeal might have been granted; such rank speculation, without more, is insufficient to establish the specific prejudice necessary to support a constitutional claim. *See, e.g., Konigsberg v. LeFevre,* 267 F.Supp.2d 255, 261-62 (N.D.N.Y.2003) (Munson, S.J.) (rejecting plaintiff's access to the courts claim where he asserts in purely speculative and conclusory terms that his inability to access certain legal files "perhaps" may have caused him to lose his subsequent new trial).

There is another, equally compelling reason for dismissing plaintiff's court access claims. Aside from Corrections Officer Gardner, who was never served and who plaintiff agrees was a mere "pawn" and could not have changed the system at Upstate, there is no one among the named defendants in this case who, plaintiff has demonstrated, had personal involvement in the failure to provide law library facilities. Since personal involvement in a constitutional deprivation is a prerequisite to finding liability, *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)), plaintiff's failure to name any defendant personally involved in that deprivation warrants dismissal of the court access claim.

G. *Personal Involvement Of Superintendent Bennett*

Among the defendants named in plaintiff's complaint is F.G. Bennett, the Superintendent at Elmira during the relevant period. Plaintiff's claims stemming from events at Elmira relate to the loss of property, a claim which was previously dismissed, as well as the alleged planting of a weapon in his cell. Defendants assert that this is an insufficient basis to hold defendant F.G. Bennett personally accountable for the constitutional claims set forth in plaintiff's complaint.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))

damages under section 1983. *Wright,* 21 F.3d at 501 (citing *Moffitt,* 950 F.2d at 885 (2d Cir.1991) and *McKinnon,* 568 F.2d at 934 (2d Cir.1977)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*18** A supervisor like Superintendent Bennett cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

The record discloses no basis to find personal involvement, or indeed any awareness, on the part of defendant Bennett in connection with plaintiff's weapons planting allegation. While plaintiff does allege that defendant Bennett was aware of the stolen properly claim by virtue of his letter to the superintendent complaining of that incident, the mere writing of the letter to a superintendent, without response, is an insufficient basis to find personal involvement on the part of the Superintendent.[FN25] *Greenwaldt v.. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at \*4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing, *inter alia, Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent

of prison where only allegation was that he ignored inmate's request for an investigation)).

> FN25. In any event, plaintiff's lost property claim has already been dismissed by the court.

In sum, based upon the lack of any showing of personal involvement on the part of defendant Bennett in the constitutional violations alleged, I recommend his dismissal from the action on this independent basis.

IV. *SUMMARY AND RECOMMENDATION*

Because plaintiff failed to file and pursue to completion a grievance regarding any of the claims asserted in his complaint, with the exception of the court access claim, the pursuit of those claims in this action is procedurally barred as a result of Applegate's failure to satisfy the PLRA's exhaustion requirement before filing suit. Turning to the merits of the claims advanced by the plaintiff, who has chosen not to file any response to defendants' summary judgment motion, I find that the record lacks any evidence from which a reasonable factfinder could conclude that excessive force was used by defendant Carlson against him during the course of a security-related pat-frisk, or that any of the defendants retaliated against him based upon, *inter alia,* his commencement of and pursuit of claims in *Applegate I.* Plaintiff's complaint is also deficient insofar as it alleges the denial of court access, based both upon the lack of any showing of involvement on the part of the defendants in the failure to provide adequate library facilities at Upstate over a brief period of time following its opening, and further based upon the fact that plaintiff has not established the existence of any injury or prejudice resulting from that alleged failure. Finally, I find that by virtue of plaintiff's failure to serve him, defendant Gardner is entitled to dismissal of plaintiff's claims against him, without prejudice, and further find that defendant Bennett is entitled to dismissal of all claims against him based upon the lack of any showing of personal involvement in the constitutional deprivations alleged.[FN26]

> FN26. In light of my findings with respect to merits of plaintiff's claims I find it unnecessary to address plaintiff's additional argument of entitled to qualified immunity. *See Saucier v. Katz,* 533

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)

(Cite as: 2008 WL 2725087 (N.D.N.Y.))


U.S. 194, 121 S.Ct. 2151 (2001).

**\*19** Based upon the foregoing, it is hereby

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 52) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety, without prejudice against defendant C.O. Gardner, but otherwise with prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2008.

Applegate v. Annucci
Not Reported in F.Supp.2d, 2008 WL 2725087 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 549440 (S.D.N.Y.)

(Cite as: 2007 WL 549440 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Michael LAWYER, Plaintiff,
v.
Timothy GATTO, Defendant.
No. 03 Civ. 7577 RPP.

Feb. 21, 2007.
Michael Lawyer, Cobleskill, New York, Plaintiff pro se.

Eliot Spitzer, Attorney General of the State of New York, New York, NY, By: Stephen Schulman, for Defendant.

OPINION and ORDER

PATTERSON, J.

**\*1** Defendant, Timothy Gatto, moves for summary judgment pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 56(c) in a lawsuit brought by Plaintiff, Michael Lawyer pursuant to 42 U.S.C. § 1983. As grounds for the motion, Defendant alleges that Plaintiff has failed to exhaust his claim as required by the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997(e) (2000). For the reasons that follow, Defendant's motion is denied.

*BACKGROUND*

A. Factual History
1. The Assault

According to Plaintiff, on April 15, 2003, while an inmate at Fishkill Correctional Facility ("Fishkill"), he was "physically assaulted" by Defendant in the office of the Corrections Officers ("CO"). (Plaintiff's Amended Complaint ("Am.Compl.") dated October 23, 2003.) Plaintiff contends that Defendant, CO Gatto, assaulted him because earlier that day Plaintiff had referred to Defendant, in front of two other COs, as "the jerk who has been writing me all the tickets." (*See* Ex. A to Affidavit of Michelle P. Stone ("Stone Aff."), dated March 14, 2006 at

3-12, Letter from Michael Lawyer, dated April 25, 2003 ("April 25, 2003 Letter").) At around 5:00 PM, Plaintiff was "called out" for his medication. On his way back from picking up his medications, he noticed Defendant sitting at the CO's desk. (*Id.*) When Plaintiff went to put his pass (to enable him to get medications) back in the appropriate box on the CO's desk, Defendant jumped up and said "get ... out of my face." (*Id.*) He then told Plaintiff to follow him into the CO's office, where he accused Plaintiff of calling him a jerk earlier in the day. (*Id.*) After a short exchange, Defendant allegedly told Plaintiff to "take the first punch, to which Plaintiff replied that he "was not a fighter." (*Id.*) Defendant hit Plaintiff in the stomach and chest, and then knocked him to the floor, shattering a coffee pot at the same time. Defendant then banged Plaintiff's head into the wall. (*See id.*) At this point Plaintiff states that the Sergeant came into the room, put handcuffs on him and took him to the Segregated Housing Unit ("SHU"). Plaintiff states that while Defendant was beating him up, the other COs were taunting him, and urging Defendant on. (*See id.*) A medical report from that day confirms that Plaintiff sustained cuts and abrasions on his right cheek, chest, and left arm. (*See* Health Assessment Form, dated April 15, 2003, attached to Am. Compl.)

2. The Disciplinary Proceeding

From April 21-28, 2003, a disciplinary hearing was held on a misbehavior report filed by CO Gatto in connection with the events of April 15, 2003. (*See* Def.'s Local Rule 56.1 Statement ("56.1 St.") ¶ 4; Ex. B to Declaration of Steven N. Schulman ("Schulman Decl."), dated March 14, 2006, Misbehavior Report dated April 15, 2003.) Plaintiff was found not guilty of "creating a disturbance," "interfering with employee" or "threats," (Ex. B to Schulman Decl., Superintendent's Hearing Disposition, dated April 28, 2003.) but was "found guilty of harassment and given 14 days keeplock and loss of privilege as sanction" by Captain Schneider (56.1 St. ¶ 4 .) Plaintiff appealed the ruling to the Director of Special Housing/Inmate Disciplinary Program, Donald Selsky, who affirmed the ruling. (*See* Ex. B to Schulman Decl.,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 549440 (S.D.N.Y.)

(Cite as: 2007 WL 549440 (S.D.N.Y.))

Review of Superintendents Hearing ("Tier III Hearing"), dated June, 30, 2003.) Plaintiff also appealed to Superintendent of Fishkill, William Mazzuca. (*See* Letter from William Mazzuca dated May 9, 2003 (denying Plaintiff's request for a discretionary review), attached to Am. Compl.)

3. Plaintiffs Attempts to Grieve

**\*2** Plaintiff states that on April 16, 2003, he met with "Captain Pike" to "discuss incident," and that an investigation was promised. (*See* Ex. B to Affidavit of Michael Lawyer ("Lawyer Aff."), dated June 7, 2006, Journal of Michael Lawyer April 15, 2003-November 26, 2004 [FN1] at 1 (recording meeting date on April 16, 2003); Ex. A to Stone Aff., Letter to IGRC, dated July 14, 2003 at 2 (noting that an investigation was promised).) He also states that on April 17, 2003, he met with Sergeant Garino, who also promised an investigation. (*See* Lawyer Aff. Ex. B at 1; Stone Aff. Ex. A. at 2.) Plaintiff also states that, while confined in the SHU, he forwarded two grievances for filing with the prison's Internal Grievance Review Committee ("IGRC"), one on April 19, 2003 and one on April 28, 2003, neither of which were responded to. (*See* Lawyer Aff. ¶ 3; Stone Aff. Ex A at 1.)

> [FN1.] If these journal entries were made contemporaneously, the journal may be admissible corroboration of Plaintiff's testimony.

During his time in the SHU, Plaintiff wrote a long, detailed letter, dated April 25, 2003, describing the incident. (*See* Lawyer Aff. ¶ 3; Ex. E.) Plaintiff states he sent copies of this letter to Mr. Mazzuca, Superintendent of Fishkill; Glenn Goord, Commissioner of DOC; "Inspector General of DOC [ ]"; Attorney General, Elliot Spitzer; and "Mr. Grady," the District Attorney of Dutchess County. (*See,* Lawyer Aff. Ex. E.) [FN2] Attached to Plaintiff's Amended Complaint is a letter from Superintendent Mazzuca's office, dated May 9, 2003, denying his request for a review of his Tier III hearing; the letter is silent, however, about Plaintiff's claims of harassment by Defendant set forth in the April 25, 2003 letter. (*See* Am. Compl.) Plaintiff states he was told, by Captain Schneider on July 7, 2003, that Superintendent Mazzuca was forwarding the matter to the Inspector General's office for investigation. (*See* Lawyer Aff. Ex B at 5.) A report filed by the Inspector General's office lists

a referral date of May 29, 2003. (*See* Ex. D to Schulman Decl., Report by Inspector Bigit, dated April 29, 2004) Inspector Bigit interviewed Plaintiff on July 8, 2003. (*Id.* at 1.)

> [FN2.] Plaintiff attaches letters responding to or referencing his claim from several of these agencies.

On July 14, 2003, Plaintiff sent a letter to the IGRC, which IGP supervisor Michelle Stone acknowledged receiving, and considered a grievance. [FN3] (*See* Ex. B to Lawyer Aff., Memorandum from Michelle Stone ("Stone Mem."), dated July 17, 2003.) In this letter, Plaintiff detailed his grievance against Defendant, and the steps he had taken to alert prison officials, including the two grievances he tried to file from SHU and the letter he had sent to Superintendent Mazzuca. (*See* Stone Aff. Ex. A.) Ms. Stone returned the grievance to Plaintiff on July 17, 2003 because it was filed more than 14 days after the incident. (*See* Stone Aff. Ex B .) She instructed Plaintiff that, in order for his complaint to be considered, he had to present a letter with "mitigating circumstances" for filing past the deadline. (*Id.*)

> [FN3.] Defendant treats this grievance as the first communication to which DOC officials were required to respond.

Plaintiff states he met with Ms. Stone on July 23, 2003 and that she told him that he had "done all he could do." (Lawyer Aff. ¶ 3 .) Ms. Stone denies having met Plaintiff. (*See* Stone Aff. ¶ 6 ("I have no recollection of meeting with plaintiff to discuss his grievance. It is my ordinary practice to record meetings with inmates ... [my] files ... contain no note of a meeting.").) She also denies having told him he had done all he could do. (*See id.* at ¶ 8 ("I would never tell an inmate that he had done all he could without first filing a grievance or that he should bring a federal legal action without first completing the grievance.").)

**\*3** On August 18, 2003, Plaintiff sent a complaint to Thomas Eagan, at the Central Office Review Committee ("CORC"), who returned the complaint instructing Plaintiff to "submit [the] grievance or appeal directly to

Not Reported in F.Supp.2d, 2007 WL 549440 (S.D.N.Y.)

(Cite as: 2007 WL 549440 (S.D.N.Y.))

the Grievance Clerk at the facility." (Ex C to Stone Aff., Letter from Thomas Eagan, dated August 28, 2003.)

The Inspector General Office's investigation concluded on April 29, 2004, and recommended that the case be closed because "the force that was used to restrain inmate Lawyer was minimal." (*See* Schulman Decl. Ex. D at 7.) On November 24, 2004, Plaintiff was released from Prison on parole.

B. Procedural History

Plaintiff's original Complaint was signed on June 19, 2003 and received by the Pro Se office on June 27, 2003. On September 25, 2003, Chief Judge Mukasey ordered Plaintiff to file an amended complaint showing that he had exhausted his administrative remedies. On October 23, 2003, Plaintiff filed his Amended Complaint, in which he detailed the steps he had taken to alert prison officials of his grievance, and asserted that he had exhausted his administrative remedies.

On January 22, 2004 the case was transferred to this judge. Defendant filed his Answer on October 18, 2004, including, as an affirmative defense, Plaintiff's failure to exhaust his administrative remedies. On March 16, 2006, after the completion of discovery, Defendant filed his Motion for Summary Judgment, based on Plaintiff's failure to exhaust his administrative remedies; Plaintiff filed his opposition on June 7, 2006; Defendant filed his reply on June 22, 2006.

*DISCUSSION*

A. Standard of Review

Summary judgment should only be granted when a court determines that there are "no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law." *Braham v. Clancy,* 425 F.3d 177, 181 (2d Cir.2005) (citing *Feingold v. New York,* 366 F.3d 138, 148 (2d Cir.2004)). The court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Id.* Furthermore, because Plaintiff is proceeding *pro se* "[the court should] read his papers liberally, interpreting them 'to raise the strongest arguments that they suggest.' " *Bennet v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

B. Exhaustion

1. Statutory Exhaustion

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). The Supreme Court recently ruled that the PLRA requires "proper exhaustion ... [which] demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo,* 126 S.Ct. 2378, 2386 (2006). Thus, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." *Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d. Cir.2006) (quoting *Woodford,* 126 S.Ct at 2382).

**\*4** However, the Second Circuit has held that:

[W]hile the PLRA's exhaustion requirement is mandatory, certain caveats apply. An inmates lawsuit may be allowed to proceed, despite failure to exhaust, if "administrative remedies are not available to the prisoner; ... defendants have either waived the defense of failure to exhaust or acted in such as way as to estopp them from raising the defense; or ... special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Id.* at 175 (internal quotations and citations omitted).[FN4] These exceptions recognize that "[t]he PLRA's exhaustion requirement is not so rigid as to permit the barring of all suits brought after administrative remedies are no longer available, regardless of the circumstances, and simply because the plaintiff failed to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 549440 (S.D.N.Y.)

(Cite as: 2007 WL 549440 (S.D.N.Y.))

follow prison grievance procedures to the letter." *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004).

> FN4. The Second Circuit has not yet addressed *Woodford's* impact, and the district courts in this circuit have continued to apply the caveats to cases involving the PLRA. *See e.g. Collins v. Goord,* 438 F.Supp.2d 399, 411 n. 13 (S.D.N.Y.2006); *Hairston v. LaMarche,* 05 Civ. 6642(KMW)(AJP), 2006 WL 2309592 *6 n. 9 (S.D.N.Y.2006); *Hernandez v. Coffey,* 99 Civ. 11615(WHP), 2006 WL 2109465, *3 (S.D.N.Y.2006).

2. DOC's Administrative Remedies

In 2003, for grievances regarding departmental and institutional complaints, New York State's Department of Corrections ("DOC") had a three step Inmate Grievance Program ("IGP") that an inmate had to follow to exhaust his or her complaint.[FN5] *See* N.Y. COMP.CODES. R. & REGS. TIT. 7 ("7 N.Y.C.R.R.") § 701.7 (2003). First, the inmate had to file a complaint with the grievance supervisor at his facility within 14 days of the alleged incident. *See id.* § 701.7(a)(1). If the inmate filed a grievance outside of this 14 day time period, his grievance would be denied as untimely unless he provided "mitigating circumstances" for his late filing. *Id.*[FN6] A timely grievance would be reviewed by the Independent Grievance Review Committee, ("IGRC"), a group of fellow inmates and prison officials. IGRC representatives "ha[d] up to seven working days to review a grievance" and either resolve it informally or hold a hearing on the complaint. *Id.* § 701.(a) (3), (a)(4). Second, the grievant had four days to appeal an adverse ruling by the IGRC to the facility's superintendent. If the grievance related to an institutional issue, the superintendent had 10 working days to respond. *Id.* § 701.7(b)(1), (b)(5)[FN7] Third, a denial of relief by the superintendent had to be appealed, within four days of receipt, to the Central Office Review Committee ("CORC") *Id.* § 701.7(c)(1). Only grievances that were reviewed by CORC were considered exhausted. *See e.g. Collins v. Goord,* 438 F.Supp.2d 399, 408 (S.D.N.Y.2006) ("In order to exhaust remedies, an inmate in a New York State correctional facility must pursue fully his complaint through DOC's three-step ... IGP.").

> FN5. The version of the IGP procedures cited in this opinion is the one that was in place in 2003, when this incident took place.

> FN6. Mitigating circumstances include "attempts to resolve informally by the inmate, referrals back to the IGP by the courts." *Id.* § 701.7(a)(1).

> FN7. A "departmental issue" is sent, by the superintendent, to the Central Office Review Committee upon receipt.

When an inmate grieved staff misconduct, or harassment,[FN8] however, the regulations provided for a different, "expedited procedure," 7 N.Y.C.R.R. at § 701.11. This process, as it existed at the time of the incident in this case, is reprinted here:

> FN8. "Employee misconduct meant to annoy, intimidate, or harm an inmate constitutes harassment." *Id.* at § 701.11(a).

**\*5** Section 701.11 Harassment.

(b) Procedure.

(1) An inmate who feels that s(he) has been the victim of employee misconduct or harassment should first report such occurrences to the immediate supervisor of that employee. This does not preclude submission of a formal grievance.

(2) All allegations of employee misconduct shall be given a grievance calendar number and recorded in sequence. All documents submitted with the allegation must be forwarded to the superintendent by close of business that day.

(3) The superintendent or his designee shall promptly determine whether the grievance, if true, would represent a bona fide case of harassment as defined in subdivision (a) of this section. If not, then it shall be returned to the IGRC for normal processing.

(4) If it is determined that the grievance is a bona fide harassment issue, the superintendent shall either:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 549440 (S.D.N.Y.)

(Cite as: 2007 WL 549440 (S.D.N.Y.))

(i) initiate an in-house investigation by higher ranking supervisory personnel into the allegations contained in the grievance; or

(ii) request an investigation by the inspector general's office or, if the superintendent determines that criminal activity is involved, by the New York State Police Bureau of Criminal Investigation.

(5) Within 12 working days of receipt of the grievance, the superintendent will render a decision on the grievance and transmit said decision, with reasons stated to the grievant, the IGP clerk, and any direct party of interest. Time limit extensions may be requested, but such extensions may be granted only with the consent of the grievant.

(6) If the superintendent fails to respond within the required time limit, the grievant may appeal his grievance to the CORC. This is done by filing a notice of decision to appeal with the IGP clerk.

(7) If the grievant wishes to appeal the superintendent's response to the CORC, he must file a notice of decision to appeal with the inmate IGP clerk within four working days of receipt of that response.

(8) All procedures, rights, and duties required in the processing of any other grievance as set forth in section 701.7(c) of this Part shall be followed.

7 N.Y.C.R.R. § 701.11.

C. Plaintiff's Administrative Remedies are Deemed Exhausted

Since Plaintiff's complaint related to harmful employee misconduct, it was reasonable for him to conclude that section 7011.11, the "harassment" section of the IGP applied to him. Plaintiff states that he met with Defendant's supervisors, Captain Pike and Sergeant Garino on April 16 and April 17, 2003 respectively, as required under section 701.11(b)(1). (*See* Stone Aff. Ex A at 1.). He also forwarded his grievance to Superintendent Mazzuca upon release from SHU, in a not unreasonable

interpretation of 701.11(b)(2). (*See* Lawyer Aff. ¶ 3.) He never received a response to the letter from the superintendent. [FN9]

> FN9. The May 9, 2003 letter from Superintendent Mazzuca is non-responsive since it only refers to Plaintiff's request for a review of his Tier III hearing, not his complaint of employee misconduct by Defendant.

By taking these steps, Plaintiff pursued all of the procedures required of inmates by section 701.11. *See Morris v. Eversley,* 205 F.Supp2d 234 (S.D.N.Y.2002) (holding that an inmate alleging harassment had exhausted her administrative remedies when she had reported the employee's misconduct to his immediate supervisors and had written a letter to the superintendent of the prison where she was an inmate).

**\*6** Defendant contends that Plaintiff has not exhausted his remedies because he never successfully submitted a grievance to the IGRC, as required under section 701.7 of the IGP. (Memorandum of Law in Support of Motion for Summary Judgment ("Def.'s Mem."), dated March 15, 2006 at 6.) In 2003, however, the expedited procedures did not plainly require an inmate complaining of CO misconduct to initiate the grievance process through the IGRC. *See Morris,* 205 F.Supp.2d at 240 ("[A]lthough Morris failed to file a grievance with the IGRC, she exhausted her remedies under § 701.11 of the IGP.").

In 2004, citing "confusion resulting from ambiguity in the current text," and noting that "numerous judicial opinions [had set] forth sometimes inconsistent analysis of the provisions of this regulation," DOC amended the harassment procedures to clarify that "inmates seeking expedited review of employee misconduct grievances are [still] required to file a level 1 grievance, rather than write directly to the prison superintendent." *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir2004) (quoting rule 28(j) letter from DOC's counsel). As contended by the plaintiff in *Hemphill,* in the unmodified version of the IGP, it was "manifestly unclear" that an inmate had to file a level 1 grievance before writing to the superintendent. *See id.* at 689.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 549440 (S.D.N.Y.)

(Cite as: 2007 WL 549440 (S.D.N.Y.))

In 2003, DOC's regulations said only that "[a]ll allegations ... shall be given a grievance calendar number and recorded in sequence with all other grievances ... [but] must be forwarded to the superintendent by the close of business day." 7 N.Y.C.R.R. 701.11(b)(2). Nowhere did section 701.11 state that an inmate was supposed to submit his grievance to the IGRC, as with institutional and departmental grievances. Section 7011.11 could reasonably be interpreted as stating (1) that an inmate should grieve only to the employee's "immediate supervisors," as required by section 701.11(a), who would then alert the superintendent; or (2) that an inmate should grieve both to the employee's "immediate supervisors" *and* write to the superintendent. Plaintiff reasonably pursued the latter course. *See Giano,* 380 F.3d at 679 (vacating dismissal of inmate's federal complaint because "even assuming that Giano read DOCS regulations incorrectly, his interpretation was hardly unreasonable.").

Moreover, Defendant's contention that Plaintiff failed to comply with DOC regulations because he did not file a timely "level one" grievance raises a genuine factual issue because Plaintiff has asserted that he made two timely attempts to grieve from the SHU in April, 2003. (*See* Lawyer Aff. ¶ 3.)

The Second Circuit has held that an inmate is excused from the PLRA's exhaustion requirement when "administrative remedies are not available to the prisoner." *Ruggiero,* 467 F.3d at 175 (2d Cir.2006) (internal quotations and citations omitted). "To be available under the PLRA, a remedy must afford 'the possibility of some relief for the action complained of." *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004).

**\*7** Plaintiff asserts that while in the SHU, he submitted two IGRC grievances, both within the 14 day time limit, to COs making rounds in the SHU, but that the IGRC did not respond. (Lawyer Aff. ¶ 3; Stone Aff. Ex. A at 1 ("Apparently the CO's on SHU didn't put my letters in the grievance box.").) The IGP devotes a section of its regulations to ensuring that prisoners can grieve from SHU. *See* 7 N.Y.C.R.R. § 701.13 ("The following procedure contains the minimum standards for filing grievances by inmates in SHU areas and is to be instituted at all correctional facilities.") Among other things, it

instructs the prison that "[a]rea supervisors will ensure that the completed grievances are placed in sealed envelopes, collected and forwarded to the IGRC office." *Id.* at § 701.13(3).

In *Hairston v. LaMarche,* 2006 WL 2309592 *8 (S.D.N.Y.2006) "[The plaintiff] had been placed in the SHU immediately after the incident and he alleg[ed] that, contrary to DOCS policy, he was never aware of any IGRC staff making rounds in SHU." *Id.* The court found that "Hairston's testimony ... create[d] an issue of fact as to whether administrative procedures were 'available' to him while he was in SHU." *Id.* Here, Plaintiff was aware of the existence of the administrative process and submitted two grievances while in the SHU; however, he got no response from the IGRC. Thus he raises an issue as to whether DOC's administrative remedies were, in fact, made available to him when he attempted to submit timely grievances.

Defendant argues that, despite the difficulties Plaintiff may have encountered while in the SHU, Plaintiff's letter to the IGRC (Ms. Stone), written on July 14, 2003 and received by Ms. Stone on July 16, 2003 shows that administrative remedies were available to him. (Def.'s Mem. at 12); *see Cole v. Miraflor,* 02 Civ 9981(RWS) 2006 WL 457817, *5 (S.D.N.Y., 2006) ("The very fact that DOCS' policies provide for the filing of late grievances where there are mitigating circumstances, demonstrates that administrative remedies were available to Plaintiff."). Defendant claims that Plaintiff's failure to resubmit his grievance, with allegations of mitigating circumstances, to the IGRC when given the chance to do so by Ms. Stone, shows that he failed to use the remedies extended by the prison's internal grievance system.

However, Ms. Stone's actions in response to Plaintiff's July 14, 2003 letter estopp Defendant from claiming that Plaintiff was at fault for not making full use of the prison's grievance system. *See Giano,* 380 F.3d at 677 ("[W]e have held that non-exhaustion is an affirmative defense subject to estoppel in cases where prison officials inhibit an inmate's ability to utilize administrative grievance procedures." (citing *Ziemba v. Wezner* 366 F.3d 161, 163-64 (2d Cir.2004)). Plaintiff's July 14, 2003 letter was rejected by Ms. Stone as untimely. In that letter Plaintiff

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 549440 (S.D.N.Y.)

(Cite as: 2007 WL 549440 (S.D.N.Y.))

set forth a number of mitigating circumstances for his untimely filing, including the fact that he filed grievances from the SHU, that he had spoken with several of CO Gatto's supervisors about the incident, and that he had filed a letter with Superintendent Mazzuca. (*See* Stone Aff. Ex. A.) Any of these reasons qualified as mitigating circumstances under the regulations. (*See supra* n. 6 (citing DOC's definition of mitigating circumstances).) Ms. Stone did give Plaintiff the option of refiling and "presenting mitigating circumstances." (Stone Aff. Ex. B.) However, in doing so, she was rejecting the mitigating circumstances Plaintiff cited in the letter he had already submitted. Her rejection of Plaintiff's mitigating circumstances effectively found that his allegations were insufficient and thus denied him further use of the prison's grievance system. Indeed, Plaintiff appealed to CORC and was referred back to the IGRC. (Stone Aff. Ex. C.) Plaintiff should not be blamed for refusing to continue this "never ending cycle of exhaustion." *Abney,* 380 F.3d at 669.

**\*8** Defendant also contends that Plaintiff's failure to appeal Superintendent Mazzuca's failure to respond to his letter should bar his federal claim. (*See* Def.'s Mem. at 6, 14.) Section 701.11(b)(6) states that "[i]f the superintendent fails to respond within the required time limit, the grievant may appeal his grievance to the CORC." *Id.* Because the PLRA requires an inmate to "us[e] all steps that the agency holds out." *Ruggerio,* 467 F.3d at 175, Plaintiff should have appealed Superintendent Mazzuca's failure to respond to show exhaustion before submitting his Original Complaint in June 19, 2003. However, when Plaintiff filed his Amended Complaint on October 23, 2003, he was aware that the superintendent had taken action on his grievance; he knew it had been forwarded to the Inspector General's office, having been told so by Captain Schneider on July 7, 2003, and interviewed by Inspector Bigit on July 8, 2003. Since an investigation was the only relief available from the superintendent under the IGP, *see* 7 N.Y.C.R.R. § 701.11(b)(4), Plaintiff had no reason to believe he needed to appeal the superintendent's failure to respond to the CORC. As Judge Peck noted recently:

DOCS procedures as to an administrative appeal are unclear to this Court where, as here, the Superintendent

has directed that the complaint be investigated by the Inspector General's Office.... At that stage, the inmate has obtained at least partial favorable relief, and as the Second Circuit has held, where the inmate receives favorable relief there is no basis for administrative appeal.

*Hairston,* 2006 WL 2309592 at \*9 (citing *Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004)).

Defendant contends that Plaintiff should have at least awaited Mr. Bigit's report before filing his federal lawsuit. (Def.'s Mem. at 14.) Although Plaintiff's Amended Complaint was filed before the Inspector General's office had notified him that his claim of excessive force was considered unsubstantiated, section 701.11 contained no language advising Plaintiff that he must await the result of this report for his administrative remedies to be considered exhausted. Nor did this section state that in the event of an adverse report from the Inspector General an appeal to CORC was available.

Under these circumstances, Plaintiff's failure to await Mr. Bigit's report was justified by the opacity of section 701.11. *See Giano,* 380 F.3d at 679. It may be that DOC's intent was frustrated when Plaintiff brought his federal complaint before the investigation into his grievance had been completed and appealed. It was, however, DOC's responsibility to make that clear to prisoners through its regulations; it did not. Since it does not appear that Plaintiff's brought suit before Mr. Bigit's investigation concluded in an attempt to "circumvent the exhaustion requirement" in order to "bypass administrative procedural rules," *Giano,* 380 F.3d at 677, he must now be allowed to proceed.

*CONCLUSION*

**\*9** Defendant's Motion for Summary Judgment is denied. The trial is set for Monday, April 23, 2007. A joint pretrial order should be filed by April 16, 2007. There will be a telephone conference with both parties on February 28, 2007 at 9:00 AM; at this time, the Court should be advised if the parties have settled the case.

IT IS SO ORDERED.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 549440 (S.D.N.Y.)

(Cite as: 2007 WL 549440 (S.D.N.Y.))

S.D.N.Y.,2007.

Lawyer v. Gatto
Not Reported in F.Supp.2d, 2007 WL 549440 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2009 WL 799969 (N.D.N.Y.)

(Cite as: 2009 WL 799969 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Patricio LINARES, Plaintiff,
v.
ALBRITH, Registered Nurse; Eri Schwebke; Anthony
DeLarosa,[FN1] Administrator for the Messhall; and R.N.
Nurse Kudlack, Defendants.

> FN1. Plaintiff misnamed Defendants "Albrith,"
> "DeLaRosa," and "Eri Schwebke," whose correct
> names are M. Joy Albright, Anthony DeRosa,
> and Eric Schwebke. The Court shall refer to
> these Defendants by their proper names.

Civ. No. 9:03-CV-1408 (LEK/RFT).

Jan. 9, 2009.
West KeySummary**Civil Rights 78** 🔑 **1319**

78 Civil Rights

    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion
of State or Local Remedies
            78k1319 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
    The Prison Litigation Reform Act (PLRA) precluded
a state inmate from bringing his federal civil rights action,
which alleged that prison officials failed to provide timely
medical treatment for his fractured finger, in federal court
as a result of failing to exhaust administrative remedies.
There was no dispute that the inmate's grievance was not
appealed to the Central Office Review Committee for a
final administrative determination. 42 U.S.C.A. § 1983; 42
U.S.C.A. § 1997e(a).
Patricio Linares, Batavia, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Richard Lombardo, Esq., Assistant Attorney
General, Megan M. Brown, Esq., Assistant Attorney

General, of Counsel, Albany, NY, for Defendants.

### *REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** *Pro se* Plaintiff Patricio Linares brought a civil
rights action, pursuant to 42 U.S.C. § 1983, alleging that
all of the above named Defendants violated his
constitutional rights when they failed to provide timely
medical treatment for his fractured finger. Dkt. No. 1,
Compl. at ¶¶ 40-42. He further alleged that Defendants
Kudlack's and Albright's failure to provide timely medical
attention was done in retaliation for past grievances
Linares filed against them. *Id.* at ¶¶ 18, 40, & 42.
    On September 26, 2007, this Court issued a
Report-Recommendation and Order recommending that
the Honorable Lawrence E. Kahn, Senior United States
District Judge, grant Defendants' Motion for Summary
Judgment and dismiss the entire Complaint. Dkt. No. 85.
The basis for our recommendation of dismissal was our
determination that the Defendants' actions did not amount
to violations of Plaintiff's constitutional rights. We then
reasoned that without the constitutional violation, there
was no need to consider the Defendants' affirmative
defense that Plaintiff failed to exhaust administrative
remedies. *Id* at p. 13. Those recommendations were
adopted by Judge Kahn and Judgment was issued on
behalf of Defendants on December 4, 2007. Dkt. Nos.
88-89. Plaintiff appealed that Decision and Judgment to
the Second Circuit Court of Appeals. Dkt. No. 90.
Thereafter, on November 20, 2008, the Second Circuit
issued a Mandate upholding the Court's ruling in so far as
the Court dismissed the claims against Defendants
Kudlack and DeRosa. Dkt.No. 97.[FN2] However, the
Second Circuit remanded the matter to the District Court
for the limited purpose of supplementing the record as to
whether Plaintiff exhausted his administrative remedies
with respect to his deliberate indifference claims against
Defendants Albright and Schwebke and his retaliation
claim against Defendant Albright. *Id.* (citing the
procedures set forth in *United States v. Jacobson*, 15 F.3d
19, 21-22 (2d Cir.1994), wherein the Circuit maintains its

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 799969 (N.D.N.Y.)

(Cite as: 2009 WL 799969 (N.D.N.Y.))

jurisdiction over the appeal thus obviating the need for the filing of a new notice of appeal after the District Court supplies its supplementation).

> FN2. The Mandate was not docketed until December 2, 2008. On December 3, 2008, Judge Kahn referred the matter back to this Court for a Report and Recommendation. Dkt. No. 98.

We start by stating the general law regarding a prisoner's obligation to exhaust available administrative remedies and then assess whether Plaintiff indeed satisfied his obligation with regard to the claims asserted against Defendants Schwebke and Albright.

## I. DISCUSSION

The Prison Litigation Reform Act of 1996 (PLRA) imposes several restrictive conditions on a prisoner's ability to bring a federal civil rights action. With regard to the issue before this Court, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citations omitted).

*2 Exhaustion of administrative remedies under the PLRA is an affirmative defense which must be raised and proven by the defendants. Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir.1999) (noting that exhaustion of remedies is an affirmative defense); Howard v. Goord, 1999 WL 1288679, at *3 (E.D.N.Y. Dec.28, 1999) (citations omitted) (noting that the burden remains with the defendants to prove that administrative remedies had not been exhausted). The party opposing the affirmative defense "may delay the ultimate determination as to its validity until trial by showing that there is a genuine issue of material fact to be determined." Id. (citations omitted).

In New York State, the administrative remedies

consist of a three-step review process. First, a grievance is submitted to the Inmate Grievance Review Committee (IGRC), a committee comprised of both inmates and facility employees. FN3 N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaint and then issues a written determination. Id. Second, if the IGRC decision is appealed, the superintendent of the facility reviews the IGRC's determination and issues a decision. Id. at § 701.5(c). Finally, if the superintendent's decision is appealed, the Central Office Review Committee (CORC) makes the final administrative determination. Id. at § 701.5(d). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to § 1983 in federal court. Cosme v. Furman, 584 F.Supp.2d 610, 2008 WL 4823604, at *1 (W.D.N.Y. Nov.6, 2008) (citing Neal v. Goord, 267 F.3d 116, 121 (2d Cir.2001), overruled on other grounds by Porter v. Nussle, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12).

> FN3. The IGRC is a five-member body consisting of two voting inmates, two voting staff members, and a non-voting chairperson (who may be an inmate, staff member, or volunteer). N.Y. COMP.CODES R. & REGS tit.7, § 701.4.

Plaintiff's claimed constitutional violations evolved from an accident that occurred on December 5, 2000, when a pan fell on Plaintiff's right hand while he was performing his duties as a back-sink worker in the Coxsackie Correctional Facility mess hall. Compl. at ¶ 16. Since the Second Circuit affirmed the District Court's dismissal of the Eighth Amendment claims against Defendants DeRosa and Kudlack, we need not reiterate those claims here. We will, however, briefly restate the bases for the Eighth Amendment claims against Defendants Schwebke and Albright and the First Amendment claim against Albright. Linares asserted that Defendant Schwebke, the Head Cook, violated the Eighth Amendment when, after being informed of the sink accident, refused to send Plaintiff to the infirmary so he could get medical attention for his right hand injury. FN4 Id. at ¶¶ 21-27. Plaintiff further asserted that Nurse Albright was deliberately indifferent to his serious medical needs when she failed to "produce" Plaintiff to the infirmary as promised and when she failed to order necessary x-rays for

Slip Copy, 2009 WL 799969 (N.D.N.Y.)

(Cite as: 2009 WL 799969 (N.D.N.Y.))

Plaintiff. *Id.* at ¶ 17 & 19. Finally, Plaintiff asserted that Albright acted in this manner in retaliation against Linares for his previously filed grievances against Albright in 1999 and 2000. *Id* at ¶¶ 18, 40, & 42. The following facts relate to the issue of whether Plaintiff fully exhausted his administrative remedies with respect to his deliberate indifference claims against Defendants Albright and Schwebke and his retaliation claim against Defendant Albright.[FN5]

> **FN4.** In our prior Report-Recommendation and Order, we noted that Linares appeared to hold Defendants Schwebke and DeRosa responsible for the accident he sustained since the former allegedly failed to provide proper training and protective gloves while the latter allegedly failed to ensure that his subordinates properly trained the workers and provided proper materials. Compl. at ¶¶ 26-27. In addressing this allegation, we stated that "[absent any allegation that either of these Defendants physically caused the pan to fall onto Plaintiff's arm, we believe Plaintiff's attempt to assert an Eighth Amendment claim on these facts is far too tenuous." Dkt. No. 98 at p. 7, n. 4. We are unsure as to whether the Second Circuit seeks supplementation as to Plaintiff's exhaustion of this purported claim.

> **FN5.** We take this moment to note that in opposing Defendants' Motion for Summary Judgment, Linares submitted a document entitled "Statement of Material Facts pursuant to Rule 7.1(a)(3)." Dkt. No. 84 at pp. 3-9. That document, however, did not "mirror the movant[s'] Statement of Material Facts by admitting and/or denying each of the movant[s'] assertions in matching numbered paragraphs." N.D.N.Y.L.R. 7.1(a)(3). In fact, Plaintiff's purported 7.1 Statement bears almost no correlation to Defendants' 7.1 Statement. *Compare* Dkt. No. 77-16, Defs.' 7.1 Statement *with* Dkt. No. 84, Pl.'s 7.1 Statement. As in our previous Report-Recommendation and Order, we are mindful of Plaintiff's *pro se* status and shall, in developing the undisputed facts, refer to his verified Complaint and deposition testimony

when practicable. However, *pro se* status notwithstanding, in light of Plaintiff's failure to *specifically* controvert facts asserted by Defendants, "[a]ny facts set forth in the [Defendants'] Statement of Material Facts shall be deemed admitted[.]" N.D.N.Y.L.R. 7.1(a)(3).

**\*3** In support of their Motion for Summary Judgment, Defendants submitted the Declaration of Thomas J. Carroll, Sr., the Inmate Grievance Program Supervisor at Coxsackie. Dkt. No. 77-8, Thomas J. Carroll, Sr., Decl., dated Feb. 7, 2007. After being apprised of Linares' claims in this action and reviewing Coxsackie records, Mr. Carroll determined that the only grievance Linares filed concerning the December 5th accident and the treatment he received for his injury is grievance number CX-8048-01. *Id.* at ¶ 9, Ex. E; Defs.' 7.1 Statement at ¶ 58. This grievance was completed by Plaintiff, in Spanish, on February 1, 2001, almost two months after the incident, and was received by the IGRC on February 9, 2001, and filed on February 12, 2001; it was also translated into English. Carroll Decl., Ex. E. According to the translated version of the grievance, Linares provides a summary of how he fractured his finger on December 5th and the medical care he received, or didn't receive, during that month. *Id.* at p. 4. After noting that he previously filed two grievances against Nurse Albright for medical negligence, Linares explains that his cast is broken and despite informing unnamed members of the medical department, nothing had been done to rectify the situation. *Id.* Though ample details were provided regarding the quality of medical treatment Linares received at Coxsackie, the only relief sought by the grievance was to have copies of his complaint sent to various individuals including the Inspector General, the Attorney General of the State of New York, the Commissioner, and Lester Wright. *Id.*

After submitting this grievance, but prior to any decision being rendered by the IGRC, Plaintiff had a follow-up examination, on February 7, 2001, by an orthopedist wherein Plaintiff's cast was removed and an x-ray was taken. Defs.' 7.1 Statement at ¶ 47. At that time, the consulting orthopedist determined that Plaintiff's fracture was healing. *Id.* On March 2, 2001, the IGRC rendered its unanimous decision recommending that Linares be seen by a doctor as soon as possible. Carroll

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 799969 (N.D.N.Y.)

(Cite as: 2009 WL 799969 (N.D.N.Y.))

Decl., Ex. E at p. 9. Linares indicated his agreement with the IGRC response by checking the appropriate box and affixing his signature therewith. *Id.* He did not check the boxes indicating his disagreement with the IGRC decision or that he desired to appeal this matter to the superintendent. *Id.* Nevertheless, as explained by Mr. Carroll, because "action by the superintendent was required," the grievance was automatically referred to the superintendent.[FN6] Carroll Decl. at ¶ 11. On March 12, 2001, the superintendent rendered the following response to Linares' complaint: "This grievance is accepted only to the extent that the grievant received appropriate medical attention. If the grievant wants his complaint sent to anyone else, he is free to do so." *Id.,* Ex. E at p. 2. The portion of that decision wherein Linares could state his desire to appeal the superintendent's decision to the CORC was left blank. *Id.* According to Mr. Carroll's review of Coxsackie records, Plaintiff did not appeal the superintendent's decision to CORC.

> FN6. It is not entirely clear why this disposition "required" action by the superintendent. Defendants supplied the Court with DOCS Directive 4041, which sets forth the parameters of the Inmate Grievance Program. Carroll Decl., Ex. D. It appears that this Directive is the most current Directive as it mirrors the language in Title 7 of the New York Codes Rules and Regulations at § 700. 1, *et seq.* In this version, committee decisions requiring superintendent action "shall be in the form of recommendations .... [and] must be transmitted to the superintendent for action and response," DOCS Directive 4041(V)(A)(4), and a time-table is provided for transmittal to the superintendent, DOCS Directive 4041(V)(B)(2). While there appears to be a lack of any list explaining which committee decisions require superintendent action, upon information and belief, any favorable ruling by the IGRC must be implemented by the superintendent. *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (citing a former version of N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(4)(vi) for the proposition that "DOCS regulations mandate that favorable IGRC recommendations requiring action by the superintendent [are] transmitted to the superintendent for review, regardless of whether the inmate makes a formal appeal of that favorable action").

**\*4** At his deposition, Plaintiff testified that after suffering the injury to his right hand, he could not write, but once the cast was removed, he filed a grievance against Defendants Schwebke and DeRosa, which was accepted for filing as CX-8048-01. Dkt. No. 77-9, Richard Lombardo Decl., dated Feb. 12, 2007, Ex. F, Deposition of Patricio Linares, dated Sept. 16, 2005, at p. 32, lines 20-25 & p. 33, line 7. Linares explained that he wrote the grievance in Spanish and it was translated to English, however, much was lost in the translation, such as his complaints about DeRosa and about the mess hall rules. *Id.* at p. 33, lines 19-25; p. 34, lines 1-4 & 17-20. He further explained that the whole grievance is about Defendants DeRosa and Schwebke regarding what transpired at the mess hall. *Id.* at p. 34, line 25; p. 35, lines 1-7. Linares claimed that at the time he wrote the grievance, he did not have Defendant Schwebke's full name, but instead referred to him as "Eri" because that is what everyone called him. *Id.* at p. 36, lines 12-25. The substance of his complaints against "Eri" was that he put the mess hall rules out in the open for all to see only after Linares broke his hand. *Id.* Later in his testimony, Linares claims that he also grieved the fact that Eri did not send him to the infirmary. *Id.* at p. 39, lines 11-18. In response to questions about his failure to appeal, Linares referred to the IGRC recommendation and explained that because he agreed with his decision, he did not need to appeal. *Id.* at p. 41, lines 9-20. Yet, in his verified Complaint, Linares stated that the CORC, "the last appeal resort, denied the grievance claiming that plaintiff had received appropriate medical care." Compl. at ¶ 5.

Based upon our review of the record and uncontested material facts outlined above, we conclude that (1) there is no dispute that an inmate grievance procedure existed at Coxsackie, (2) Linares filed only one grievance pertaining to his December 5th injury and the ensuing treatment of his injury, (3) the IGRC recommended that Linares be seen by a doctor as soon as possible, and (4) the superintendent accepted the grievance "to the extent that [Linares] received appropriate medical attention[,]" but, if

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 799969 (N.D.N.Y.)

(Cite as: 2009 WL 799969 (N.D.N.Y.))

he wanted his complaint sent elsewhere he was free to do so on his own, Carroll Decl., Ex. E. We also conclude there is no real dispute that such grievance was not appealed to the CORC.[FN7] Thus, irregardless of our review of the content grieved in grievance CX-8048-01, it would appear that Plaintiff did not fully exhaust his available administrative remedies with respect to any claim raised in his Complaint.

> FN7. The only "dispute" as to whether an appeal was brought to the CORC is manifested by Plaintiff's discrepant testimony. In his verified Complaint, Plaintiff states that he appealed to CORC who determined he received appropriate medical care, yet, at his deposition, he swore under oath that he did not need to further appeal his grievance beyond the IGRC decision because it had been resolved in his favor. The Court will not accept this self-contradiction as a means of defeating summary judgment. *See Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987) (citing cases for the "well settled" proposition that "a party's affidavit which contradicts is own prior deposition testimony should be disregarded on a motion for summary judgment"); *see also AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.,* 361 F.Supp.2d 312, 316 (S.D.N.Y.2005) (citing cases and extending this proposition to inconsistent allegations made in a complaint and further noting that given the "increased level of reliability of deposition testimony" the court could not "simply disregard plaintiff's earlier sworn testimony in favor of inconsistent post hoc statements prepared for purposes of [the] lawsuit"). Similarly, this Court will not disregard Plaintiff's deposition, and, notwithstanding the clear contradiction, the record clearly shows that no appeal was taken to CORC.

However, our inquiry cannot end there, for there is more to the analysis of this affirmative defense. Though exhaustion is mandatory, certain caveats apply wherein a prisoner's failure to exhaust may be excused: (1) when administrative remedies are not available to the prisoner, *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004); (2) when the defendants waive the defense by failing to raise or

preserve it, *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004), or acted in such a manner that they are estopped from raising it, *Ziemba v. Wezner,* 366 F.3d 161 (2d Cir.2004); and (3) when special circumstances exist to justify the prisoner's failure to comply with the exhaustion requirement, *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004). No where in his opposition to Defendants' Motion to Summary Judgment, does Linares address whether he in fact sufficiently satisfied his obligation to exhaust his available administrative remedies prior to bringing suit in federal court. Yet, there exists in the record at least some explanation for this deficiency, which, given his *pro se* status, we are compelled to consider. Specifically, at his deposition, Linares claimed he did not appeal any further because he felt he received a favorable response from the IGRC. Plaintiff's excuse that he received a favorable determination falls within the first category, prompting the Court to evaluate whether further administrative remedies were *available* to Linares.

**\*5** According to the English translation of Linares' grievance, he complained about the medical treatment of his broken arm. Nurses Kudlack and Albright are specifically named and specific reference is made to the grievances Linares filed against Nurse Albright in 1999 and 2000 for medical negligence. In the conclusion portion of the English translation, Linares explains that his cast is broken in two pieces and nothing had been done to remedy the situation, though the specific request for relief is that copies of his complaint be sent to various individuals. The English translation provides no reference to Defendant Schwebke either by name or circumstance. Without hesitation, this Court could find that in viewing the evidence most favorably to Plaintiff, the English version of the grievance includes complaints against Nurse Albright for deliberate indifference and retaliation, but does not include the claim of deliberate indifference against Schwebke.

The Spanish, original version of the grievance is visibly longer and, according to Linares' deposition testimony, included more details, including problems he had with Defendant Schwebke, who he did not know by name at that time. According to Linares' testimony, the Spanish version contains the complaint that Schwebke failed to send him to the infirmary for medical attention.

Slip Copy, 2009 WL 799969 (N.D.N.Y.)

(Cite as: 2009 WL 799969 (N.D.N.Y.))

Again, if we were to construe the record in a light most favorable to Plaintiff, we could say that he included deliberate indifferent claims against Defendants Schwebke in his original grievance. Thus, taking the two versions of the grievance together, we can conclude that Plaintiff completed the first of his tri-level obligation to fully exhaust available administrative remedies. Because he did not appeal this grievance through each level of review, the question for the Court is, did the IGRC's/superintendent's favorable response render other administrative remedies unavailable? [FN8]

> FN8. Upon information and belief, at the time Linares filed his grievance and received a determination therewith, there was no mechanism in DOCS regulations for appealing a favorable determination. *See Abney v. McGinnis,* 280 F.3d 663, 668 (2d Cir.2004) (noting that while a favorable IGRC response is automatically transmitted to the superintendent for action, "[t]here is no similar procedure available for automatic advancement of a favorable ruling from the superintendent to the CORC"). In 2006, the regulations were amended and a new section was added allowing for oversight and follow-up to ensure implementation of favorable dispositions are carried out. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(c)(4) ( "Implementation of decisions. The IGP supervisor or the superintendent must verify compliance with superintendents' responses that require some form of implementation. Documentation of compliance must be filed with the grievance record. If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), *adopted on* June 28, 2006 by New York Regulation Text-Netscan, 2006 N.Y. REG TEXT 7 NYCRR 701 (JUNE 28, 2006), *effective* July 1, 2006.

To be "available" under the PLRA, a remedy must afford "the possibility of some relief for the action complained of." *Booth v. Churner,* 532 U.S. 731, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). To answer our question, we must look not only at the matters grieved and

responses received, but also the matters at issue in this action keeping in mind that the concept of "availability" speaks to the "procedural means, not the particular relief ordered," since "one 'exhausts' processes, not forms of relief." *Id.* at 739. Thus, though an inmate may be interested in obtaining solely monetary relief, the fact that the grievance program does not afford such relief does not mean that other administrative remedies are not available to the prisoner. *See generally id.* While Linares may have grieved Albright's and Schwebke's deliberate indifference and Albright's retaliation, the IGRC's response was that he receive immediate medical attention, perhaps in response to the fact that he claimed he had a broken cast and no one would fix it. The superintendent then accepted the grievance to the extent Linares' received proper medical care, perhaps due to the fact that he, by that point, had seen a doctor who had removed the cast and provided another x-ray. Regardless of these postulations, the fact remains that Plaintiff's civil Complaint makes no mention of a failure to fix a broken cast and the relief sought is well beyond the desire for medical care. The fact that Plaintiff felt the IGRC was favorable to him did not excuse his obligation to pursue available remedies with regard to his claims against Defendants Albright and Schwebke. In *Ruggiero v. County of Orange,* the Second Circuit grappled with the situation where an inmate sought a transfer from his cell for fear that his cell mate may harm him; instead of being transferred to a new cell, the prisoner was transferred to another facility. 467 F.3d 170, 177 (2d Cir.2006). Though in his lawsuit he asserted that the transfer to another facility was retaliation for his complaints, the inmate claimed he did not need to file a grievance since he had been afforded the remedy he desired, namely, transfer out of his cell and out of harms way. The Second Circuit considered its past decisions and Supreme Court precedent and determined that administrative remedies were still available. In rendering this decision, the Second Circuit distinguished the case from the situation in *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), wherein the inmate kept receiving favorable decisions that were never implemented, and instead relied upon *Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) and *Braham v. Clancy,* 425 F.3d 177 (2d Cir.2005), for the proposition that other remedies still existed such as disciplining the officers or changing policy and thus being provided with a desirable result did

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 799969 (N.D.N.Y.)

(Cite as: 2009 WL 799969 (N.D.N.Y.))

not render all remedies unavailable. *Id.* Similarly, with regard to the claims in this action, Linares had other remedies available to him prior to initiating this federal case. Arguably, though the IGRC's/superintendent's response was acceptable, it did not address his complaints against the Defendants in this action. Linares could have pursued the fact that neither the IGRC nor the superintendent took any action with regard to his complaints of employee misconduct. Linares' receipt of medical care, while arguably providing him with some relief sought, "did not provide him with all of the relief available to him.... [and] so long as some remedy remains available, failure to exhaust is not excused." *Ruggiero v. County of Orange,* 467 F.3d 170,177 (2d Cir.2006).

## II. CONCLUSION

**\*6** For the reasons stated herein, it is hereby
**RECOMMENDED,** that in supplementing the record to the Second Circuit, the District Judge adopt the facts as set forth by this Court as undisputed and find that the Plaintiff did not exhaust his available administrative remedies with regard to the deliberate indifference claims stated against Defendants Schwebke and Albright nor the retaliation claim against Defendant Albright; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action at the addresses listed above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

PATRICIO LINARES,

Plaintiff,

-v-

ALBRITH, Registered Nurse; FN1 *et al.,*

> FN1. As noted in the Report-Recommendation, Plaintiff misnamed Defendants "Albrith," "DeLaRosa," and "Eri Schwebke," whose correct names are M. Joy Albright, Anthony DeRosa and Eric Schwebke.

Defendants.

## *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.
This matter comes before the Court following a Report-Recommendation filed on January 9, 2009 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 101).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. Objections to the Report-Recommendation were due by January 26, 2009. On January 21, 2009, the Court granted Plaintiff's request for an extension until February 23, 2009 to file objections to the Report-Recommendation. Dkt. No. 102. On February 25, 2009, the Court received another request for an extension. Dkt. No. 103. Per Text Order dated February 27, 2009, the Court granted Plaintiff a further extension until March 20, 2009. On March 20, Plaintiff filed yet another request for an extension (Dkt. No 104), which the Court denied per Text Order on March 23, 2009.

Thus, no objections have been raised in the allotted time with respect to Judge Treece's Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 799969 (N.D.N.Y.)

(Cite as: 2009 WL 799969 (N.D.N.Y.))


**ORDERED,** that the Report-Recommendation (Dkt. No. 101) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that in supplementing the record to the Second Circuit, the Court adopts the facts as set forth by Magistrate Judge Treece in the Report-Recommendation as undisputed, and finds that the Plaintiff did not exhaust his available administrative remedies with regard to the deliberate indifference claims stated against Defendants Schwebke and Albright nor the retaliation claim against Defendant Albright; and it is further

**\*7 ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2009.

Linares v. Albrith
Slip Copy, 2009 WL 799969 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 666103 (N.D.N.Y.)

(Cite as: 2011 WL 666103 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Gregory FERGUSON, Plaintiff,
v.
COLE,[FN1] Correctional Officer, Auburn Correctional
Facility, Defendant.

> FN1. The correct spelling of this Defendant's
> name is "Jody Kowal" and the Court will refer to
> him as such. Dkt. No. 12 at p. 2; Dkt. No. 16 at
> ¶ 3.

Civ. No. 9:09-CV-549 (DNH/RFT).

Jan. 24, 2011.
Gregory Ferguson, Pine City, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Michael G. McCartin, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for Defendant.

***REPORT-RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** *Pro se* Plaintiff Gregory Ferguson brings this civil
rights action, pursuant to 42 U.S.C. § 1983, alleging that,
while housed at Auburn Correctional Facility, Defendant
Kowal violated his constitutional rights when he failed to
transfer Plaintiff out of a double-bunked cell as Plaintiff
requested, thereby failing to protect him from his cell mate
who physically assaulted Plaintiff. *See generally* Dkt. No.
8, Am. Compl. Pending before this Court is Defendant
Kowal's Motion for Summary Judgment, pursuant to
Federal Rule of Civil Procedure 56(c), based solely on
Plaintiff's purported failure to fully exhaust his available
administrative remedies. Dkt. No. 21. Defendant claims
that Plaintiff failed to present his failure to protect claim
to the highest level of administrative review, namely the
Central Office Review Committee (CORC). *See generally*

*id.* Plaintiff opposes the Motion, claiming he ultimately
received the relief sought through the grievance process
and therefore had nothing further to appeal. Dkt. No. 24.
For the following reasons, this Court recommends
**granting** Defendant's Motion and **dismissing** this case in
its entirety.

**I. DISCUSSION**

**A. Standard of Review**

Pursuant to FED. R. CIV. P. 56(c)(2), summary
judgment is appropriate only where "there is no genuine
issue as to any material fact and ... the movant is entitled
to judgment as a matter of law." The moving party bears
the burden to demonstrate through "pleadings,
depositions, answers to interrogatories, and admissions on
file, together with [ ] affidavits, if any," that there is no
genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34
F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v.
Catrett,* 477 U.S. 317, 323 (1986)). "When a party has
moved for summary judgment on the basis of asserted
facts supported as required by [Federal Rule of Civil
Procedure 56(e) ] and has, in accordance with local court
rules, served a concise statement of the material facts as to
which it contends there exist no genuine issues to be tried,
those facts will be deemed admitted unless properly
controverted by the nonmoving party." *Glazer v. Formica
Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the
non-movant must "set out specific facts showing [that
there is] a genuine issue for trial," and cannot rest "merely
on allegations or denials" of the facts submitted by the
movant. FED. R. CIV. P. 56(e)(2); *see also Scott v.
Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory
allegations or denials are ordinarily not sufficient to
defeat a motion for summary judgment when the moving
party has set out a documentary case."); *Rexnord Holdings, Inc.
v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that
end, sworn statements are "more than mere conclusory
allegations subject to disregard ... they are specific and
detailed allegations of fact, made under penalty of perjury,
and should be treated as evidence in deciding a summary
judgment motion" and the credibility of such statements is
better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 666103 (N.D.N.Y.)

(Cite as: 2011 WL 666103 (N.D.N.Y.))

289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*2** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Background[FN2]

> FN2. The Court is utilizing Plaintiff's examination before trial solely to provide some background information as to what events gave rise to Plaintiff's Complaint. Dkt. No. 21-2, Michael McCartin, Esq ., Decl., dated Aug. 10, 2010, Ex. A, Pl.'s Dep., dated May 21, 2010 (docketed at Dkt. No. 21-3). Because Plaintiff's testimony is riddled with equivocations and inconsistencies, we proceed with great caution and assure the parties and the District Judge that by using Plaintiff's testimony to set forth the background for this case, in no way do we find that any fact discussed in this section is established or uncontested. In the event this Court's recommendation is not adopted and this case proceeds to trial, the Plaintiff will bear the burden of proving, by a preponderance of the evidence, the substantive facts underlying his *prima facie* case.

Plaintiff testified at his deposition that he arrived at Auburn on June 23, 2008, and was assigned to a double-bunked cell with an inmate named Grady, whom Plaintiff alleges was a gang member and was supposed to be assigned to a special housing unit, not a double-bunked cell. Dkt. No. 21-2, Michael McCartin, Esq., Decl., dated Aug. 10, 2010, Ex. A, Pl.'s Dep., dated May 21, 2010 (docketed at Dkt. No. 21-3), at pp. 9 & 21-22. Plaintiff asserts that he arrived at the cell first and was told by the officer to take the top bunk. *Id.* at pp. 10-13. At some point on June 23rd, Plaintiff and Inmate Grady engaged in an elongated verbal dispute over who would sleep on the top bunk; this argument is alleged to have spanned, on and off, for over five hours. *Id.* at pp. 10-19. The verbal altercation petered out when Plaintiff unilaterally took the top bunk at 11:00 p.m. *Id.* The following date, the verbal fighting over the bunk assignment resumed, but this time Inmate Grady allegedly threatened Plaintiff with physical harm. *Id.* at pp. 18-19. Plaintiff testified that at approximately 8:00 a.m., he informed Defendant Kowal about the violent threats and asked that one of them be transferred out of the cell, but Defendant Kowal allegedly declined the request. *Id.* at pp. 19-21 & 25. Approximately twenty minutes later, Inmate Grady allegedly assaulted Plaintiff. *Id.* at pp. 37-46. It is not clear how long the physical altercation lasted, but at some point Defendant broke up the fight and informed both inmates that he was not going to issue either of them a misbehavior report because their transport buses were ready to take them each to another facility. *Id.* at pp. 46-47. Later, Plaintiff arrived at Green Haven Correctional Facility and was seen by medical staff. *Id.* at pp. 49-50. [FN3]

> FN3. Plaintiff asserts that over the following months, it was discovered that his eye lens had been dislocated, resulting in surgery in August 2008. Dkt. No. 21-3, Pl.'s Dep. at pp. 50-62. He attributes the injury to his eye to the altercation with Inmate Grady.

### C. Exhaustion of Remedies

**\*3** The Prison Litigation Reform Act of 1996 (PLRA) imposes several restrictive conditions on a prisoner's ability to bring a federal civil rights action. With regard to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 666103 (N.D.N.Y.)

(Cite as: 2011 WL 666103 (N.D.N.Y.))

the issue before this Court, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (citations omitted).

Exhaustion of administrative remedies under the PLRA is an affirmative defense which must be raised and proven by the defendants. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999) (noting that exhaustion of remedies is an affirmative defense); *Howard v. Goord,* 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999) (citations omitted) (noting that the burden remains with the defendants to prove that administrative remedies had not been exhausted). The party opposing the affirmative defense "may delay the ultimate determination as to its validity until trial by showing that there is a genuine issue of material fact to be determined." *Id.* (citations omitted).

In New York State, the administrative remedies consist of a three-step review process. First, a grievance is submitted to the Inmate Grievance Review Committee (IGRC), a committee comprised of both inmates and facility employees. FN4 N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* Second, if the IGRC decision is appealed, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, if the superintendent's decision is appealed, the Central Office Review Committee (CORC) makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to § 1983 in federal court. *Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 239 (W.D.N.Y.2010) (citing, *inter alia, Porter v. Nussle,* 534 U.S. at 524); *see also Neal v. Goord,* 267 F.3d 116, 121 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516.

FN4. The IGRC is a five-member body consisting of two voting inmates, two voting staff members, and a nonvoting chairperson (who may be an inmate, staff member, or volunteer). N.Y. COMP.CODES R. & REGS tit. 7, § 701.4.

In support of his request for summary judgment, Defendant produces a Declaration from Karen Bellamy, Director of the Inmate Grievance Program of the New York State Department of Correctional Services (DOCS). Dkt. No. 21-4, Karen Bellamy Decl., dated Aug. 9, 2010. Ms. Bellamy searched CORC records and determined that Plaintiff never filed an appeal with CORC relating to the June 24, 2008 assault at Auburn. *Id.* at ¶ 2, Ex. A. This fact is not contested by Plaintiff. Pl.'s Dep. at p. 81.

**\*4** During the course of Plaintiff's examination before trial, a detailed discussion developed regarding Plaintiff's efforts to exhaust his available administrative remedies. *Id.* at pp. 62-101. Regarding the Auburn incident, Plaintiff asserts that he filed grievances at Green Haven, Auburn, and at Southport. *Id.* at pp. 62-63. During the deposition, Plaintiff claimed that he filed the grievance at Green Haven shortly after his transfer in early July 2008, but he did not receive a response. *Id.* at pp. 62 & 68-73. Because of his befuddling testimony, it is unclear whether Plaintiff complained of only the Grady assault or if he also complained of Defendant's purported failure to protect him. *Compare id.* at p. 66, lines 6-11 ("Q: [D]id you say that Defendant Kowal was the reason for you being assaulted because you didn't get moved out of the cell? A: No.") *with id.* at p. 67, lines 15-17 ("Q: Did you mention Defendant Kowal by name in that Green Haven grievance? A: Yes. Yes, I mentioned his name."). Plaintiff further avowed that he wrote letters to the grievance office and superintendent regarding his unanswered grievance, but never received a response to those letters. *Id.* at pp. 72-74. Having received no response, Plaintiff took no further action with regard to his Green Haven grievance. *Id.* at pp. 78-81.

Months later, in March 2009, Plaintiff filed a grievance at Auburn during a temporary stay at that facility. *Id.* at pp. 87-88. The subject of this grievance was the fact that he was doubled-bunked; he did not mention Defendant Kowal or the fact that he feared being assaulted

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 666103 (N.D.N.Y.)

(Cite as: 2011 WL 666103 (N.D.N.Y.))

by Inmate Grady and advised an officer as such. *Id.* at pp. 90 & 98-99. As with the case of the Green Haven grievance, Plaintiff asserts he did not receive a response. *Id.* at pp. 90-91. Again, he wrote letters, this time to the Auburn grievance office, but not to the superintendent nor to CORC. *Id.*

Also in March 2009, Plaintiff filed a grievance at Southport. *Id.* at pp. 81-82. In response, he was told to file a grievance at Auburn, where the incident occurred. *Id.* at pp. 62-63 & 92-93. Plaintiff took no further steps with regard to his Southport grievance. *Id.* at p. 96. However, he claimed that after receiving the Southport response, he again followed up with the Auburn grievance office and was told that his Auburn grievance had been granted. *Id.* at pp. 96-97.

Throughout the testimony relayed above, Plaintiff continually insisted that in his cell he had copies of several grievances and letters he filed in an attempt to fully exhaust his administrative remedies; Defendant's counsel accordingly made discovery requests, on the record, for those documents.[FN5] *See id.* at pp. 62-102. In reviewing the pending Motion, the Court noticed that while Defendant provided proof in support for his basis for summary judgment, in response, Plaintiff did not provide the Court with any documentary proof of his efforts to exhaust. Instead, he relies upon the conclusory notion that he received a "favorable recommendation from the IGRC" and therefore had nothing further to appeal. Dkt. No. 24, Pl.'s Opp'n, at p. 3. In light of his *pro se* status, this Court sought to provide Plaintiff with an opportunity to submit all documentation he had in his possession that would support his exhaustion efforts. Dkt. No. 27, Order, dated Oct. 22, 2010. In this regard, we directed both parties to file written statements as to Plaintiff's response to the oral discovery requests; copies of those documents were also summoned. *Id.* In response, Defendant stated that he had not received any document from Plaintiff. Dkt. No. 28. Plaintiff stated that the only document in his possession is the grievance he filed at Auburn; he did not provide a copy of that grievance. Dkt. No. 29.

> FN5. Plaintiff provided no explanation as to why he did not previously provide Defendant with copies of those documents in accordance with the

Court's Mandatory Pretrial Discovery and Scheduling Order. That Order, issued on January 28, 2010, directed Plaintiff, *inter alia,* to serve Defendant with "[c]orrespondence, grievances, grievance appeals, and other documents relating to requests for administrative remedies or the inability or failure to exhaust such remedies." Dkt. No. 17 at Part I.A. 1.b. Prior to the deposition, Defendant's counsel reminded Plaintiff of his obligation to provide to him "material that would show that [he] in any way filed an administrative grievance related to the subject action." Dkt. No. 18.

**\*5** Plaintiff's only defense to Defendant's Motion is the notion that a grievance was decided in his favor and, so, there was nothing for him to appeal. Pl's Opp'n at p. 3 ("Practically speaking there was nothing more plaintiff could have accomplished from DOCS, as the assault on him had [already] taken place. At this point[,] litigation was the only avenue in which plaintiff would be able to get the monetary relief he currently seeks."). This defense is not supported by the evidence before the Court nor the law in this Circuit.

Though exhaustion is mandatory, certain caveats apply wherein a prisoner's failure to exhaust may be excused: (1) when administrative remedies are not available to the prisoner, *Abney v.. McGinnis,* 380 F.3d 663 (2d Cir.2004); (2) when the defendants waive the defense by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004), or acted in such a manner that they are estopped from raising it, *Ziemba v. Wezner,* 366 F.3d 161 (2d Cir.2004); and (3) when special circumstances exist to justify the prisoner's failure to comply with the exhaustion requirement, *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004). Plaintiff's response to Defendant's Motion rests on the notion that, ultimately, a grievance was decided in his favor, therefore litigation was the logical next step. Based upon this theory, we find that scenarios two and three above are not applicable here. Instead, because Plaintiff admits that he did not appeal his grievances through each level of review, the question for the Court is whether a purportedly favorable IGRC response renders other administrative remedies unavailable.[FN6]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 666103 (N.D.N.Y.)

(Cite as: 2011 WL 666103 (N.D.N.Y.))

FN6. Previously, there was no mechanism in DOCS regulations for appealing a favorable determination. *See Abney v. McGinnis,* 280 F.3d 663, 668 (2d Cir.2004) (noting that while a favorable IGRC response is automatically transmitted to the superintendent for action, "[t]here is no similar procedure available for automatic advancement of a favorable ruling from the superintendent to the CORC") In 2006, the regulations were amended and a new section was added allowing for oversight and follow-up to ensure implementation of favorable dispositions are carried out. *See* N . Y. COMP.CODES R. & REGS. tit. 7, § 701.5(c)(4) ("Implementation of decisions. The IGP supervisor or the superintendent must verify compliance with superintendents' responses that require some form of implementation. Documentation of compliance must be filed with the grievance record. If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), *adopted on* June 28, 2006 by New York Regulation Text-Netscan, 2006 N.Y. REG TEXT 7 NYCRR 701 (June 28, 2006), *effective* July 1, 2006.

To be "available" under the PLRA, a remedy must afford "the possibility of some relief for the action complained of." *Booth v. Churner,* 532 U.S. 731, 738 (2001). To answer our question, we must look not only at the matters grieved and responses received, but also the matters at issue in this action, keeping in mind that the concept of "availability" speaks to the "procedural means, not the particular relief ordered," since "one 'exhausts' processes, not forms of relief." *Id.* at 739. Thus, though an inmate may be interested in obtaining solely monetary relief, the fact that the grievance program does not afford such relief does not mean that other administrative remedies are not available to the prisoner. *See generally id.*

Based on what has been presented, we are not entirely convinced that Plaintiff included his failure to protect claim in any of his alleged grievances. From the paucity of information provided by Plaintiff, it appears that the favorable result he references is the validation that he should not have been double-bunked. Pl.'s Opp'n at p. 3. This is further bolstered by reviewing Plaintiff's Original Complaint, wherein he attached a copy of a Green Haven Inmate Grievance Complaint, dated June 24, 2008, which he signed. Dkt. No. 1, Compl. at p. 9. The document does not contain an official stamp from Green Haven's Inmate Grievance Program. That grievance concerns the assault that took place on June 24th at Auburn, but there is no mention of Defendant Kowal and his alleged failure to protect Plaintiff. Plaintiff also attached what appears to be a letter, dated July 15, 2008, from Plaintiff (though it is unsigned) to the superintendent of Green Haven seeking follow-up to the aforementioned grievance. *Id.* at p. 8. Curiously, neither of these documents are attached to Plaintiff's Amended Complaint, which he filed as of right. Dkt. No. 8, Am. Compl. Instead, attached to that pleading is an Inmate Grievance Resolution Committee (IGRC) response, dated April 9, 2009, to some unknown grievance. *Id.* at p. 8. The response reads as follows: "ACTION REQUE [S]TED GRANTED[.] PE[R] LT OUIMETTE GRIEVANT SHOULD NOT HAVE BEEN DOUBLE BUNKED WITH ANY ONE[.] INMATE FERGUSON SHOULD BE IN A SINGLE CELL[.] HE DOES NOT MEET DOUBLE BUNK STATUS DUE TO HIS RECENT DISCIPLINARY HISTORY." *Id.* Because Plaintiff only attached the portion of the grievance wherein the IGRC provides its decision, it is unclear what issue was before the IGRC. Nevertheless, it seems consistent and logical to find that this IGRC response, served on Plaintiff at Southport, is perhaps the response he received to his Auburn grievance-the grievance he admits did not contain any reference to Defendant Kowal, either by name or by a retelling of the circumstance of his alleged involvement in failing to protect Plaintiff from Inmate Grady.

**\*6** The fact that Plaintiff felt the IGRC was favorable to him did not excuse his obligation to pursue available remedies with regard to his failure to protect claim against Defendant. In *Ruggiero v. County of Orange,* the Second Circuit grappled with the situation where an inmate sought a transfer from his cell for fear that his cell mate may harm him; instead of being transferred to a new cell, the prisoner was transferred to another facility. 467 F.3d 170,

Slip Copy, 2011 WL 666103 (N.D.N.Y.)

(Cite as: 2011 WL 666103 (N.D.N.Y.))

177 (2d Cir.2006). Though in his lawsuit he asserted that the transfer to another facility was retaliation for his complaints, the inmate claimed he did not need to file a grievance because he had been afforded the remedy he desired, namely, transfer out of his cell and out of harms way. The Second Circuit considered its past decisions and Supreme Court precedent and determined that administrative remedies were still available. Id. at 177-78. In rendering this decision, the Second Circuit distinguished the case from the situation in Abney v. McGinnis, 380 F.3d 663 (2d Cir.2004), wherein the inmate kept receiving favorable decisions that were never implemented, and instead relied upon Booth v. Churner, 532 U.S. 731 (2001) and Braham v. Clancy, 425 F.3d 177 (2d Cir.2005), for the proposition that other remedies still existed such as disciplining the officers or changing policy and thus being provided with a desirable result did not render all remedies unavailable. Id. Similarly, with regard to the claims in this action, Plaintiff had other remedies available to him prior to initiating this federal case. Arguably, though the IGRC's response was acceptable to him, it did not address his complaints against the Defendant in this action. Since we did not receive the grievances themselves, we have no way of verifying whether Plaintiff grieved the factual circumstances at issue in this litigation. And his bewildering testimony further complicates our ability to do so. But, nevertheless, Plaintiff could have pursued the fact that neither the IGRC nor the superintendent took any action with regard to his purported complaints of employee misconduct. His vindication that he should not have been double-bunked "did not provide him with all of the relief available to him .... [and] so long as some remedy remains available, failure to exhaust is not excused." Ruggiero v. County of Orange, 467 F.3d 170,177 (2d Cir.2006). Thus, we find that Plaintiff did not fully exhaust the administrative remedies available to him and Defendant's Motion should be **granted.**

### III. CONCLUSION

For the reasons stated herein, it is hereby **RECOMMENDED,** that the Defendant's Motion for Summary Judgment (Dkt. No. 21) be granted and this entire case be **dismissed;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Sec'y of Health and Human Servs ., 892 F.2d 15 (2d Cir.1989)*); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2011.

Ferguson v. Cole
Slip Copy, 2011 WL 666103 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER, Corrections Officer, Great Meadow
Correctional Facility; S. Griffin, Corrections Officer,
Great Meadow Correctional Facility; M. Terry,
Corrections Officer, Great Meadow Correctional
Facility; F. Englese, Corrections Officer, Great Meadow
Correctional Facility; Sergeant Edwards, Great Meadow
Correctional Facility; K. Bump, Sergeant, Great
Meadow Correctional Facility; K.H. Smith, Sergeant,
Great Meadow Correctional Facility; A. Paolano,
Facility Health Director: and Ted Nesmith, Physicians
Assistant, Defendants.
No. 9:03-CV-1010 (DNH/GLS).

June 20, 2008.
James Murray, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, James Seaman, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

**\*1** Plaintiff, James Murray, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a 51 page Report
Recommendation dated February 11, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted in part (i.e., to the extent that it
requests the dismissal with prejudice of plaintiff's claims
against defendant Paolano and Nesmith); and denied in
part (i.e., to the extent that it requests dismissal of
plaintiff's claims against the remaining defendants on the
grounds of plaintiff's failure to exhaust available
administrative remedies) for the reasons stated in the

Report Recommendation. Lengthy objections to the
Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

2. Plaintiff's complaint against defendants Paolano
and Nesmith is DISMISSED with prejudice;

3. Defendants' motion for summary judgment is
DENIED, to the extent that their request for dismissal of
plaintiff's assault claims under the Eighth Amendment
against the remaining defendants on the grounds of
plaintiff's failure to exhaust available administrative
remedies as stated in the Report-Recommendation.

IT IS SO ORDERED.

JAMES MURRAY, Plaintiff,

-v.-

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow
C.F.; F. ENGLESE, Corrections Officer, Great Meadow
C.F.; P. EDWARDS, Sergeant, Great Meadow C.F.; K.
BUMP, Sergeant, Great Meadow C.F.; K.H. SMITH,
Sergeant, Great Meadow C.F.; A. PAOLANO, Health
Director, Great Meadows C.F.; TED NESMITH,
Physicians Assistant, Great Meadows C.F., Defendants.

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

C.F.; Counter Claimants,

-v.-

JAMES MURRAY, Counter Defendant.

### ORDER and REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 78.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Plaintiff's Second Amended Complaint

In his Second Amended Complaint, James Murray ("Plaintiff") alleges that nine correctional officials and health care providers employed by the New York State Department of Correctional Services ("DOCS") at Great Meadow Correctional Facility ("Great Meadow C.F .") violated his rights under the Eighth Amendment on August 17, 2000, when (1) Defendants Palmers, Griffin, Terry, and Englese assaulted him without provocation while he was incapacitated by mechanical restraints, (2) Defendants Edwards, Bump, and Smith witnessed, but did not stop, the assault, and (3) Defendants Paolano and Nesmith failed to examine and treat him following the assault despite his complaints of having a broken wrist. (Dkt. No. 10, ¶¶ 6-7 [Plf.'s Second Am. Compl.].)

### B. Defendants' Counterclaim

*2 In their Answer to Plaintiff's Second Amended Complaint, three of the nine Defendants (Palmer, Griffin and Terry) assert a counterclaim against Defendant for personal injuries they sustained as a result of Plaintiff's assault and battery upon them during the physical struggle that ensued between them and Plaintiff due to his threatening and violent behavior on August 17, 2000, at Great Meadow C.F. (Dkt. No. 35, Part 1, ¶¶ 23-30 [Defs.' Answer & Counterclaim].)

I note that the docket in this action inaccurately indicates that this Counterclaim is asserted also on behalf of Defendants Englese, Edwards, Bump, Smith, Paolano, and "Nejwith" (later identified as "Nesmith"). (*See* Caption of Docket Sheet.) As a result, at the end of this Report-Recommendation, *I direct the Clerk's Office to correct the docket sheet to remove the names of those individuals as "counter claimants" on the docket.*

I note also that, while such counterclaims are unusual in prisoner civil rights cases (due to the fact that prisoners are often "judgment proof" since they are without funds), Plaintiff paid the $150 filing fee in this action (Dkt. No. 1), and, in his Second Amended Complaint, he alleges that he received a settlement payment in another prisoner civil rights actions in 2002. (Dkt. No. 10, ¶ 10 [Plf.'s Second Am. Compl.].) Further investigation reveals that the settlement resulted in a payment of $20,000 to Plaintiff. *See Murray v. Westchester County Jail,* 98-CV-0959 (S .D.N.Y.) (settled for $20,000 in 2002).

## II. DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE

### A. Defendants' Motion

In their motion for summary judgment, Defendants argue that Plaintiff's Second Amended Complaint should be dismissed for four reasons: (1) Plaintiff has failed to adduce any evidence establishing that Defendant Paolano, a supervisor, was personally involved in any of the constitutional violations alleged; (2) Plaintiff has failed to adduce any evidence establishing that Defendant Nesmith was deliberately indifferent to any of Plaintiff's serious medical needs; (3) at the very least, Defendant Nesmith is protected from liability by the doctrine of qualified immunity, as a matter of law; and (4) Plaintiff has failed to adduce any evidence establishing that he exhausted his available administrative remedies with respect to his assault claim, before filing that claim in federal court. (Dkt. No. 78, Part 13, at 2, 4-13 [Defs.' Mem. of Law].)

In addition, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

to honor non-life-sustaining medical prescriptions written at a former facility. (*Id.* at 3.) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

**\*3** Defendants' motion is accompanied by a Statement of Material Facts, submitted in accordance with Local Rule 7.1(a)(3) ("Rule 7.1 Statement"). (Dkt. No. 78, Part 12.) Each of the 40 paragraphs contained in Defendants' Rule 7.1 Statement is supported by an accurate citation to the record evidence. (*Id.*) It is worth mentioning that the record evidence consists of (1) the affirmations of Defendants Nesmith and Paolano, and exhibits thereto, (2) the affirmation of the Inmate Grievance Program Director for DOCS, and exhibits thereto, (3) affirmation of the Legal Liaison between Great Meadow C.F. and the New York State Attorney General's Office during the time in question, and exhibits thereto, and (4) a 155-page excerpt from Plaintiff's deposition transcript. (Dkt. No. 78.)

**B. Plaintiff's Response**

After being specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and after being granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83), Plaintiff submitted a barrage of documents: (1) 49 pages of exhibits, which are attached to neither an affidavit nor a memorandum of law (Dkt. No. 84); (2) 113 pages of exhibits, attached to a 25-page affidavit (Dkt. No. 85); (3) 21 pages of exhibits, attached to a 12-page supplemental affidavit (Dkt. No. 86); and (4) a 29-page memorandum of law (Dkt. No. 86); and a 13-page supplemental memorandum of law (Dkt. No. 88).

Generally in his Memorandum of Law and Supplemental Memorandum of Law, Plaintiff responds to

the legal arguments advanced by Defendants. (*See* Dkt. No. 86, Plf.'s Memo. of Law [responding to Defs.' exhaustion argument]; Dkt. No. 88, at 7-13 [Plf.'s Supp. Memo. of Law, responding to Defs.' arguments regarding the personal involvement of Defendant Paolano, the lack of evidence supporting a deliberate indifference claim against Defendant Nesmith, the applicability of the qualified immunity defense with regard to Plaintiff's claim against Defendant Nesmith, and the sufficiency and timing of Plaintiff's prescription-review claim against Defendant Paolano].) Those responses are described below in Part IV of this Report-Recommendation.

However, unfortunately, not among the numerous documents that Plaintiff has provided is a *proper* response to Defendants' Rule 7.1 Statement. (*See* Dkt. No. 85, Part 2, at 45-52 [Ex. N to Plf.'s Affid.].) Specifically, Plaintiff's Rule 7.1 Response (which is buried in a pile of exhibits) fails, with very few exceptions, to "set forth ... specific citation[s] to the record," as required by Local Rule 7.1(a)(3). (*Id.*) I note that the notary's "sworn to" stamp at the end of the Rule 7.1. Statement does not transform Plaintiff's Rule 7.1 Response into record evidence so as to render that Response compliant with Local Rule 7.1. First, Local Rule 7.1 expressly states, "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." N.D.N.Y. L.R. 7.1(a)(3). In this way, the District's Local Rule, like similar local rules of other districts, contemplates citations to a record that is independent of a Rule 7.1 Response. *See, e.g., Vaden v. GAP, Inc.,* 06-CV-0142, 2007 U.S. Dist. LEXIS 22736, at \*3-5, 2007 WL 954256 (M.D.Tenn. March 26, 2007) (finding non-movant's verified response to movant's statement of material facts to be deficient because it did cite to affidavit or declaration, nor did it establish that non-movant had actual knowledge of matters to which he attested); *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 4-5 (D.D.C.2000) (criticizing party's "Verified Statement of Material Facts," as being deficient in citations to independent record evidence, lacking "firsthand knowledge," and being purely "self-serving" in nature. Moreover, many of Plaintiff's statements in his Rule 7.1 Response are either argumentative in nature or lacking in specificity and personal knowledge, so as to disqualify those statements from having the effect of

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

sworn testimony for purposes of a summary judgment motion. *See, infra,* notes 10-12 of this Report-Recommendation.

## III. GOVERNING LEGAL STANDARD

**\*4** Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists,[FN1] the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN2]

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN2. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN3] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN4] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN5]

> FN3. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary

judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN5. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to *properly* respond to a defendant's Rule 7.1 Statement of Material Facts is that the facts as set forth in that Rule 7.1 Statement will be accepted as true [FN6] to the extent that (1) those facts are supported by the evidence in the record,[FN7] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.[FN8]

> FN6. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.* ") [emphasis in original].

> FN7. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted].

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

FN8. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Implied in the above-stated standard is the fact that a district court has no duty to perform an *independent* review of the record to find proof of a factual dispute, even if the non-movant is proceeding *pro se.*[FN9] In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory.[FN10] (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.)[FN11] Finally, even where an affidavit is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN12]

FN9. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

**IV. ANALYSIS**

**A. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Paolano Was Personally Involved in the Constitutional Violations Alleged**

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN14] If the defendant is a supervisory official, such as a correctional facility superintendent or a facility health services director, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN17]

FN13. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN14. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN15. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN16. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN17. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*5** Defendants argue that Plaintiff has not adduced evidence establishing that Defendant Paolano, the Great Meadow C.F. Health Services Director during the time in question, was personally involved in the constitutional violations alleged. (Dkt. No. 78, Part 13, at 2 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that, during the time in which Plaintiff was incarcerated at Great Meadow C.F. (i . e., from early August of 2000 to late November of 2000), Defendant Paolano never treated Plaintiff for any medical condition, much less a broken wrist on August 17, 2000. (*Id.; see also* Dkt. No. 78, Part 4, ¶¶ 7-8 [Paolano Affid.]; Dkt. No. 78, Part 5 [Ex. A to Paolano Affid.]; Dkt. No. 78, Part 11, at 32-33 [Plf.'s Depo.].)

Plaintiff responds that (1) Defendant Paolano was personally involved since he "treated" Plaintiff on August 17, 2000, by virtue of his supervisory position as the Great Meadow C.F.'s Health Services Director, and (2) Defendant Paolano has the "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F. (Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites a paragraph of his Supplemental Affidavit, and an administrative decision, for the proposition that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care." (*Id.; see also* Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14.)

**1. Whether Defendant Paolano Was Personally Involved in Plaintiff's Treatment on August 17, 2000**

With respect to Plaintiff's first point (regarding Defendant Paolano's asserted "treatment" of Plaintiff on August 17, 2000), the problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants' assert, Defendant Paolano did not, in fact, treat Plaintiff on August 17, 2000 (or at any time when Plaintiff was incarcerated at Great Meadow C.F.). This was the fact asserted by Defendants in Paragraphs 38 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶ 38 [Defs.' Rule 7.1 Statement].) Defendants supported this

factual assertion with record evidence. (*Id.* [providing accurate record citations]; *see also* Dkt. No. 78, Part 12, ¶¶ 37-38 [Defs.' Rule 7.1 Statement, indicating that it was Defendant Nesmith, not Defendant Paolano, who treated Plaintiff on 8/17/00].) Plaintiff has failed to specifically controvert this factual assertion, despite having been given an adequate opportunity to conduct discovery, and having been specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and having been granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83). Specifically, Plaintiff fails to cite any record evidence in support of his denial of Defendants' referenced factual assertion. (*See* Dkt. No. 85, Part 2, at 50 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

**\*6** The Court has no duty to perform an independent review of the record to find proof disputing this established fact. *See, supra,* Part III and note 9 of this Report-Recommendation. Moreover, I decline to exercise my discretion, and I recommend that the Court decline to exercise its discretion, to perform an independent review of the record to find such proof for several reasons, any one of which is sufficient reason to make such a decision: (1) as an exercise of discretion, in order to preserve judicial resources in light of the Court's heavy caseload; (2) the fact that Plaintiff has already been afforded considerable leniency in this action, including numerous deadline extensions and liberal constructions; and (3) the fact that Plaintiff is fully knowledgeable about the requirements of a non-movant on a summary judgment motion, due to Defendants' notification of those requirements, and due to Plaintiff's extraordinary litigation experience.

With regard to this last reason, I note that federal courts normally treat the papers filed by *pro se* civil rights litigants with special solicitude. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" that is normally afforded *pro se* litigants.[FN18] Generally, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

rationale for diminishing special solicitude (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending special solicitude to a *pro se* litigant in the first place.[FN19] The Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions.[FN20] Similarly, I decide to do so, here, and I recommend the Court do the same.

> FN18. *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept.26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted].

> FN19. *Koehl,* 2007 WL 2846905, at *3 & n. 18 [citations omitted].

> FN20. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977) [citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

Plaintiff is no stranger to the court system. A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") System reveals that Plaintiff has filed at least 15 other federal district court actions,[FN21] and at least three federal court appeals.[FN22] Furthermore, a review of the New York State Unified Court System's website reveals that he has filed at least 20 state court actions,[FN23] and at least two state court appeals.[FN24] Among these many actions he has had at least one victory, resulting in the payment of $20,000 to him in

settlement proceeds.[FN25]

> FN21. *See Murray v. New York,* 96-CV-3413 (S.D.N.Y.); *Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y.); *Murray v. McGinnis,* 99-CV-1908 (W.D.N.Y.); *Murray v. McGinnis,* 99-CV-2945 (S.D.N.Y.); *Murray v. McGinnis,* 00-CV-3510 (S.D.N.Y.); *Murray v. Jacobs,* 04-CV-6231 (W.D.N.Y.); *Murray v. Bushey,* 04-CV-0805 (W.D.N.Y.); *Murray v. Goord,* 05-CV-1113 (N.D.N.Y.); *Murray v. Wissman,* 05-CV-1186 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1579 (N.D.N.Y.); *Murray v. Doe,* 06-CV-0205 (S.D.N.Y.); *Murray v. O'Herron,* 06-CV-0793 (W.D.N.Y.); *Murray v. Goord,* 06-CV-1445 (W.D.N.Y.); *Murray v. Fisher,* 07-CV-0306 (W.D.N.Y.); *Murray v. Escrow,* 07-CV-0353 (W.D.N.Y.).

> FN22. *See Murray v. McGinnis,* No. 01-2533 (2d Cir.); *Murray v. McGinnis,* No. 01-2536 (2d Cir.); *Murray v. McGinnis,* No. 01-2632 (2d Cir.).

> FN23. *See Murray v. Goord,* Index No. 011568/1996 (N.Y. Sup.Ct., Westchester County); *Murray v. Goord,* Index No. 002383/1997 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002131/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002307/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002879/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002683/2004 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002044/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. McGinnis,* Index No. 002099/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Sullivan,* Index No. 002217/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002421/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002495/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002496/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002888/2006 (N.Y. Sup.Ct., Chemung

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

County); *Murray v. LeClaire,* Index No. 002008/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002009/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002010/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002011/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. Fisher,* Index No. 002762/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. New York,* Claim No. 108304, Motion No. 67679 (N.Y.Ct.Cl.); *Murray v. New York,* Motion No. M-67997 (N.Y.Ct.Cl.).

FN24. *See Murray v. Goord,* No. 84875, 709 N.Y. S.2d 662 (N.Y.S.App.Div., 3d Dept.2000); *Murray v. Goord,* No. 83252, 694 N.Y.S .2d 797 (N.Y.S.App.Div., 3d Dept.1999).

FN25. *See Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y .) (settled for $20,000 in 2002).

I will add only that, even if I were inclined to conduct such an independent review of the record, the record evidence that Plaintiff cites regarding this issue in his Supplemental Memorandum of Law does not create such a question of fact. (*See* Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law, citing Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14].) It appears entirely likely that Defendant Paolano had the ultimate responsibility for providing medical treatment to the inmates at Great Meadow C.F.FN26 However, this duty arose solely because of his supervisory position, i.e., as the Facility Health Services Director. It is precisely this sort of supervisory duty that does *not* result in liability under 42 U.S.C. § 1983, as explained above.

FN26. To the extent that Plaintiff relies on this evidence to support the proposition that Defendant Paolano had the "sole" responsibility for such health care, that reliance is misplaced. Setting aside the loose nature of the administrative decision's use of the word "sole," and the different context in which that word was used (regarding the review of Plaintiff's grievance about having had his prescription

discontinued), the administrative decision's rationale for its decision holds no preclusive effect in this Court. I note that this argument by Plaintiff, which is creative and which implicitly relies on principles of estoppel, demonstrates his facility with the law due to his extraordinary litigation experience.

**\*7** As for the other ways through which a supervisory official may be deemed "personally involved" in a constitutional violation under 42 U.S.C. § 1983, Plaintiff does not even argue (or allege facts plausibly suggesting)FN27 that Defendant Paolano *failed to remedy* the alleged deliberate indifference to Plaintiff's serious medical needs on August 17, 2000, after learning of that deliberate indifference through a report or appeal. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano created, or allowed to continue, *a policy or custom* under which the alleged deliberate indifference on August 17, 2000, occurred. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano had been *grossly negligent* in managing subordinates (such as Defendant Nesmith) who caused the alleged deliberate indifference. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that Defendant Nesmith was violating Plaintiff's constitutional rights.

FN27. *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

original].

In the alternative, I reach the same conclusion (that Plaintiff's claim against Defendant Paolano arising from the events of August 17, 2000, lacks merit) on the ground that there was no constitutional violation committed by Defendant Nesmith on August 17, 2000, in which Defendant Paolano could have been personally involved, for the reasons discussed below in Part IV.B. of this Report-Recommendation.

**2. Whether Defendant Paolano Was Personally Involved in the Review of Plaintiff's Prescriptions in Early August of 2000**

With respect to Plaintiff's second point (regarding Defendant Paolano's asserted "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F.), there are three problems with this argument.

First, the argument regards a claim that is not properly before this Court for the reasons explained below in Part IV.E. of this Report-Recommendation.

Second, as Defendants argue, even if the Court were to reach the merits of this claim, it should rule that Plaintiff has failed to adduce evidence establishing that Defendant Paolano was personally involved in the creation or implementation of DOCS' prescription-review policy. It is an uncontroverted fact, for purposes of Defendants' motion, that (1) the decision to temporarily deprive Plaintiff of his previously prescribed pain medication (i.e., pending the review of that medication by a physician at Great Meadow C.F.) upon his arrival at Great Meadow C.F. was made by an "intake nurse," not by Defendant Paolano, (2) the nurse's decision was made pursuant to a policy instituted by DOCS, not by Defendant Paolano, and (3) Defendant Paolano did not have the authority to alter that policy. These were the facts asserted by Defendants in Paragraphs 6 through 9 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 6-9 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits two of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at

46-47 [Ex. N to Plf.'s Affid.].)

**\*8** For example, in support of his denial of Defendants' factual assertion that "[t]his policy is not unique to Great Meadow, but applies to DOCS facilities generally," Plaintiff says that, at an unidentified point in time, "Downstate CF honored doctors proscribed [sic] treatment and filled by prescriptions from Southport Correctional Facility .... Also I've been transferred to other prisons such as Auburn [C.F.] in which they honored doctors prescribe[d] orders." (*Id.*) I will set aside the fact that Defendants' factual assertion is not that the policy applies to every single DOCS facility but that it applies to them as a general matter. I will also set aside the fact that Plaintiff's assertion is not supported by a citation to independent record evidence. The main problem with this assertion is that it is not specific as to what year or years he had these experiences, nor does it even say that his prescriptions were immediately honored without a review by a physician at the new facility.

The other piece of "evidence" Plaintiff cites in support of this denial is "Superintendent George B. Duncan's 9/22/00 decision of Appeal to him regarding [Plaintiff's Grievance No.] GM-30651-00." (*Id.*) The problem is that the referenced determination states merely that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care, and has the final say regarding all medical prescriptions." (Dkt. No. 86, at 14 [Ex. 14 to Plf.'s Suppl. Affid.].) For the sake of much-needed brevity, I will set aside the issue of whether an IGP Program Director's broadly stated *rationale* for an appellate determination with respect to a prisoner's grievance can ever constitute evidence sufficient to create proof of a genuine issue of fact for purposes of a summary judgment motion. The main problem with this "evidence" is that there is absolutely nothing inconsistent between (1) a DOCS policy to temporarily deprive prisoners of non-life-sustaining prescription medications upon their arrival at a correctional facility, pending the review of those medical prescriptions by a physician at the facility, and (2) a DOCS policy to give Facility Health Service Directors the "final say" regarding the review of those medical prescriptions.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Because Plaintiff has failed to support his denial of these factual assertions with citations to record evidence that actually controverts the facts asserted, I will consider the facts asserted by Defendants as true. N.D.N.Y. L.R. 7.1(a)(3). Under the circumstances, I decline, and I recommend the Court decline, to perform an independent review of the record to find proof disputing this established fact for the several reasons described above in Part IV.A.1. of this Report-Recommendation.

Third, Plaintiff has failed to adduce evidence establishing that the policy in question is even unconstitutional. I note that, in his Supplemental Memorandum of Law, Plaintiff argues that "deliberate indifference to serious medical needs is ... shown by the fact that prisoners are denied access to a doctor and physical examination upon arrival at [Great Meadow] C.F. to determine the need for pain medications which aren't life sustaining ...." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) As a threshold matter, Plaintiff's argument is misplaced to the extent he is arguing about the medical care other prisoners may not have received upon their arrival at Great Meadow C.F. since this is not a class-action. More importantly, to the extent he is arguing about any medical care that he (allegedly) did not receive upon his arrival at Great Meadow C.F., he cites no record evidence in support of such an assertion. (Id.) Indeed, he does not even cite any record evidence establishing that, upon his arrival at Great Meadow C.F. in early 2000, either (1) he asked a Defendant in this action for such medical care, or (2) he was suffering from a serious medical need for purposes of the Eighth Amendment. (Id.)

**\*9** If Plaintiff is complaining that Defendant Paolano is liable for recklessly causing a physician at Great Meadow C.F. to excessively delay a review Plaintiff's pain medication upon his arrival at Great Meadow C.F., then Plaintiff should have asserted that allegation (and some basic facts supporting it) in a pleading in this action so that Defendants could have taken adequate discovery on it, and so that the Court could squarely review the merits of it. (Dkt. No. 78, Part 11, at 53 [Plf.'s Depo.].)

For all of these reasons, I recommend that Plaintiff's claims against Defendant Paolano be dismissed with

prejudice.

**B. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Nesmith Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Generally, to state a claim for inadequate medical care, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that, even assuming that Plaintiff's broken wrist constituted a sufficiently serious medical condition for purposes of the Eighth Amendment, Plaintiff has not adduced evidence establishing that, on August 17, 2000, Defendant Nesmith acted with deliberate indifference to that medical condition. (Dkt. No. 78, Part 13, at 4-9 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that Defendant Nesmith sutured lacerations in Plaintiff's forehead, ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. (Id. at 7-9 [providing accurate record citations].) Moreover, argue Defendants, Plaintiff's medical records indicate that he did not first complain of an injury to his wrist until hours after he experienced that injury. (Id. at 8 [providing accurate record citation].)

Plaintiff responds that "[he] informed P.A. Nesmith that his wrist felt broken and P.A. Nesmith ignored plaintiff, which isn't reasonable. P.A. Nesmith didn't even care to do a physical examination to begin with[,] which would've revealed [the broken wrist] and is fundamental medical care after physical trauma." (Dkt. No. 88, at 11 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites *no* record evidence. (Id. at 11-12.)

The main problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants have argued, Defendant Nesmith (1) sutured lacerations in Plaintiff's forehead within hours if not minutes of Plaintiff's injury and (2) ordered an x-ray

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. These facts were asserted by Defendants in Paragraphs 27 through 32 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 27-32 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits most of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 48-50 [Ex. N to Plf.'s Affid.].)

**\*10** The only denial he supports with a record citation is with regard to when, within the referenced 24-hour period, Defendant Nesmith ordered his wrist x-ray. This issue is not material, since I have assumed, for purposes of Defendants' motion, merely that Defendant Nesmith ordered Plaintiff's wrist x-ray within 24 hours of the onset of Plaintiff's injury.[FN28] (Indeed, whether the wrist x-ray was ordered in the late evening of August 17, 2000, or the early morning of August 18, 2000, would appear to be immaterial for the additional reason that it would appear unlikely that any x-rays could be conducted in the middle of the night in Great Meadow C.F.)

FN28. Furthermore, I note that the record evidence he references (in support of his argument that the x-ray was on the morning of August 18, 2000, not the evening of August 17, 2000) is "Defendants exhibit 20," which he says "contains [an] 11/20/00 Great Meadow Correctional Facility Investigation Sheet by P. Bundrick, RN, NA, and Interdepartmental Communication from defendant Ted Nesmith P.A. that state [that the] X ray was ordered on 8/18/00 in the morning." (*Id.*) I cannot find, in the record, any "exhibit 20" having been submitted by Defendants, who designated their exhibits by letter, not number. (*See generally* Dkt. No. 78). However, at Exhibit G of Defendant Nesmith's affidavit, there is the "Investigation Sheet" to which Plaintiff refers. (Dkt. No. 78, Part 3, at 28 [Ex. G to Nesmith

Affid.].) The problem is that document does not say what Plaintiff says. Rather, it says, "Later that evening [on August 17, 2000] ... [a]n x-ray was ordered for the following morning ...." (*Id.*) In short, the document says that the x-ray was not ordered *on* the morning of August 18, 2007, but *for* that morning. Granted, the second document to which Plaintiff refers, the "Interdepartmental Communication" from Defendant Nesmith, does say that "I saw him the next morning and ordered an xray ...." (*Id.* at 29.) I believe that this is a misstatement, given the overwhelming record evidence to the contrary.

Moreover, in confirming the accuracy of Defendants' record citations contained in their Rule 7.1 Statement, I discovered several facts further supporting a finding that Defendant Nesmith's medical care to Plaintiff was both prompt and responsive. In particular, the record evidence cited by Defendants reveals the following specific facts:

(1) at approximately 10:17 a.m. on August 17, 2000, Plaintiff was first seen by someone in the medical unit at Great Meadow C.F. (Nurse Hillary Cooper);

(2) at approximately 10:40 a.m. on August 17, 2000, Defendant Nesmith examined Plaintiff; during that examination, the main focus of Defendant Nesmith's attention was Plaintiff's complaint of the lack of feeling in his lower extremities; Defendant Nesmith responded to this complaint by confirming that Plaintiff could still move his lower extremities, causing Plaintiff to receive an x-ray examination of his spine (which films did not indicate any pathology), and admitting Plaintiff to the prison infirmary for observation;

(3) at approximately 11:00 a.m. on August 17, 2000, Defendant Nesmith placed four sutures in each of two 1/4" lacerations on Plaintiff's left and right forehead;

(4) by 11:20 a.m. Plaintiff was given, or at least prescribed, Tylenol by a medical care provider;

(5) Plaintiff's medical records reflect no complaint by Plaintiff of any injury to his wrist at any point in time other than between 4:00 p.m. and midnight on August 17,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

2000;

(6) at some point after 9:00 p.m. on August 17, 2000, and 9:00 a.m. on the morning of August 18, 2000, Defendant Nesmith ordered that Plaintiff's wrist be examined by x-ray, in response to Plaintiff's complaint of an injured wrist; that x-ray examination occurred at Great Meadow C.F. at some point between 9:00 a.m. on August 17, 2000, and 11:00 a.m. on August 18, 2000, when Defendant Nesmith personally performed a "wet read" of the x-rays before sending them to Albany Medical Center for a formal reading by a radiologist;

(7) at approximately 11:00 a.m. on August 18, 2000, Defendant Nesmith placed a splint on Plaintiff's wrist and forearm with the intent of replacing it with a cast in a couple of days; the reason that Defendant Nesmith did not use a cast at that time was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith believed, based on 30 years experience treating hundreds of fractures, that it was generally not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides;

**11** (8) on August 22, 2000, Defendant Nesmith replaced the splint with a cast;

(9) on August 23, 2000, Plaintiff was discharged from the infirmary at Great Meadow C.F.; and

(10) on August 30, 2000, Defendant Nesmith removed the sutures from Plaintiff's forehead. (*See generally* Dkt. No. 78, Part 2, ¶¶ 3-15 [Aff. of Nesmith]; Dkt. No. 78, Part 3, Exs. A-E [Exs. to Affid. of Nesmith].)

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," [FN29] one that is "equivalent to criminal recklessness." [FN30] There is no evidence of such criminal recklessness on the part of Defendant Nesmith, based on the uncontroverted facts before the Court, which show a rather prompt and responsive level of medical care given by Defendant Nesmith to Plaintiff, during the hours and days following the onset of his injuries.

FN29. *Farmer v. Brennan,* 511 U.S. 825, 835,

114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN30. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *cf. Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").

In his argument that his treatment in question constituted deliberate indifference to a serious medical need, Plaintiff focuses on the approximate 24-hour period that appears to have elapsed between the onset of his injury and his receipt of an x-ray examination of his wrist. He argues that this 24-hour period of time constituted a delay that was unreasonable and reckless. In support of his argument, he cites two cases. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), cert. denied, *496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), cert. denied, *446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980).* However, the facts of both cases are clearly distinguishable from the facts of the case at hand.

In *Brown v. Hughes,* the Eleventh Circuit found a genuine issue of material fact was created as to whether a correctional officer knew of a prisoner's foot injury during the four hours in which no medical care was provided to the prisoner, so as to preclude summary judgment for that officer. *Brown, 894 F.2d at 1538-39.* However, the Eleventh Circuit expressly stated that the question of fact was created because the prisoner had "submitted affidavits stating that [the officer] was called to his cell because there had been a fight, that while [the officer] was present [the prisoner] began to limp and then hop on one leg, that his foot began to swell severely, that he told [the officer] his foot felt as though it were broken, and that [the officer] promised to send someone to look at it but never did." *Id.* Those are *not* the facts of this case.

In *Loe v. Armistead,* the Fourth Circuit found merely that, in light of the extraordinary leniency with which *pro se* complaints are construed, the court was unable to conclude that a prisoner had failed to state a claim upon which relief might be granted for purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) because the prisoner had alleged that the defendants-*despite being (at some point) "notified" of the prisoner's injured arm*-had inexplicably delayed for 22 hours in giving him medical treatment for the injury. *Loe, 582 F.2d at 1296.* More specifically, the court expressly construed the prisoner's

complaint as alleging that, following the onset of the plaintiff's injury at 10:00 a.m. on the day in question, the plaintiff was immediately taken to the prison's infirmary where a nurse, while examining the prisoner's arm, heard him complain to her about pain. *Id. at 1292.* Furthermore, the court construed the prisoner's complaint as alleging that, "[t]hroughout the day, until approximately 6:00 p.m., [the prisoner] repeatedly requested that he be taken to the hospital. He was repeatedly told that only the marshals could take him to a hospital and that they had been notified of his injury." *Id. at 1292-93.* Again, those are *not* the facts of this case.

**\*12** Specifically, there is no evidence in the record of which I am aware that at any time before 4:00 p.m. on August 17, 2000, Defendant Nesmith either (1) heard Plaintiff utter a complaint about a wrist injury sufficient to warrant an x-ray examination or (2) observed physical symptoms in Plaintiff's wrist (such as an obvious deformity) that would place him on notice of such an injury. As previously stated, I decline, and I urge the Court to decline, to tediously sift through the 262 pages of documents that Plaintiff has submitted in the hope of finding a shred of evidence sufficient to create a triable issue of fact as to whether Plaintiff made, and Defendant Nesmith heard, such a complaint before 4:00 p.m. on August 17, 2000.

I note that, in reviewing Plaintiff's legal arguments, I have read his testimony on this issue. That testimony is contained at Paragraphs 8 through 12, and Paragraph 18, of his Supplemental Affidavit. (*See* Dkt. No. 86, at ¶¶ 8-10, 18 [Plf.'s Supp. Affid., containing two sets of Paragraphs numbed "5" through "11"].) In those Paragraphs, Plaintiff swears, in pertinent part, that "[w]hile I was on the x-ray table I told defendant Ted Nesmith, P.A. and/or Bill Redmond RN ... that my wrist felt broken, and was ignored." (*Id.* at ¶ 9.) Plaintiff also swears that "I was [then] put into a room in the facility clinic[,] and I asked defendant Ted Nesmith, PA[,] shortly thereafter for [an] x-ray of [my] wrist[,] pain medication and [an] ice pack but wasn't given it [sic]." (*Id.* at ¶ 10.) Finally, Plaintiff swears as follows: "At one point on 8/17/00 defendant Nesmith told me that he didn't give a damn when I kept complaining that my wrist felt broken and how I'm going to sue him cause I'm not stupid

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

[enough] to not know he's supposed to do [a] physical examination [of me], [and not] to ignore my complaints about [my] wrist feeling broke and feeling extreem [sic] pain. He told me [to] stop complaining [and that] he's done with me for the day." (*Id.* at ¶ 18.)

This last factual assertion is important since a response of "message received" from the defendant appears to have been critical in the two cases cited by Plaintiff. It should be emphasized that, according to the undisputed facts, when Plaintiff made his asserted wrist complaint to Defendant Nesmith during the morning of August 17, 2000, Defendant Nesmith was either suturing up Plaintiff's forehead or focusing on Plaintiff's complaint of a lack of feeling in his lower extremities. (This complaint of lack of feeling, by the way, was found to be inconsistent with Defendant Nesmith's physical examination of Plaintiff.)

In any event, Defendant Nesmith can hardly be said to have, in fact, "ignored" Plaintiff since he placed him under *observation* in the prison's infirmary (and apparently was responsible for the prescription of Tylenol for Plaintiff).FN31 Indeed, it was in the infirmary that Plaintiff was observed by a medical staff member to be complaining about his wrist, which resulted in an x-ray examination of Plaintiff's wrist.

FN31. In support of my conclusion that this fact alone is a sufficient reason to dismiss Plaintiff's claims against Defendant Nesmith, I rely on a case cited by Plaintiff himself. *See Brown,* 894 F.2d at 1539 ("Although no nurses were present [in the hospital] at the jail that day, the procedure of sending [the plaintiff] to the hospital, once employed, was sufficient to ensure that [the plaintiff's broken] foot was treated promptly. Thus, [the plaintiff] has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.").

*13 Even if it were true that Plaintiff made a wrist complaint directly to Defendant Nesmith (during Defendant Nesmith's examination and treatment of Plaintiff between 10:40 a.m. and 11:00 a.m. on August 17,

2000), and Defendant Nesmith heard that complaint, and that complaint were specific and credible enough to warrant an immediate x-ray examination, there would be, at most, only some *negligence* by Defendant Nesmith in not ordering an x-ray examination until 9:00 p.m. that night.

As the Supreme Court has observed, "[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.FN32 For this reason, this Court has actually held that a *17-day* delay between the onset of the prisoner's apparent wrist fracture and the provision of an x-ray examination and cast did not constitute deliberate indifference, as a matter of law. *Miles v. County of Broome,* 04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at *27-28, 2006 WL 561247 (N.D.N.Y. Mar. 6, 2006) (McAvoy, J.) (granting defendants' motion for summary judgment with regard to prisoner's deliberate indifference claim).

FN32. *See also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (prisoner's "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention [with regard to the treatment of his broken finger], are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]; *cf. O'Bryan v. Federal Bureau of Prisons,* 07-CV-0076, 2007 U.S. Dist. LEXIS 65287, at *24-28 (E.D.Ky. Sept. 4, 2007) (holding no deliberate indifference where prisoner wore wrist brace/bandage on his broken wrist for two months even though he had asked for a cast; finding that "the type of wrap would only go the difference of opinion between a patient and doctor about what should be done, and the Supreme Court has stated that a difference of opinion regarding the plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

diagnosis and treatment does not state a constitutional claim.").

As I read Plaintiff's complaints about the medical care provided to him by Defendant Nesmith in this action, I am reminded of what the Second Circuit once observed:

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

For all of these reasons, I recommend that Plaintiff's claims against Defendant Nesmith be dismissed with prejudice.

**C. Whether Defendant Nesmith Is Protected from Liability by the Doctrine of Qualified Immunity, As a Matter of Law**

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " [FN33] In determining whether a particular right was *clearly established,* courts in this Circuit consider three factors:

FN33. *Williams,* 781 F.2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

*14 (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.[FN34]

FN34. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

Regarding the issue of whether *a reasonable person would have known* he was violating a clearly established right, this "objective reasonableness" [FN35] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." [FN36] As the Supreme Court explained,

FN35. See *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights are clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

FN36. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

should be recognized.[FN37]

FN37. *Malley,* 475 U.S. at 341.

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law."[FN38]

FN38. *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases].)

Here, I agree with Defendants that, based on the current record, it was not clearly established that, between August 17, 2000, and August 22, 2000, Plaintiff possessed an Eighth Amendment right to receive an x-ray examination and casting of his wrist any sooner than he did. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].) I note that neither of the two decisions cited by Plaintiff (discussed earlier in this Report-Recommendation) were controlling in the Second Circuit. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), cert. denied, 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), cert. denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). I also note that what was controlling was the Supreme Court's decision in *Estelle v. Gamble,* holding that "the question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.

Furthermore, I agree with Defendants that, at the very least, officers of reasonable competence could have believed that Defendant Nesmith's actions in conducting the x-ray examination and casting when he did were legal.[FN39] In his memorandum of law, Plaintiff argues that Defendant Nesmith *intentionally* delayed giving Plaintiff an x-ray for 12 hours, and that the four-day delay of placing a hard cast on Plaintiff's wrist caused Plaintiff *permanent injury* to his wrist. (Dkt. No. 88, at 12-13 [Plf.'s Supp. Memo. of Law].) He cites no portion of the

record for either assertion. (*Id.*) Nor would the fact of permanent injury even be enough to propel Plaintiff's Eighth Amendment claim to a jury.[FN40] I emphasize that it is an undisputed fact, for purposes of Defendants' motion, that the reason that Defendant Nesmith placed a splint and not a cast on Plaintiff's wrist and arm on the morning of August 18, 2000, was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith's medical judgment (based on his experience) was that it was not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides.[FN41] Officers of reasonable competence could have believed that decision was legal.

FN39. (*Id.*)

FN40. This particular point of law was recognized in one of the cases Plaintiff himself cites. *Loe,* 582 F.2d at 1296, n. 3 ("[Plaintiff's] assertion that he suffered pain two and one-half weeks after the injury and that the fracture had not healed do not establish deliberate indifference or lack of due process. Similarly, his allegation that he has not achieved a satisfactory recovery suggests nothing more than possible medical malpractice. It does not assert a constitutional tort.").

FN41. (Dkt. No. 78, Part 12, ¶¶ 31-33 [Defs.' Rule 7.1 Statement]; *see also* Dkt. No. 78, Part 2, ¶¶ 11-13 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Ex. C [Exs. to Affid. of Nesmith] )

**\*15** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Nesmith based on the doctrine of qualified immunity.

**D. Whether Plaintiff Has Adduced Evidence Establishing that He Exhausted His Available Administrative Remedies with Respect to His Assault Claim**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

or other correctional facility until such administrative remedies as are available are exhausted." [FN42] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN43] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN44]

> FN42. 42 U.S.C. § 1997e.

> FN43. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

> FN44. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[FN45] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal. It is important to emphasize that *any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.* [FN46]

> FN45. 7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

> FN46. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g ., Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN47] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[FN48] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN49] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN50] *Third,* if the remedies were available and some of the defendants did not forfeit, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN51]

> FN47. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

> FN48. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

> FN49. *Hemphill,* 380 F.3d at 686 (citation omitted).

> FN50. *Id.* [citations omitted].

> FN51. *Id.* [citations and internal quotations omitted].

**\*16** Defendants argue that Plaintiff never exhausted his available administrative remedies with regard to his claim arising out of the assault that allegedly occurred on August 17, 2000. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)

Plaintiff responds with four different legal arguments. First, he appears to argue that he handed a written grievance to an unidentified corrections officer but never got a response from the IGRC, and that filing an appeal under such a circumstance is merely optional, under the PLRA (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) Second, he argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (*Id.* at 25-29.) In support of this argument, he cites unspecified record evidence that, although he sent a letter to one "Sally Reams" at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) Third, he argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (*Id.* at 30-38.) Fourth, he argues that Defendants rendered any

administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (*Id.* at 39-45.) [FN52]

> FN52. I note that the breadth of Plaintiff's creative, thoughtful and well-developed legal arguments further demonstrates his extraordinary experience as a litigant.

For the reasons set forth below, I reject each of these arguments. However, I am unable to conclude, for another reason, that Plaintiff has failed to exhaust his administrative remedies as a matter of law, based on the current record.

**1. Plaintiff's Apparent Argument that an Appeal from His Lost or Ignored Grievance Was "Optional" Under the PLRA**

Plaintiff apparently argues that filing an appeal to CORC when one has not received a response to one's grievance is merely optional under the PLRA. (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) If this is Plaintiff's argument, it misses the point.

It may be true that the decision of whether or not to file an appeal in an action is always "optional"-from a metaphysical standpoint. However, it is also true that, in order to satisfy the PLRA's exhaustion requirement, one *must* file an appeal when one has not received a response to one's grievance (unless one of the exceptions contained in the Second Circuit's three-party inquiry exists). *See, supra,* note 46 of this Report-Recommendation.

**2. Plaintiff's Argument that Defendants "Can't Realistically Show" that Plaintiff Never Sent any Grievances or Appeals to the Great Meadow C.F. Inmate Grievance Clerk**

Plaintiff also argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (Dkt. No. 86,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

at 25-29 [Plf.'s Memo. of Law].) This argument also fails.

**\*17** Plaintiff appears to misunderstand the parties' respective burdens on Defendants' motion for summary judgment. Even though a failure to exhaust is an affirmative defense that a defendant must plead and prove, once a defendant has met his initial burden of establishing the absence of any genuine issue of material fact regarding exhaustion (which initial burden has been appropriately characterized as "modest"),[FN53] the burden then shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial regarding exhaustion. *See, supra,* Part III of this Report-Recommendation.

> FN53. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at \*9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at \*17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.).

Here, it is an uncontroverted fact, for purposes of Defendants' motion, that (1) grievance records at Great Meadow C.F. indicate that Plaintiff never filed a timely grievance alleging that he had been assaulted by corrections officers at Great Meadow C.F. in 2000, and (2) records maintained by CORC indicate that Plaintiff never filed an appeal (to CORC) regarding any grievance alleging that he had been so assaulted. (*See* Dkt. No. 78, Part 12, ¶¶ 39-40 [Defs.' Rule 7.1 Statement, providing accurate record citations].) Plaintiff has failed to properly controvert these factual assertions with specific citations to record evidence that actually creates a genuine issue of fact. (*See* Dkt. No. 85, Part 2, at 50-51 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

With respect to Plaintiff's argument that the referenced factual assertions are basically meaningless because Great Meadow C.F. did not (during the time in question) have a grievance "receipt system," that argument also fails. In support of this argument, Plaintiff cites unspecified record evidence that, although he sent a letter to Sally Reams (the IGP Supervisor at Great Meadow C.F. in May 2003) at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) (*See* Dkt. No. 86, at 29 [Plf.'s Memo. of Law].) After examining Plaintiff's original Affidavit and exhibits, I located and carefully read the documents in question. (Dkt. No. 85, Part 1, ¶ 23 [Plf.'s Affid.]; Dkt. No. 85, Part 2 [Exs. F and G to Plf.'s Affid.].)

These documents do not constitute sufficient evidence to create a triable question of fact on the issue of whether, in August and/or September of 2000, Great Meadow C.F. did not have a grievance "receipt system." At most, they indicate that (1) at some point, nearly three years after the events at issue, Plaintiff (while incarcerated at Attica C.F.) wrote to Ms. Reams complaining about the alleged assault on August 17, 2000, (2) she responded to Plaintiff, on May 5, 2003, that he must grieve the issue at Attica C .F., where he must request permission to file an untimely grievance, and (3) at some point between April 7, 2003, and June 23, 2003, Ms. Reams informed Mr. Eagen that she did not "remember" receiving "correspondence" from Plaintiff. (*Id.*) The fact that Ms. Reams, after the passing of several weeks and perhaps months, did not retain an independent memory (not record) of receiving a piece of "correspondence" (not grievance) from Plaintiff (who was not an inmate currently incarcerated at her facility) bears little if any relevance on the issue of whether Great Meadow C.F. had, in April and/or May of 2003, a mechanism by which it recorded its receipt of *grievances.* Moreover, whether or not Great Meadow C.F. had a grievance "receipt system" in April and/or 2003 bears little if any relevance to whether it had a grievance "receipt system" in August and/or September of 2000.

**\*18** It should be emphasized that Defendants have adduced record evidence specifically establishing that, in August and September 2000, Great Meadow C.F. had a *functioning* grievance-recording process through which,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

when a prisoner (and specifically Plaintiff) filed a grievance, it was "assign[ed] a number, title and code" and "log[ged] ... into facility records." (Dkt. No. 78, Part 6, ¶¶ 7-9 [Bellamy Decl.]; Dkt. No. 78, Part 7, at 2 [Ex. A to Bellamy Decl.] Dkt. No. 78, Part 8, ¶ 4 [Brooks Decl.]; Dkt. No. 78, Part 9, at 6 [Ex. B to Brooks Decl.].)

Finally, even if Great Meadow C.F. did not (during the time in question) have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level. *See, supra,* note 46 of this Report-Recommendation.

**3. Plaintiff's Argument that the Determination He Received from CORC Satisfied the PLRA's Exhaustion Requirement**

Plaintiff argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (Dkt. No. 86, at 30-38 [Plf.'s Memo. of Law].) This argument also fails.

Plaintiff does not clearly articulate the specific portion of the record where this determination is located. (*See id.* at 30 [Plf.'s Affid., referencing merely "plaintiff's affidavit and exhibits"].) Again, the Court has no duty to *sua sponte* scour the 209 pages that comprise Plaintiff's "affidavit and exhibits" for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed what I believe to be the material portions of the documents to which Plaintiff refers. I report that Plaintiff appears to be referring to a determination by the Upstate C.F. Inmate Grievance Program, dated June 20, 2003, stating, "After reviewing [your June 11, 2003, Upstate C.F.] grievance with CORC, it has been determined that the grievance is unacceptable. It does not present appropriate mitigating circumstances for an untimely filing." (Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.]; *see also* Dkt. No. 85, Part 1, ¶¶ 22-34 [Plf.'s Affid.].)

There are two problems for Plaintiff with this document. First, this document does *not* constitute a written determination by *CORC* on a written appeal by

Plaintiff to *CORC* from an Upstate C.F. written determination. (*See* Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.].) This fact is confirmed by one of Plaintiff's own exhibits, wherein DOCS IGP Director Thomas Eagen advises Plaintiff, "Contrary to the IGP Supervisor's assertion in his memorandum dated June 20, 2003, the IGP Supervisor's denial of an extension of the time frames to file your grievance from Great Meadow in August 2000 has not been reviewed by the Central Office Review Committee (CORC). The IGP Supervisor did review the matter with Central Office staff who is [sic] not a member of CORC." (*See* Dkt. No. 85, Part 2, at 39 [Ex. K to Plf.'s Affid.].) At best, the document in question is an indication by Upstate C.F. that the success of an appeal by Plaintiff to CORC would be unlikely.

**\*19** Second, even if the document does somehow constitute a written determination by CORC on appeal by Plaintiff, the grievance to which the determination refers is a grievance filed by Plaintiff on June 11, 2003, at Upstate C.F., not a grievance filed by Plaintiff on August 30, 2000, at Great Meadow C.F. (Dkt. No. 85, Part 2, at 32-35 [Ex. I to Plf.'s Affid.].) Specifically, Plaintiff's June 11, 2003, grievance, filed at Upstate C.F., requested permission to file an admittedly *untimely* grievance regarding the injuries he sustained during the assault on August 17, 2000. (*Id.*)

A prisoner has not exhausted his administrative remedies with CORC when, years after failing to file a timely appeal with CORC, the prisoner requests *and is denied* permission to file an untimely (especially, a two-year-old) appeal with CORC due to an unpersuasive showing of "mitigating circumstances." *See Burns v. Zwillinger,* 02-CV-5802, 2005 U.S. Dist. LEXIS 1912, at *11 (S.D.N .Y. Feb. 8, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") [collecting cases]. If the rule were to the contrary, then, as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement. The very reason for requiring that a prisoner obtain permission before filing an untimely appeal presumes that the permitted appeal would be required to complete the exhaustion requirement. Viewed from another standpoint, a decision by CORC to refuse the filing of an untimely appeal does not involve a review of the merits of the appeal.

**4. Plaintiff's Argument that Defendants Rendered any Administrative Remedies "Unavailable" to Plaintiff**

Plaintiff also argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash[ing]" Plaintiff's grievances and appeals. (Dkt. No. 86, at 39-45 [Plf.'s Memo. of Law].) This argument also fails.

In support of this argument, Plaintiff "incorporates by reference all the previously asserted points, Plaintiff's Affidavit in Opposition with supporting exhibits, as well as[ ] the entire transcripts of Defendants['] deposition on [sic] Plaintiff ...." (*Id.* at 40, 45.) Again, the Court has no duty to *sua sponte* scour the 265 pages that comprise Plaintiff's Affidavit, Supplemental Affidavit, exhibits, and deposition transcript for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed the documents to which Plaintiff refers, and I report that I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.

**\*20** For example, Plaintiff has adduced no evidence

that he possesses any *personal knowledge* (only speculation) of any Defendant in this action having "trashed" his alleged grievance(s) and appeal(s),[FN54] nor has he even adduced evidence that it was *one of the named Defendants in this action* to whom he handed his alleged grievance(s) and appeal(s) for delivery to the Great Meadow C.F. Inmate Grievance Program Clerk on August 30, 2000, September 13, 2000, and September 27, 2000.[FN55] Similarly, the legal case cited by Plaintiff appears to have nothing to do with any Defendant to this action, nor does it even have to do with Great Meadow C.F.[FN56]

FN54. (*See* Dkt. No. 85, Part 1, ¶¶ 13-14, 16-17 [Plf.'s Affid., asserting, "Prison officials trashed my grievances and appeals since they claim not to have them despite [the] fact I sent them in a timely manner. It's [the] only reason they wouldn't have them.... Prison officials have a history of trashing grievances and appeals.... I've been subjected to having my grievances and appeals trashed prior to and since this matter and have spoken to alot [sic] of other prisoners whom [sic] said that they were also subjected to having their grievances and appeals trashed before and after this incident, in alot [sic] of facilities.... Suspecting foul play with respect to my grievances and appeals, I wrote, and spoke to[,] prison officials and staff that did nothing to rectify the matter, which isn't surprising considering [the] fact that it's an old problem ...."].)

FN55. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk ... which contained the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail, in F-Block

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

SHU [at] Great Meadow CF ...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

FN56. (*See* Dkt. No. 85, Part 1, ¶ 15 [Plf.'s Affid., referencing case]; Dkt. No. 85, Part 2, at 16-17 [Ex. B to Plf.'s Affid., attaching a hand-written copy of case, which mentioned a prisoner's grievances that had been discarded in *1996* by an *unidentified* corrections officer at *Sing Sing Correctional Facility* ].)

**5. Record Evidence Creating Genuine Issue of Fact**

Although I decline to *sua sponte* scour the lengthy record for proof of a triable issue of fact regarding exhaustion, I have, while deciding the many issues presented by Defendants' motion, had occasion to review in detail many portions of the record. In so doing, I have discovered evidence that I believe is sufficient to create a triable issue of fact on exhaustion.

Specifically, the record contains Plaintiff's testimony that (1) on August 30, 2000, he gave a corrections officer a grievance regarding the alleged assault on August 17, 2000, but he never received a response to that grievance, (2) on September 13, 2000, he gave a corrections officer an appeal (to the Superintendent) from that non-response, but again did not receive a response, and (3) on September 27, 2000, he gave a corrections officer an appeal (to CORC) from that non-response, but again did not receive a response.[FN57]

FN57. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk in which contained [sic] the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent

by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail; in F-Block SHU [at] Great Meadow CF...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid ., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

The remaining issue then, as it appears to me, is whether or not this affidavit testimony is so self-serving and unsubstantiated by other direct evidence that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN58] Granted, this testimony appears self-serving. However, based on the present record, I am unable to find that the testimony is so wholly unsubstantiated by other direct evidence as to be incredible. Rather, this testimony appears corroborated by two pieces of evidence. First, the record contains what Plaintiff asserts is the grievance that he handed to a corrections officer on August 30, 2000, regarding the alleged assault on August 17, 2000. (Dkt. No. 85, Part 2, at 65-75 [Ex. Q to Plf.'s Affid.].) Second, the record contains two pieces of correspondence between Plaintiff and legal professionals *during or immediately following the time period in question* containing language suggesting that Plaintiff had received no response to his grievance. (Dkt. No. 85, Part 2, at 19-21 [Exs. C-D to Plf.'s Affid .].)

FN58. *See, supra,* note 12 of this Report-Recommendation (collecting cases).

Stated simply, I find that sufficient record evidence exists to create a genuine issue of fact as to (1) whether Plaintiff's administrative remedies were, with respect to his assault grievance during the time in question, "available" to him, for purposes of the first part of the Second Circuit's three-part exhaustion inquiry, and/or (2) whether Plaintiff has shown "special circumstances" justifying his failure to comply with the administrative procedural requirements, for purposes of the third part of the Second Circuit's three-part exhaustion inquiry.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**\*21** As a result, I recommend that the Court deny this portion of Defendants' motion for summary judgment.

**E. Whether Plaintiff Has Sufficiently Alleged, or Established, that Defendants Were Liable for the Policy to Review the Non-Life-Sustaining Medical Prescriptions of Prisoners Upon Arrival at Great Meadow C.F.**

As explained above in Part II.A. of this Report-Recommendation, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (Dkt. No. 78, Part 13, at 3 [Defs.' Mem. of Law].) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

Plaintiff responds that "[he] didn't have to get in particular [sic] about the policy [of] discontinuing all incoming prisoners['] non[-]life[-]sustaining medications without examination and indiscriminitely [sic] upon arrival at [Great Meadow] C.F. in [his Second] Amended Complaint. Pleading[s] are just supposed to inform [a] party about [a] claim[,] and plaintiff informed defendant [of] the nature of [his] claims including [the claim of] inadequate medical care. And discovery revealed [the] detail[s] [of that claim] as [Plaintiff had] intended." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) In addition, Plaintiff responds that Defendant Paolano must have been personally involved in the creation and/or implementation of the policy in question since he was the Great Meadow Health Services Director. (*Id.* at 10.)

I agree with Defendants that this claim is not properly

before this Court. Plaintiff's characterization of the notice-pleading standard, and of the contents of his Amended Complaint, are patently without support (both legally and factually). It has long been recognized that a "claim," under Fed.R.Civ.P. 8, denotes "the aggregate of operative facts which give rise to a right enforceable in the courts." [FN59] Clearly, Plaintiff's Second Amended Complaint alleges no facts whatsoever giving rise to an asserted right to be free from the application of the prescription-review policy at Great Meadow C.F. Indeed, his Second Amended Complaint-which asserts Eighth Amendment claims arising *solely* out of events that (allegedly) transpired on August 17, 2000-says nothing at all of the events that transpired immediately upon his arrival at Great Meadow C.F. in early August of 2000, nor does the Second Amended Complaint even casually mention the words "prescription," "medication" or "policy." (*See generally* Dkt. No. 10 [Second Am. Compl.].)

> FN59. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir.1943); *United States v. Iroquois Apartments, Inc.,* 21 F.R.D. 151, 153 (E.D.N.Y.1957); *Birnbaum v. Birrell,* 9 F.R.D. 72, 74 (S.D.N.Y.1948).

**\*22** Furthermore, under the notice-pleading standard set forth by Fed.R.Civ.P. 8(a)(2), to which Plaintiff refers in his Supplemental Memorandum of Law, Defendants are entitled to *fair notice* of Plaintiff's claims.[FN60] The obvious purpose of this rule is to protect defendants from undefined charges and to facilitate a proper decision on the merits.[FN61] A complaint that fails to provide such fair notice "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN62] This fair notice does not occur where, as here, news of the claim first springs up in a deposition more than two years after the action was commenced, approximately seven months after the amended-pleading deadline expired, and approximately two weeks before discovery in the action was scheduled to close. (*Compare* Dkt. No. 1 [Plf.'s Compl., filed 8/14/03] *with* Dkt. No. 42, at 1-2 [Pretrial Scheduling Order setting amended-pleading deadline as 2/28/05] *and* Dkt. No. 78, Part 11, at 52-53 [Plf.'s Depo.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Transcript, dated 9/30/05] *and* Dkt. No. 49 [Order setting discovery deadline as 10/14/05].)

FN60. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (the statement required by Fed.R.Civ.P. 8 [a][2] must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

FN61. *Ruffolo v. Oppenheimer & Co., Inc.,* 90-CV-4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb.5, 1991); *Howard v. Koch,* 575 F.Supp. 1299, 1304 (E.D.N.Y.1982); *Walter Reade's Theatres, Inc. v. Loew's Inc.,* 20 F.R.D. 579, 582 (S.D.N.Y.1957).

FN62. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996]).

Under the circumstances, the mechanism by which to assert such a late-blossoming claim was a motion to reopen the amended-pleading filing deadline (the success of which depended on a showing of cause), coupled with a motion for leave file a Third Amended Complaint (the success of which depended, in part, on a showing of lack of prejudice to Defendants, as well as a lack of futility). Plaintiff never made such motions, nor showed such cause.

I acknowledge that, generally, the liberal notice-pleading standard set forth by Fed.R.Civ.P. 8 is applied with even greater force where the plaintiff is proceeding *pro se.* In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are

generally construed with an *extra* degree of liberality. As an initial matter, I have already concluded, based on my review of Plaintiff's extensive litigation experience, that he need not be afforded such an extra degree of leniency since the rationale for such an extension is a *pro se* litigant's inexperience with the court system and legal terminology, and here Plaintiff has an abundance of such experience. *See, supra,* notes 21-25 of this Report-Recommendation. Moreover, even if he were afforded such an extra degree of leniency, his phantom prescription-review claim could not be read into his Second Amended Pleading, for the reasons discussed above. (I note that, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended.") FN63

FN63. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Nor could Plaintiff's late-blossoming prescription-review claim properly be read into his papers in opposition to Defendants' motion for summary

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

judgment. Granted, a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.[FN64]

> FN64. *See Auguste v. Dept. of Corr.,* 424 F.Supp.2d 363, 368 (D.Conn.2006) ("Auguste [a *pro se* civil rights plaintiff] cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment.") [citations omitted].

**\*23** Finally, in the event the Court decides to construe Plaintiff's Second Amended Complaint as somehow asserting this claim, I agree with Defendants that the Court should dismiss that claim, also for the reasons discussed above in Part IV.A.2. of this Report-Recommendation. Specifically, Plaintiff has failed to adduce evidence establishing that Defendant Paolano (or any named Defendant in this action) was personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided evidence establishing that the policy is even unconstitutional. *See, supra,* Part IV.A.2. of this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk's Office shall, in accordance with note 1 of this Order and Report-Recommendation, correct the docket sheet to remove the names of Defendants Englese, Edwards, Bump, Smith, Paolano, and Nesmith as "counter claimants" in this action; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 78) be ***GRANTED*** **in part** (i.e., to the extent that it requests the dismissal with prejudice of Plaintiff's claims against Defendants Paolano and Nesmith) and ***DENIED* in part** (i.e., to the extent that it requests dismissal of Plaintiff's claims against the

remaining Defendants on the grounds of Plaintiff's failure to exhaust available administrative remedies) for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Murray v. Palmer
Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
John CROSWELL, Plaintiff,
v.
Joseph E. MCCOY, Superintendent, Cayuga
Correctional Facility; Joseph Lippa, Correction Officer,
Cayuga Correctional Facility, Defendants.
No. Civ.9:01–CV–00547.

March 11, 2003.

Inmate sued superintendent of correctional facility and a correction officer under § 1983, asserting violations of his civil rights under the First and Eighth Amendments. On cross-motions for summary judgment, the District Court, Gary L. Sharpe, United States Magistrate Judge, held that: (1) genuine issues of material fact existed as to whether the inmate exhausted his administrative remedies; (2) inmate's allegations were insufficient to show that he suffered from a serious medical condition; (3) inmate failed to prove that he was retaliated against for filing a grievance requesting the use of a larger room to conduct meetings of a religious organization; and (4) defendants were entitled to qualified immunity.

Defendants' motion granted.

West Headnotes

**[1] Federal Civil Procedure 170A** 🔑 **2491.5**

170A Federal Civil Procedure

170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
Genuine issues of material fact as to whether an inmate filled out the bottom of a grievance form so as to

appeal precluded summary judgment as to whether the inmate exhausted his administrative remedies, as required by the Prison Litigation Reform Act (PLRA). 42 U.S.C.A. § 1997e(a).

**[2] Prisons 310** 🔑 **192**

310 Prisons

310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In General. Most Cited Cases
(Formerly 310k17(2))
**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
Inmate's allegations were insufficient to show that he suffered from a serious medical condition, thus defeating his claim that a correction officer was deliberately indifferent to his health and safety when the officer required him to clean pesticide residue from an exterminated beehive; the inmate simply had wheezing, which was not uncommon for persons with asthma, and a headache. U.S.C.A. Const. Amend. 8; 42 U.S.C.A. § 1983.

**[3] Constitutional Law 92** 🔑 **1438**

92 Constitutional Law

92XV Right to Petition for Redress of Grievances
92k1438 k. Prisoners. Most Cited Cases
(Formerly 92k91)
**Prisons 310** 🔑 **152**

310 Prisons

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

310II Prisoners and Inmates
310II(B) Care, Custody, Confinement, and Control
310k151 Religious Practices and Materials
310k152 k. In General. Most Cited Cases
(Formerly 310k4(14))

Inmate failed to prove that he was retaliated against for filing a grievance requesting the use of a larger room to conduct meetings of a religious organization, thus defeating the inmate's First Amendment claim; correction officer's requiring the inmate to clean pesticide residue was not an adverse action, and in any event was not shown to be causally related to the grievance, and the superintendent was not shown to have disregarded the request, would have moved the meetings to another location if necessary, and was not involved in a transfer of the inmate. U.S.C.A. Const. Amend. 1; 42 U.S.C.A. § 1983.

[4] Civil Rights 78 ⚖ 1376(7)

78 Civil Rights

78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
(Formerly 78k214(7))

It was objectively reasonable for a correction officer to believe that requiring an inmate to clean pesticide residue did not violate the inmate's constitutional rights, and thus, the officer was entitled to qualified immunity in the inmate's § 1983 suit; the officer did not violate a clearly established right when he relied on the department of correctional services for the appropriate usage of toxic materials at the prison. 42 U.S.C.A. § 1983.

[5] Civil Rights 78 ⚖ 1376(7)

78 Civil Rights

78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(7) k. Prisons, Jails, and Their

Officers; Parole and Probation Officers. Most Cited Cases
(Formerly 78k214(7))

It was objectively reasonable for a superintendent of a correctional facility to deny an inmate's request for a larger room to conduct meetings of a religious organization and thus, the superintendent was entitled to qualified immunity in the inmate's section 1983 suit; the superintendent relied on a memorandum stating that the room provided for the meetings was "more than adequate." 42 U.S.C.A. § 1983.

[6] Civil Rights 78 ⚖ 1376(7)

78 Civil Rights

78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
(Formerly 78k214(7))

Transfer of an inmate would have been a lawful exercise of prison superintendent's authority had he been involved, in light of a prison policy mandating a transfer whenever a civilian employee was assaulted by an inmate, and thus, the superintendent was entitled to qualified immunity regarding the allegedly retaliatory transfer in the inmate's § 1983 suit. 42 U.S.C.A. § 1983.

John Croswell, Massapequa, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York, Department of Law, The Capitol, Litigation Bureau, Albany, New York, for the Defendants.

Sean M. Seely, Asst. Attorney General, of counsel.

*REPORT–RECOMMENDATION*

SHARPE, Magistrate J.
I. *INTRODUCTION* [FN1]
FN1. This matter has been referred to the undersigned for a Report–Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

**\*1** On June 3, 2002, plaintiff, *pro se* John Croswell filed a motion for summary judgment (*Dkt. No. 29* ). On June 10, 2002, defendants Joseph Lippa and Joseph McCoy filed a cross-motion for summary judgment (*Dkt. No. 34* ). On June 24, 2002, Croswell filed a response in opposition to the cross-motion (*Dkt. No. 42* ). After reviewing Croswell's claims and for the reasons set forth below, this court recommends denying Croswell's motion for summary judgment and granting the defendants' cross-motion for summary judgment for only the reasons stated.

## II. *Background*

Croswell brings this action under 42 U.S.C. § 1983 claiming that the defendants violated his civil rights under the First and Eighth Amendments. Specifically, Croswell moves for summary judgment claiming that: (1) Lippa was deliberately indifferent to his health and safety; (2) McCoy transferred him in retaliation for filing various grievances with the Inmate Grievance Review Committee ("IGRC"); (3) McCoy is liable for being grossly negligent in managing his subordinate; and, (4) unnamed defendants provided him with inadequate medical treatment while at the Upstate Correctional Facility.

The defendants filed a cross-motion for summary judgment based on the following: (1) Croswell failed to exhaust his administrative remedies concerning his pesticide exposure claim; (2) Croswell failed to state an Eighth Amendment claim; (3) Croswell failed to state a First Amendment claim; and, (4) they are entitled to qualified immunity. The court shall address each of these issues *seriatim*.

## III. *FACTS*

### A. *Pesticide Incident*

On September 5, 2000, as part of Croswell's inmate job assignment, he was ordered to clean pesticide residue from an exterminated beehive at the Cayuga Correctional Facility. He informed Lippa that he was asthmatic and requested a protective mask. Lippa refused to provide a mask and as a result, Croswell inhaled a considerable quantity of pesticide. Following the completion of his work assignment, Croswell requested permission to report

to the infirmary because he was wheezing and had a severe headache.

### B. *Medical Treatment*

Croswell was treated by Nurse Timothy Burns. Burns detected some slight bi-lateral wheezing. Burns prescribed 4 tylenol tablets and offered a nebulizer treatment which Croswell refused. Croswell took two tylenol and went to use an inhaler that he had in his cell. He did not seek additional medical attention until three days later, and the issue was unrelated to any respiratory difficulty.

### C. *Grievances*

#### 1. *Nation Of Islam Grievance*

On September 5, 2000, the same day as the pesticide incident, Croswell filed a grievance on behalf of the Nation of Islam ("NOI") requesting a larger room to conduct meetings. The IGRC recommended granting his request to the extent that NOI meetings could be moved to a larger room when the number of inmates attending called for a larger venue. On September 8, 2000, Imam Saad Sahraoui submitted a memorandum indicating that there were only 23 inmates declared as NOI members at the time, and noted that the room used to conduct services was "more than adequate." (*Defs. ['] Cross-Mot. for Summ. J., Ex. D* ).

**\*2** Croswell appealed the recommendation and McCoy, in reviewing the IGRC's recommendation, stated in relevant part that:

[An][i]nvestigation reveals that there were only 25 registered members of the NOI at the time this griev[ance] was filed. The registered membership has risen to 46 since that time but with fewer than 30 inmates attending services on a regular basis. I find no reason to move the NOI services or classes to a larger room at this time. Should there be a need for such in the future, a suitable location will be selected.

(*Defs. ['] Cross–Mot. for Summ. J., Ex. F* ). Croswell appealed the decision to the Central Office Review Committee ("CORC") which subsequently denied his grievance. (*Defs. ['] Cross–Mot. for Summ. J., Ex. G* ).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

2. *Pesticide Exposure Grievance*

On September 18, 2000, Croswell filed a grievance concerning the pesticide exposure of September 5. In responding to the grievance, McCoy stated the following:
[T]he Material Safety Data Sheets for the product used indicated that inhalation is unlikely due to the large size of the particles. It also provides that no respiratory or eye protection is required for application nor gloves required. The product also carries a Health Risk Rating of 1(low).

(*Defs.* ['] *Cross–Mot. for Summ. J., Ex. I* ). McCoy determined that Croswell's health and safety were not placed in jeopardy by assigning him to clean up the residue.

D. *Misbehavior Report and Transfer*

On October 9, 2000, Croswell was charged with assaulting a civilian employee. Specifically, he was charged with grabbing a female civilian employee nurse's buttock in the prison infirmary. The hearing was conducted by McCoy's designee. Croswell was found guilty and he was sentenced to 270 days in the Special Housing Unit ("SHU"). He was also transferred to Upstate.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994) (alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

**\*3** Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00–CV–3725, 2001 WL 527484, at \*2 (S.D.N.Y, May 16, 2001). More specifically, Local Rule 7.1(a)(3) specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00–CV–1178, 2002 WL 368534, at *2 (N.D.N.Y. March 1, 2002)(*interalia* citing *Bundy Am. Corp. v. K–Z Rental Leasing, Inc.,* 00–CV–260, 2001 WL 237218, at *1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470–71. With this standard in mind, the court now turns to the sufficiency of Croswell's claims.

B. *Exhaustion: Prison Litigation Reform Act*

[1] Before addressing the substance of Croswell's claims, the court must first consider whether he properly exhausted his administrative remedies. The Prison Litigation Reform Act ("PLRA") requires that suits brought by prisoners under 42 U.S.C. § 1983 must first exhaust their available administrative remedies.[FN2] Recently, the Supreme Court held that the PLRA exhaustion requirement applies to all inmate suits. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The Court has further held that the PLRA requires administrative exhaustion even where the grievance process does not permit award of money damages and the prisoner seeks only money damages, so long as the grievance tribunal has authority to take some responsive action. *See Booth v. Churner,* 531 U.S. 731, 741 (2001). However, "a dismissal of an action for failing to comply with the PLRA is without prejudice." *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

> FN2. "No action shall be brought with respect to prison conditions under Section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

*4 The New York State Inmate Grievance Program involves three steps. First, an inmate must submit a grievance to the clerk of the I.G.R.C. within 14 days of the alleged occurrence. 7 NYCRR § 701.7[a]. The I .G.R.C. is a five-member body consisting of two voting inmates, two voting staff members, and a non-voting chair. 7 NYCRR § 701.4. Next, a party to the grievance may appeal to the superintendent within four working days after receipt of the I.G.R.C.'s written response. As a general rule, the superintendent or his designee must issue a decision within ten working days of receipt of the appeal. 7 NYCRR § 701.7[b]. Then, a party to a grievance may appeal the superintendent's action to the C.O.R.C. which consists of the deputy commissioners or their designees. 7 NYCRR § 701.6.

If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA. *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) (citation omitted). Furthermore, simply writing letters of complaint to the superintendent is insufficient to comply with the requirement that a plaintiff must exhaust his administrative remedies. *See Houze v. Segarra,* 217 F.Supp.2d 394, 396 (S.D.N.Y.2002)(citing *interalia Betty v. Goord,* 210 F.Supp.2d 250, 255–256 (S.D.N.Y.2000)); *see also, Meehan v. Frazier,* 2002 U.S. Dist LEXIS 20604, at *11–12; *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002).

However, an inmate may fulfill the PLRA's exhaustion requirement where he: (1) relies on a prison officials' representations that correct procedure was followed; or (2) makes a "reasonable attempt" to exhaust administrative remedies, especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts; and, (3) the state's time to respond to the grievance has expired. *O'Connor v. Featherston,* 01–CV–3251, 2002 WL 818085, *2 (S.D.N.Y. Apr.29, 2002) (citations omitted).

Croswell indicates in his complaint that he did not present the facts to the prisoner grievance program. (*Compl., P. 2, ¶ 4* ). However, in Croswell's response papers, he asserts that he made every effort possible to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

exhaust all avenues of administrative relief before seeking redress through the court in his pesticide [FN3] grievance. Croswell provides the court with a copy of his pesticide grievance which shows that he filled out the bottom of the form to appeal to the CORC *(Croswell Aff., Exs. D & E; Dkt. No. 42)*. He also provides a letter from Thomas Eagen indicating that he did not receive Croswell's appeal concerning the pesticide exposure grievance. Croswell maintains that "once Eagen denied having ever received plaintiff's appeal ... plaintiff's avenues of administrative relief, with regard to said grievances, had been exhausted pursuant to time guidelines." (*Pl. ['s] Mem. Opp'n to Defs. ['] Cross-Mot. for Summ. J., P. 2; Dkt. No. 42* ).

> FN3. It appears that Croswell did exhaust his administrative remedies concerning his NOI grievance.

**\*5** In contrast, the defendants provided a copy of Croswell's pesticide grievance which was not filled out at the bottom to indicate that he wanted to appeal to the CORC (*Seely Aff., Ex. I* ). The defendants contend that he failed to appeal McCoy's decision denying the pesticide grievance to the CORC. As such, the defendants urge the court to strike this claim since he has failed to exhaust his administrative remedies in regards to his pesticide grievance.

This court finds that it is unclear whether or not Croswell has exhausted his administrative remedies in his pesticide claim. Despite the defendants' claim that Croswell failed to fill out the bottom of his grievance form for his pesticide claim, Croswell insists that he did appeal and that the appeal never arrived. It is apparent that Croswell was familiar with the grievance process and the requirement to exhaust. Nonetheless, it may well be that Croswell has failed to exhaust his administrative remedies. However, without more information, the court cannot as a matter of law find that Croswell failed to exhaust his administrative remedies. Accordingly, this court recommends that the defendants' cross-motion for summary judgment based on Croswell's failure to exhaust his administrative remedies should be denied.

C. *Eighth Amendment*

[2] Croswell claims that Lippa was deliberately indifferent to his health and safety when he required him to clean pesticide residue from an exterminated beehive. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. at 102. Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id.* at 103 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

A state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. See *Estelle,* 429 U.S. at 103. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical needs." *Id.* at 104. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104–105.

**\*6** The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (quoting *Farmer,* 511 U.S. at 837). " 'The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Id.*

However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 94–CV–1684, 1998 WL 166840, at *4 (N.D.N.Y. April 9, 1998) (citation omitted). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at *4 (citation omitted).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated some of the factors to be considered when determining if a serious medical condition exists, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." ' *Chance,* 143 F.3d at 702–703 (citation omitted).

In this case, Croswell asserts that he had wheezing and he suffered from a severe headache subsequent to cleaning the pesticide residue. He maintains that since the inhalation of the pesticide, he has had to undergo nebulizer treatments, was prescribed a steroid medication and has been treated for chronic bronchitis. He claims that he is currently suffering from gastrointestinal bleeding. Croswell maintains that even after Lippa admitted familiarity with the toxic substances directives, he still opted to order Croswell to remove the pesticide residue in violation of his rights.

The defendants contend that Croswell has failed to allege that Lippa was deliberately indifferent to his serious medical needs. They maintain that Croswell did not suffer from a serious medical need. Furthermore, Croswell was permitted to report to the infirmary immediately after the incident occurred. Burns noted wheezing but no shortness of breath (*see Seely Aff.,* ¶ 5; Dkt. No. 40 ). Burns attests that the detection of slight wheezing in an individual having a history of asthma is not uncommon or indicative of a health problem. *Id.* Burns noted that other than a headache, Croswell appeared to be in no acute distress. *Id.* at ¶ 5.

*7 In addition, the defendants argue that even if the court found that Croswell suffered from a serious medical condition, Lippa did not possess the requisite culpable intent. Moreover, Lippa relied on the Department of Corrections Services ("DOCS") to use only those materials that were appropriate and suitable for usage. Finally, the defendants claim that Croswell's claim accusing them of negligence is not actionable under § 1983.

This court finds that Croswell has failed to state an Eighth Amendment violation. It is evident that Croswell did not suffer from a serious injury or the presence of a medical condition that significantly affected his daily activities. Croswell admitted that he was provided with prompt medical attention, including pain medication. He also conceded that he deferred on the nebulizer treatment since he was reluctant to be away from this work detail for fear he would be given an inmate misbehavior report. Croswell also admitted that the nurse directed him to go to his cell and use his regular inhaler and then report back to his work detail.

As noted, a plaintiff may show deliberate indifference by corrections officers if they attempt to deny or delay an inmate's access to medical care or if they intentionally interfere with an inmate's treatment. Even if the court found that Croswell suffered from a serious medical condition, the record is clear that Lippa did not deny, delay or interfere with his treatment. In fact, Croswell was seen immediately and he was given medication to alleviate

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

the problem.

Furthermore, Lippa attests that it was not his function to determine the type of materials that were suitable for usage. Croswell asserts no fact which shows that Lippa intentionally attempted to cause him harm by exposing him to toxic substances. Despite his bald assertions to the contrary, he simply had wheezing which is not uncommon in persons with asthma and a headache. These allegations are insufficient to show that he suffered from a "serious" medical condition and that the defendants were deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendants' cross-motion for summary judgment should be granted in regards to Croswell's Eighth Amendment claim.

D. *First Amendment*

[3] Croswell accuses the defendants of retaliating against him for filing a grievance on behalf of the NOI. The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

In *Dawes v. Walker,*[FN4] 239 F.3d 489 (2001), the Second Circuit recited the factors that must be asserted in a retaliation complaint in order to survive summary dismissal. Thus, a plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *Id* . at 492 (citation omitted). The court stated that "to adequately plead an adverse action, a plaintiff must allege that the defendants subjected him to 'conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.' " *Morales,* 278 F.3d at 131 (2d Cir.2002)(quoting *Dawes,* 239 F.3d at 492.) "Prisoners may be required to tolerate

more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes,* 239 F.3d at 492.

FN4. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

**\*8** In this case, Croswell filed a grievance requesting the use of a larger room to conduct NOI meetings. He contends that Lippa asked him to clean the pesticide residue to punish him for filing that grievance. He also maintains that McCoy ordered the removal of names from the NOI class roster in an effort to neutralize the grievance that he filed. Lastly, Croswell claims that McCoy ordered him to be transferred in retaliation for filing complaints against him and his subordinates.

The defendants argue that Croswell's conclusory allegation that Lippa retaliated against him for filing a grievance is untrue. They contend that Lippa was unaware of the filed grievance when he ordered him to clean the pesticide residue. Moreover, the grievance did not involve Lippa. Lippa attests that even if the grievance would have been filed against him, he would not have been told the same day.

In addition, the defendants argue that there is nothing in the record which shows that McCoy retaliated against Croswell when he denied the NOI request for a larger room. Imam Sahraoui's statement that the room was adequate for the NOI members was used by McCoy to deny the request for a larger room. Furthermore, if the need arose, McCoy would move the NOI meetings to a more suitable location.

Lastly, the defendants contend that Croswell cannot demonstrate that McCoy transferred him in retaliation for filing his grievances. Kelly Huffman, a Corrections Counselor at Cayuga, attests that McCoy played no role in Croswell's administrative hearing or the decision to transfer him (*Huffman Aff.,* ¶¶ *6, 8–9* ). Moreover, Croswell's transfer occurred as a matter of course since he was found to have assaulted a civilian employee nurse (*Huffman Aff.,* ¶ 6). Furthermore, the defendants contend that even if McCoy was involved in Croswell's transfer, it

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

was a result of being found guilty of violating a prison policy and not for filing grievances.

This court finds that Croswell asserts no set of facts which, if true, would show that Lippa and/or McCoy retaliated against him. It is undisputed that Croswell has a right to file a grievance and that this conduct is protected. However, Croswell fails to meet the second and third prong of a retaliation claim. Croswell has failed to show how the defendants took an adverse action against him. Lippa relied on DOCS to use materials which were appropriate for usage. As such, this court cannot find that Lippa took an adverse action.

However, even if the court found that requiring Croswell to clean the pesticide residue was an adverse action, he has failed to show that there was a causal connection between the protected speech and the adverse action. There is nothing in the record which shows that Lippa knew of the grievance filed the same day that he required Croswell to clean the pesticide residue. As previously mentioned, the grievance did not involve Lippa and even if it did, he attests that he would not have been informed of the grievance the same day. Moreover, there would not have been any reason to have informed Lippa about the grievance since he was not involved.

**\*9** Croswell's conclusory allegation that McCoy retaliated against him when he denied his request for a larger room for the NOI meetings is also without merit. Croswell fails to provide any proof which purports to show that McCoy erased records or that he somehow disregarded his request. Inman Sahraoui states that the NOI did not need more space. McCoy noted that there was an increase of registered NOI inmates since the grievance was filed. However, it was also noted that fewer than 30 inmates attended the meetings. As previously mentioned, if the need arose, McCoy would move the NOI meetings to a more suitable location.

Thus, the court cannot find that McCoy took an adverse action against Croswell because he exercised his right to file a grievance. In addition, as the defendants correctly point out, there is nothing in the record which purports to show McCoy was involved in Croswell's transfer to Upstate. Moreover, even if McCoy would have

been involved in the transfer, Cayuga had a policy to transfer an inmate whenever an inmate assaulted a civilian employee as a matter of course (*Huffman Aff.*, ¶ 6).

Finally, Croswell has failed to allege facts that show how he was deterred from exercising his constitutional right to file grievances. Croswell continued to file numerous grievances subsequent to the incidents at issue in this case (*Seely Aff., Exs. N–T* )(He filed seven grievances from December 2000 to July 2001). This court notes that Croswell's right to file grievances was not affected by the defendants' conduct in this case. Accordingly, this court recommends that the defendant's cross-motion for summary judgment should be granted as to Croswell's retaliation claim.

E. *Qualified Immunity*

As an alternative basis to grant dismissal, the defendants argue that they are entitled to qualified immunity. Qualified immunity protects government officials who perform discretionary functions in the course of their employment. It shields them from liability for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It also protects officials from "the burdens of costly, but insubstantial, lawsuits." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999)(quotation marks and internal citations omitted).

The question of whether qualified immunity will protect a public official depends upon " 'the objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citations omitted). Furthermore, the contours of the right violated must be sufficiently clear that a reasonable official might understand that his actions violate that right. *Id.* at 640; *Keane,* 196 F.3d at 332. The test for "evaluating whether a right was clearly established at the time a § 1983 defendant acted is: '(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." ' *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002). *See also, Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000).

**\*10** Additionally, the Second Circuit has held that a court may dismiss a claim based upon qualified immunity without first deciding the substantive claims therein. *See Horne v. Coughlin,* 191 F.3d 244 (2d Cir.1999). Also within this decision, the Second Circuit suggested that the qualified immunity issue should be addressed before the substance of a claim. The court shall now consider the defendants' claim that they are entitled to qualified immunity.

[4] In this case, it has been clearly established that inmates have a right to file grievances. However, this court finds that it was objectively reasonable for the defendants to believe that their conduct did not violate Croswell's constitutional rights. Lippa, in relying upon DOCS for the appropriate usage of toxic materials at the prison, did not violate a clearly established right. As Lippa admitted, he did not possess any expertise with respect to pesticides or insecticides. In addition, this expertise was not required in his position as a corrections officer. As such, Lippa is entitled to qualified immunity since a reasonable corrections officer in Lippa's position could not have understood that his acts were unlawful.

[5] McCoy is entitled to qualified immunity concerning Croswell's request for a larger room since his decision was a lawful exercise of his authority. He relied on Imam Sahraoui's statement, dated September 8, 2000, that the room provided for the NOI meetings was "more than adequate." There is nothing in the record which shows that McCoy's decision was unlawful or in violation of a clearly established right. Moreover, the record is clear that McCoy was not involved in Croswell's transfer from Cayuga to Upstate in October of 2000.

[6] In addition, the prison's policy was clear that a transfer was mandated whenever a civilian employee was assaulted by an inmate. As such, even if McCoy would have been involved, the transfer would have been a lawful

exercise of his authority. Accordingly, as an additional basis to grant summary judgment, this court recommends that the defendants Lippa and McCoy should be dismissed from this suit because they are entitled to qualified immunity.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Croswell's motion for summary judgment (*Dkt. No. 29* ) be DENIED; and it is further

RECOMMENDED, that the defendants' cross-motion for summary judgment (*Dkt. No. 34* ) based on Croswell's failure to exhaust his administrative remedies claim be DENIED; and it is further

RECOMMENDED, that the defendants' cross-motion for summary judgment (*Dkt. No. 34* ) be GRANTED in regards to Croswell's First Amendment claim; and it is further

RECOMMENDED, that the defendants' cross-motion for summary judgment (*Dkt. No. 34* ) be GRANTED in regards to Croswell's Eighth Amendment claim since he fails to state a claim for which relief can be granted; and it is further

RECOMMENDED, as an additional basis to grant summary judgment, that the defendants' cross-motion for summary judgment be GRANTED based on qualified immunity; and it is further

**\*11** ORDERED, that the Clerk of the Court serve a copy of this Report–Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

Croswell v. McCoy
Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.